IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSUMERS ENERGY COMPANY
and DTE ELECTRIC COMPANY,

    Plaintiffs/Counter-Defendants,

    v.

TOSHIBA AMERICA ENERGY
SYSTEMS CORPORATION and
TOSHIBA CORPORATION,

    Defendants/Counter-Plaintiffs.

Case No: 4:22-cv-10847

Hon. F. Kay Behm

Mag. Judge Curtis Ivy, Jr.

**Oral Argument Requested**

### TOSHIBA AMERICA ENERGY SYSTEMS CORPORATION AND TOSHIBA CORPORATION'S MOTION FOR SUMMARY JUDGMENT

Defendants Toshiba America Energy Systems Corporation ("TAES") and Toshiba Corporation ("Toshiba") respectfully move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to all four counts in the Complaint filed by Plaintiffs Consumers Energy Company ("Consumers") and DTE Electric Company ("DTE") (collectively "Plaintiffs"). In support of this Motion, TAES and Toshiba rely on the statement of material facts, legal argument, and authorities set forth in their accompanying Brief.

As the accompanying Brief shows, this Motion is based on the plain language of undisputed contractual provisions, a quintessential basis for determinations as a matter of law. *See, e.g.*, *Royal Ins. Co. of Am. v. Orient Overseas Container Line*

*Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008) ("The proper interpretation of a contract is a question of law. . . . If a contract is clear and unambiguous . . . there is no issue of fact to be determined.") (applying substantive law of Michigan).  Resolution of these issues of contractual interpretation may obviate or at least streamline any trial of this action.

Prior to filing this Motion, counsel for TAES and Toshiba conferred with counsel for Plaintiffs on March 3, 2025 and again on March 18, 2025, pursuant to L.R. 7.1(a)(1), and explained the nature and legal basis of this Motion.  TAES and Toshiba requested but did not obtain concurrence in the relief sought.

Dated: March 20, 2025

FOLEY & LARDNER LLP

Nicholas J. Ellis (P73174)
500 Woodward Avenue, Suite 2700
Detroit, MI  48226-3489
(313) 234-7100
nellis@foley.com

Tony Tootell
555 South Flower Street, Suite 3300
Los Angeles, CA  90071-2418
(213) 972-4796
ttootell@foley.com

Kelsey Leiper Imam
1000 Louisiana Street, Suite 2000
Houston, TX  77002
(713) 276-5039
kimam@foley.com

Respectfully submitted,

**WHITE & CASE**

By:  */s/ Christopher M. Curran*
Christopher M. Curran

Christopher M. Curran
Eric Grannon
J. Frank Hogue
Holly Tao
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600
ccurran@whitecase.com
egrannon@whitecase.com
fhogue@whitecase.com
holly.tao@whitecase.com

*Attorneys for Toshiba America Energy Systems Corporation and Toshiba Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSUMERS ENERGY COMPANY
and DTE ELECTRIC COMPANY,

     Plaintiffs/Counter-Defendants,

     v.

TOSHIBA AMERICA ENERGY
SYSTEMS CORPORATION and
TOSHIBA CORPORATION,

     Defendants/Counter-Plaintiffs.

Case No: 4:22-cv-10847

Hon. F. Kay Behm

Mag. Judge Curtis Ivy, Jr.

**Oral Argument Requested**

**TOSHIBA AMERICA ENERGY SYSTEMS CORPORATION
AND TOSHIBA CORPORATION'S BRIEF
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

March 20, 2025

## QUESTION PRESENTED

1. Whether the Court should grant summary judgment in Defendants' favor dismissing or limiting Plaintiffs' claims pursuant to Rule 56 of the Federal Rules of Civil Procedure as follows:

- Dismissing Plaintiffs' claims to the extent they are based on an alleged defect or uncompleted work that was identified in a Unit before Plaintiffs granted Unit Interim Acceptance or Unit Final Acceptance for that Unit;

- Dismissing Plaintiffs' claims to the extent they are based on alleged cavitation damage to components other than the runners;

- Dismissing Count I of the Complaint to the extent it seeks recovery of costs and expenses that have not been incurred and paid by Plaintiffs;

- Dismissing Count II to the extent it seeks recovery of costs and expenses (or other monetary damages);

- Dismissing Count III to the extent it seeks relief beyond completion of unfinished work or certain liquidated damages;

- Dismissing Count IV to the extent it seeks damages from Toshiba in excess of the limitations on the liability of TAES under the Contract;

- Enforcing the Contract's cap on TAES's liability and bar of prejudgment interest for either party; and

- Holding that Plaintiffs' termination of the Contract is a termination for convenience and not a termination for major default.

Defendants:     Yes.

Plaintiffs:     In the pre-motion conference, Plaintiffs' counsel stated that they did not concur in the Motion and planned to oppose the Motion.

## **CONTROLLING OR MOST APPROPRIATE AUTHORITY**

*Bobchick v. Grange Ins. Co.*, 2021 WL 927370 (E.D. Mich. Mar. 11, 2021)

*Chrysler Realty Co., LLC v. Design Forum Architects, Inc.*, 544 F. Supp. 2d 609 (E.D. Mich. 2008)

*DaimlerChrysler Corp. v. Wesco Distrib.*, 760 N.W.2d 828 (Mich. Ct. App. 2008) (2008)

*Detroit IT, LLC v. LS Inv. Advisors, LLC*, No. 23-199795, 2024 Mich. Cir. LEXIS 599 (Oakland County Cir. Ct. Aug. 23, 2024)

*JD Norman Indus., Inc. v. Am. Axle & Mfg. Inc.*, No. 360041, 2023 WL 3030069 (Mich. Ct. App. Apr. 20, 2023)

*Nat'l Fire Ins. Co. v. Roofmaster Constr., Inc.*, 2005 WL 1030326 (E.D. Mich. April 28, 2005)

*Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409 (6th Cir. 2008)

*Tangas v. Int'l House of Pancakes LLC*, 779 F. App'x 317 (6th Cir. 2019)

*Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192 (Mich. Ct. App. 2017)

*Wilkes v. Allegan Fruit & Produce Co.*, 206 N.W. 483 (Mich. 1925)

*Willkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776 (Mich. 2003)

# **TABLE OF CONTENTS**

STATEMENT OF MATERIAL FACTS ................................................................ 1

LEGAL STANDARD ........................................................................................... 8

ARGUMENT ........................................................................................................ 8

I.      Plaintiffs Cannot Maintain Any Claim Based on an Alleged Defect or Uncompleted Work Identified Before Plaintiffs Granted UIA or UFA and Accepted a Unit as Completed Under the Contract............................... 8

II.     The Contract Provides a Cavitation Warranty Only on the Runners, Not on Other Components. ................................................................................. 11

III.    As to Count I:  Plaintiffs' Damages Under GC22(b)(ii) Are Expressly Limited to Reimbursement for Costs and Expenses that Have Been Incurred and Paid By the Plaintiffs. ........................................................... 14

IV.     As to Count II:  Plaintiffs' Warranty Rights Under Article I.1, GC15(j), and GC22(b)(ii) Are Expressly Limited to Defendants Performing Any Warranty Work and Do Not Include Costs Incurred by the Owner. ......... 19

V.      As to Count III:   Plaintiffs' Remedies Are Limited to Alleged Unfinished Work and Liquidated Damages for Units 1, 3, and 6. ........... 22

VI.     As to Count IV:  Any Liability for Toshiba Under the Parent Guaranty Is Subject to the Limitations on TAES's Liability Under the Contract. .. 28

VII.    Article GC28 of the Contract Expressly Caps Defendants' Liability, Both in Total and on a Per-Unit Basis, and Bars Consequential Damages for Either Side........................................................................... 28

VIII.   The Contract Has Not Been Terminated for Major Default Under GC7(b)(ii). ................................................................................................ 34

CONCLUSION .................................................................................................. 40

## <u>TABLE OF AUTHORITIES</u>

### CASES

<u>Page(s)</u>

*Ajax Paving Indus., Inc. v. Vanopdenbosch Const. Co.*,
    797 N.W.2d 704 (Mich. Ct. App. 2010)............................................................17

*Am. Seating Co. v. Transp. Seating, Inc.*,
    220 F. Supp. 2d 845 (W.D. Mich. 2002) ..................................................... 38-39

*Atlas Resources, LLC v. McJunkin RedMan Corp.*,
    No. 1:12-41, 2013 WL 4786484 (W.D. Mich. Sept. 6, 2013)...........................17

*Bent v. Bostwick*,
    384 N.W.2d 124 (Mich. Ct. App.1986)............................................................33

*Bobchick v. Grange Ins. Co.*,
    No. 19-12467, 2021 WL 927370 (E.D. Mich. Mar. 11, 2021)..........................32

*Century Plastics, LLC v. Frimo, Inc.*,
    No. 347535, 2020 WL 504977 (Mich. Ct. App. 2020) ............................... 19-20

*Chrysler Realty Co., LLC v. Design Forum Architects, Inc.*,
    544 F. Supp. 2d 609 (E.D. Mich. 2008) ............................................................38

*Coffee Capital & Dev., LLC v. RPT Rest. Acct. Servs., LLC*,
    No. 23-13203, 2025 WL 283217 (E.D. Mich. Jan. 23, 2025),
    appeal docketed, No. 25-1163 (6th Cir. Feb. 24, 2025) ......................................8

*Convergent Grp. Corp. v. County of Kent*,
    266 F. Supp. 2d 647 (W.D. Mich. 2003) ..........................................................38

*DaimlerChrysler Corp. v. Wesco Distrib.*,
    760 N.W.2d 880 (Mich. Ct. App. 2008)............................................................40

*Detroit IT, LLC v. LS Inv. Advisors, LLC*,
    No. 23-199795, 2024 Mich. Cir. LEXIS 599
    (Oakland County Cir. Ct. Aug. 23, 2024).........................................................38

*Doe v. Henry Ford Health Sys.*,
    865 N.W.2d 915 (Mich. Ct. App. 2014)............................................................18

v

*Gordon Sel-Way, Inc. v. Spence Bros., Inc.*,
    475 N.W.2d 704 (Mich. 1991)...............................................................33

*JD Norman Indus., Inc. v. Am. Axle & Mfg. Inc.*,
    No. 360041, 2023 WL 3030069 (Mich. Ct. App. Apr. 20, 2023).....................40

*Nat'l Fire Ins. Co. v. Roofmaster Constr., Inc.*,
    No. 04-71142, 2005 WL 1030326 (E.D. Mich. April 28, 2005)......................32

*People v. Jose*,
    896 N.W.2d 491 (Mich. Ct. App. 2016)............................................16

*Premo v. United States*,
    599 F.3d 540 (6th Cir. 2010) .......................................................33

*Schmidt Indus. v. Huntington Nat'l Bank*,
    No. 22-10412, 2022 WL 2121527 (E.D. Mich. June 13, 2022)................. 28-29

*Tangas v. Int'l House of Pancakes LLC*,
    779 F. App'x 317 (6th Cir. 2019) ...................................................17

*Transp. Ins. Co. v. Citizens Ins. Co. of Am.*,
    574 F. App'x 607 (6th Cir. 2014) ............................................... 31-32

*USAA Grp. v. Universal Alarms, Inc.*,
    405 N.W.2d 146 (Mich. Ct. App.1987)...............................................29

*Van Buren Charter Twp. v. Visteon Corp.*,
    904 N.W.2d 192 (Mich. Ct. App. 2017)............................................18

*Wal-Mart Real Estate Bus. Trust v. Eastwood, LLC*,
    No. 13-1348, 2014 WL 12637935 (W.D. Mich. Aug. 22, 2014)......................39

*Wilkes v. Allegan Fruit & Produce Co.*,
    206 N.W. 483 (Mich. 1925).........................................................32

*Willkie v. Auto-Owners Ins. Co.*,
    664 N.W.2d 776 (Mich. 2003)......................................................10

## STATUTES AND RULES

Fed. R. Civ. P. 56 ..................................................................8, 40

M.C.L. § 600.6013 ....................................................................31

**MISCELLANEOUS**

Black's Law Dictionary (11th ed. 2019) ..................................................................16

Merriam-Webster's Collegiate Dictionary (11th ed. 2003)......................................16

Int'l Electrotechnical Comm'n, IEC 60609, Hydraulic Turbines, Storage
    Pumps and Pump-Turbines – Cavitation Pitting Evaluation (2004) .................13

Louis P. Miaramontes & Hugh L. Rice,
    *Construction Accounting Deskbook* (2005).......................................................23

## STATEMENT OF MATERIAL FACTS

### The Ludington Plant

1.      Plaintiffs jointly own the Ludington Pumped Storage Plant, one of the largest hydroelectric plants of its type in the world.  (Compl. ¶¶ 2, 1, ECF No. 1, PageID.1).

2.      The Ludington Plant is located in Ludington, Michigan, on the shore of Lake Michigan.  (Compl. ¶ 21, ECF No. 1, PageID.7).

3.      Initial construction on the Ludington Plant began in 1969.  (Pls.' Ans. to TAES Countercl. ¶ 15, ECF No. 20, PageID.427).  The Ludington Plant began operating in 1973, with an initial license from the Federal Energy Regulatory Commission ("FERC") to operate until 2019.  (Compl. ¶ 22, ECF No. 1, PageID.7).

4.      The Ludington Plant consists of six hydroelectric pump-turbines that can each independently pump water and generate electricity.  These six pump-turbines are each referred to as "Units."  Each Unit has a large ring of turbine blades — referred to as a "runner" — fitted to a rotating main shaft.  Each runner weighs more than 300 tons.  (Compl. ¶ 26, ECF No. 1, PageID.8).

5.      Each hydroelectric turbine is approximately five stories tall, with most of the equipment placed underground and below the water level of Lake Michigan. (Compl. ¶ 28, ECF No. 1, PageID.8).

**The Overhaul Contract**

6.     In the mid-2000s, Plaintiffs began planning for an overhaul and upgrade of the Ludington Plant in order to extend the operating life of the Plant in tandem with the planned renewal of the Plant's FERC license that was set to expire in 2019. (Compl. ¶ 34, ECF No. 1, PageID.10).

7.     Plaintiffs conducted a competitive bidding process for the overhaul and upgrade work.  Each bidding contractor created and tested a design for a new and more efficient turbine runner for each Unit as part of a design process funded by Plaintiffs.  (Compl. ¶ 36, ECF No. 1, PageID.11).

8.     At the conclusion of that competitive bidding process, Plaintiffs selected Toshiba International Corporation ("TIC") as the contractor to perform the overhaul and upgrade.  (Compl. ¶ 37, ECF No. 1, PageID.11).

9.     In January 2011, Plaintiffs and TIC executed the Ludington Plant Engineering, Procurement, & Construction Contract for Units 1 through 6 Turbine Generator Overhaul, effective as of October 15, 2010 ("Contract").  (Compl. ¶ 40, ECF No. 1, PageID.12; Ex. 1 (original Contract in full)).  The Contract is governed by Michigan law.  (Contract § I.6, ECF No. 1-1, PageID.64).

10.    The Contract refers to Plaintiffs collectively as the "Owner" and to TIC as the "Contractor."  (Contract at 1, ECF No. 1-1, PageID.60; Compl. ¶ 2, ECF No. 1, PageID.1).

- 2 -

11.     As required by Article GC26 of the Contract (ECF No. 1-1, PageID.88), in March 2011 the President and CEO of Toshiba executed a Parent Guaranty in the form of Exhibit L to the Contract.  (ECF No. 1-3, PageID.171-74; Compl. ¶¶ 60, 197, ECF No. 1, PageID.18, 53).

12.     On April 1, 2015, with the consent of Plaintiffs, TIC assigned the Contract, including all of its obligations, to TAES.  (Compl. ¶ 42, ECF No. 1, PageID.12; ECF No. 1-2, PageID.166-69).  (TIC is thus included in "TAES" hereinafter.)

13.     As of the most recent contract change order, the total price paid to TAES under the Contract is more than $500,000,000.  (Compl. ¶ 44, ECF No. 1, PageID.12 citing Contract §IV.1A, as amended by Contract Change Order 10(4), ECF No. 1-1, PageID.162-63 (specifying Overall Total Fixed Price of $559,190,561)).

14.     Contract Change Order No. 10 outlined the sequence of TAES's work on the Ludington Plant as follows:  Unit 2, Unit 4, Unit 5, Unit 6, Unit 1, and Unit 3.  (Pls.' Ans. to TAES Countercl. ¶ 28, ECF No. 20, PageID.433).

15.     One project milestone under the Contract is "Unit Interim Acceptance" ("UIA").  (Compl. ¶¶ 53-54, 67, 68, 72, 74, 76, ECF No. 1, PageID.15-16, 20-22). Under the Contract:  "If the Owner . . . finds the Work to have been completed in accordance with this Contract, the Owner will advise the Contractor in writing of its acceptance thereof through issuance of the Unit Interim Acceptance."  (Art. GC18(d), ECF No. 1-1, PageID.82).

- 3 -

16.     Another project milestone under the Contract is "Unit Final Acceptance" ("UFA").  Under the Contract:  "Following Unit Interim Acceptance of a particular Unit, the Owner shall conduct operational and performance testing as set forth in the Conformed Contract Specification (including 'Limited Commercial Operation Test', 'Extended Commercial Operation Test', and 'Acceptance Testing' as set forth in the Conformed Contract Specification).  If the Owner, following said Unit testing, finds the Work to have been completed in accordance with this Contract, the Owner will advise the Contractor in writing of its acceptance thereof through issuance of the Unit Final Acceptance."  (Art. GC18(e), ECF No. 1-1, PageID.83).

**Contractual Performance By TAES**

17.     TAES achieved UIA on each of the six Units, and Plaintiffs communicated as much in formal written notices.  Ex. 2 (Unit 2 on March 12, 2015, CEC-00713926); (Unit 4, May 27, 2016, CEC-01087130); (Unit 5, May 21, 2017, CEC-00503154); (Unit 6 limited UIA, August 1, 2018, CEC-00719511); (Unit 6 unconditional UIA, June 27, 2019, CEC-00719512); (Unit 1, June 26, 2019, CEC-00454032); (Unit 3, April 2, 2022, CEC-01230557).  (*See also* Pls.' Ans. to TAES Countercl. ¶ 30, ECF No. 20, PageID.435; Compl. ¶ 67 (Unit 2), ¶ 68 (Unit 4), ¶ 72 (Unit 5), ¶ 74 (Units 6 and 1), ¶ 76 (Unit 3), ECF No. 1, PageID.20-22).

18.     Each of the six Units was placed into commercial service following the achievement of UIA for that Unit.  (Ex. 3, May 9, 2024 Deposition of Kristopher

Koster (Consumers) at 238:1–239:6; Ex. 1 Conformed Contract Specification ("CCS") Part Two–Technical Requirements § 5.7 at TR-39–40, CEC-01219471-72). After achievement of UIA, each Unit has generated electricity for Michigan consumers and revenues for Plaintiffs.  *See* Ex. 4 (Dep. Ex. 122, listing revenue for each Unit from 2018-2023); Ex. 5 (Srikanth Maddipati (Consumers) Dep. Tr. at 38:23–39:19, explaining that Dep. Ex. 122 "was the MISO revenue generated at Ludington").

19.     Plaintiffs have also communicated through formal written notices that TAES achieved UFA on three of the Units.  Ex. 6 (notice of UFA of Unit 5 on December 18, 2017, CEC-00719059); (Unit 2, December 21, 2019, CEC-01087480); (Unit 4, December 21, 2019, CEC-00445964); (*see also* Pls.' Ans. to TAES Countercl. ¶¶ 30-32, ECF No. 20, PageID.436-37).

20.     In parallel with the overhaul and upgrade work, Plaintiffs applied for and received a new 50-year FERC license for the Ludington Plant spanning from 2019 to 2069.  (Compl. ¶ 43, ECF No. 1, PageID.12; Ex. 7, Order Issuing New License, 167 FERC ¶¶ 62, 151 (June 6, 2019); Ex. 8 at 109:2-7 (Matthew Ray (Consumers) Dep. Tr.:  "[T]he submission for the relicensing [in 2019 with FERC] . . . was based off of the upgraded capabilities and performance identified to be done by Toshiba.")).

21.     On March 31, 2022 — less than a month before Plaintiffs filed this action —

Consumers' Project Manager Mr. Koster provided testimony to the Michigan Public

Service Commission ("MPSC"), as part of Consumers' annual financial

reconciliation process, acknowledging that TAES's overhaul of the Ludington Plant

was successful in key respects:

> The Owners selected the Toshiba entities as their contractor for several
> reasons, including their promise to deliver increased plant output and
> efficiency via a new runner design.  Additional benefits of the new one-
> piece runner design proposed by Toshiba included increased runner
> durability and resistance to cavitation on the runner surface; this would
> allow for decreased maintenance costs.  As I understand, no other
> contractor demonstrated an ability to provide these benefits during the
> model testing that was performed.  It is true that the Toshiba entities are
> responsible for a number of errors to date — most especially related to
> a component of each unit known as the discharge ring extension
> ("DRE"), as discussed elsewhere in my testimony.  But the runner
> design — i.e., a key basis for selecting Toshiba as the contractor — has
> in fact delivered increased output and efficiency for five completed
> units.  It has also delivered, so far, on its design requirement to prevent
> cavitation damage of the runner during operation.

Ex. 9 at 5 (Dep. Ex. 99 at CEC-01072964).  He added that "[w]hen the overhaul is

complete, the output of each Ludington Plant Unit will have increased from

approximately 330 MW to approximately 385 MW and the efficiency of each unit

will have increased by approximately 5%" and that "[t]he overhaul project was also

one of several reasons why Consumers Energy and DTE were able to secure a new,

50-year hydroelectric project license from [FERC] in 2019."  (Ex. 9 at 4 (Dep.

Ex. 99 at CEC-01072963; *see also* Ex. 10 at 229:14–230:16 (May 10, 2024 Rule

30(b)(6) Deposition of Kristopher Koster (Consumers)) ("Koster 30(b)(6) Dep.") ("the generating capabilities for these units is around 385 megawatts" post-overhaul versus "around 330 megawatts" pre-overhaul).

22.    As Mr. Koster's testimony to the MPSC suggests, before TAES's overhaul, the runners at the Ludington Plant experienced cavitation.  (Ex. 10 at 9:20–10:21 (Koster 30(b)(6) Dep. acknowledging that the Units "experienced corrosion" as of 2010; *id.* at 9:20–10:21; Ex. 11 (*Hydro Review*, Ray, *et al.*, "Major Overhaul Boosts Performance at Ludington Pumped-Storage Plant" (Nov. 1, 2016) (Article co-authored by Consumers' senior project manager Matthew Ray describing numerous maintenance issues pre-overhaul:  "The bulk of the maintenance activity during this time was cavitation repair on the pump-turbine runners.")).

23.    Less than one month after Mr. Koster's testimony to the MPSC and after Plaintiffs' ensuing grant of UIA on Unit 3 on April 2, 2022 — thereby gaining commercial use of that sixth and final Unit — and with their new FERC permit secured, Plaintiffs commenced this action.  (ECF No. 1, PageID.1).  According to Plaintiffs, TAES and Toshiba owe Plaintiffs $820.2 million:  $690.1 million in damages and $130.1 million in prejudgment interest, far more than the total Contract price.  (Ex. 12 at 46 (report of Plaintiffs' proposed damages expert, Michael P. Emmert)).

**LEGAL STANDARD**

The standard under Rule 56 of the Federal Rules of Civil Procedure is familiar to this Court as recently demonstrated in *Coffee Capital & Dev., LLC v. RPT Rest. Acct. Servs., LLC*, 2025 WL 283217, at *3-6 (E.D. Mich. Jan. 23, 2025) (granting summary judgment in diversity action), appeal docketed, No. 25-1163 (6th Cir. Feb. 24, 2025).

**ARGUMENT**

While Plaintiffs opportunistically seek a huge cash windfall through this action, their claims cannot be squared with the specific terms of the Contract.

**I.    Plaintiffs Cannot Maintain Any Claim Based on an Alleged Defect or Uncompleted Work Identified Before Plaintiffs Granted UIA or UFA and Accepted a Unit as Completed Under the Contract.**

Under the express terms of the Contract, UIA and UFA are milestones at which Plaintiffs certify that a Unit complies with contractual requirements and is accepted by Plaintiffs, first on an interim basis and then on a final basis.  (SOMF ¶¶ 15, 16).  Both UIA and UFA follow a rigorous inspection and testing procedure that is detailed in the Contract.  (*See* GC18(d), (e), ECF No. 1-1, PageID.82-83 ("Contract Schedule; Commencement, Prosecution, and Completion of Work"); Ex. 1, CCS Technical Requirements TR-37–41, Section 5.0 – EXAMINATIONS, INSPECTIONS, AND TESTS, CEC-01219469-73)).   At every stage of that procedure, Plaintiffs have the right to require TAES to correct defective or

uncompleted work at TAES's expense.  (GC18(d)-(e), ECF No. 1-1, PageID.82-83).

The Contract expressly provides that the inspection and testing procedure shall be

repeated until Plaintiffs "determine[] that the Work has been completed in

accordance with the Contract" and issue the UIA or UFA certificate.  (Ex. 1, CCS

Technical Requirements TR-37–41, Section 5.0 – EXAMINATIONS,

INSPECTIONS, AND TESTS, CEC-01219469-73)).

Through such certification, UIA and UFA conclusively resolve previously

identified issues and prevent Plaintiffs from later seeking compensation for any

defects or uncompleted work identified during the extensive inspection and testing

procedure.   This procedure serves to protect Plaintiffs by giving them the

opportunity to inspect and test the work multiple times, identify deficiencies, and

either require TAES to rectify those deficiencies, or to accept the work and move

forward with commercial operation.

Following UIA and UFA, TAES remains obligated to remedy "any failure to

comply with the warranties" that "appears during the Warranty Period."

(GC22(b)(i), ECF No. 1-1, PageID.85).  UIA and UFA also do not relieve TAES of

"obligations and liabilities" that exist at the time Plaintiffs certify UIA or UFA, but

that language has a specific meaning and cannot possibly be read to nullify the

consequences of Plaintiffs' acceptance through UIA and UFA.  (Ex. 1, CCS

Technical Requirements TR-37–39, Section 5.5-5.6 – EXAMINATIONS,

INSPECTIONS, AND TESTS, CEC-01219470-71).  For example, if TAES had an existing obligation or liability for an indemnity (GC16, ECF No. 1-1, PageID.81) or for liquidated damages for lateness (Section IV Contract Price 2(B), ECF No. 1-1, PageID.99), that obligation or liability would not be extinguished by UIA or UFA. But previously identified defects or uncompleted work extinguished by UIA or UFA are not surviving "obligations" or "liabilities."  *See Willkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 796 n.11 (Mich. 2003) ("We read contracts as a whole, giving harmonious effect, if possible, to each word and phrase.").

In short, therefore, Plaintiffs cannot bring, and Defendants are entitled to judgment as a matter of law on, claims for:  (i) alleged defects or uncompleted work on Units 1-6 that had been identified when Plaintiffs issued UIA on those Units; and (ii) alleged defects or uncompleted work on Units 2, 4, and 5 that had been identified when Plaintiffs issued UFA on those Units.  For example, Plaintiffs' most significant claim — relating to alleged cavitation erosion on discharge rings in Units 2 and 4 — must be dismissed as a matter of law because Plaintiffs admit to discovering the cavitation erosion months *before* they granted UFA certificates on those Units. (*Compare* Compl. ¶¶ 88-89, ECF No. 1, PageID.26 (alleging discovery of cavitation erosion "in September 2019"), *with* SOMF ¶ 19 (Units 2 and 4 received UFA on December 21, 2019)).

## II.    The Contract Provides a Cavitation Warranty Only on the Runners, Not on Other Components.

Article GC21(b)(iii) of the Contract provides a cavitation warranty on the brand-new runners that Defendants designed as part of the overhaul:

> Without limiting the generality of the Contractor's warranty as set forth in GC[21](b)(ii), the Contractor warrants that the pump-turbine runner for each Unit will not show cavitation in excess of the limits and parameters set forth in the Conformed Contract Specification, PART TWO, Design Data Sheet ME-11450.2, Section 3.3 (the "Cavitation Warranty").

(GC21(b)(iii), ECF No. 1-1, PageID.84).   The next sentence of GC21(b)(iii) then defines the "Cavitation Warranty Period" as being less than half of the temporal length of the defined, general "Warranty Period" under GC21(b)(ii).   (*Id.*)

The "Design Data Sheet" that is cited in GC21(b)(iii) sets the parameters for the "Cavitation Warranty":

> 3.3 PUMP-TURBINE RUNNER CAVITATION GUARANTEE
>
> 3.3.1   Pump-turbine runner shall be designed such that cavitation damage shall be kept to a minimum.   ***Cavitation damage, if it occurs, shall be in an area or a magnitude that will not reduce efficiency or power output and will not weaken the pump-turbine runner.***
>
> 3.3.2   The Contractor shall guarantee the metal loss from the pump-turbine runner due to cavitation will not exceed 0.0094 pounds per operating hour for a period . . . .
>
> 3.3.3   Measurement of metal removal shall be defined in IEC Publication 60609, "Cavitation Pitting Evaluation in Hydraulic Turbines, Storage Pumps, and Pump-Turbines" except no measurement inaccuracy will be permitted. . . .

(CCS, Part Two, Design Data Sheet ME-11450.2, Section 3.3, CEC-01219695-96) (emphasis added). These are the only references to any cavitation warranty in the Contract and they expressly apply *only* to the runners. The Contract does *not* provide for any cavitation warranty on any other component besides the runners. Critically, Plaintiffs have *not* alleged any impermissible cavitation on the runners. As to cavitation, Plaintiffs allege damage only to the *discharge rings*, which are *not* covered by the Cavitation Warranty that expressly applies only to the runners. (*See, e.g.*, Ex. 13 (June 14, 2024 proposed expert report of Zachary Owens at xii-xiv) (discussing alleged cavitation on discharge rings)).

To be sure, the Cavitation Warranty (GC21(b)(iii)) begins with the clause, "Without limiting the generality of the Contractor's warranty as set forth in GC[21](b)(ii)," but the general warranty in GC21(b)(ii) — while applying to the runner generally — does *not* apply to cavitation damage. More specifically, the cavitation damage that Plaintiffs allege on the discharge rings (*see, e.g.*, Compl. ¶¶ 88-89, ECF No. 1, PageID.26-27) *cannot* constitute a defect under the "free from defects" requirement of the warranty in GC21(b)(ii). The Contract repeatedly refers to "cavitation damage," including "cavitation damage, if it occurs . . . ." (Ex. 1, CCS Part Two, Design Data Sheet ME-11450.2, Section 3.3 – PUMP-TURBINE RUNNER CAVITATION GUARANTEE, CEC-01219695). Indeed, the parties agreed in advance on a published, international engineering standard to evaluate the

*tolerability* of cavitation damage.   (*Id.* at Section 2.2.4 adopting International Electrotechnical Commission (IEC) Publication 60609, "Cavitation Pitting Evaluation in Hydraulic Turbines, Storage Pumps and Pump-Turbines," CEC-01219693).

The international standard adopted in the Contract explains that because cavitation is a byproduct of the service environment of hydroelectric plants, the parties must specifically *agree* to any cavitation performance guarantees:

> Guarantees applied to cavitation pitting in hydraulic reaction turbines, storage pumps and pump-turbines ***are quite different from other performance guarantees stated in the contract documents*** representing inherent characteristics of the machine, such as efficiency. The extent of cavitation pitting depends essentially on five factors . . . [including, for example, the machine, operating conditions, and water quality].   ***Therefore, the guarantee for cavitation pitting can be established only by mutual agreement*** between the employer and the contractor during the planning of the plant or during the contract negotiations.

(Ex. 14, IEC International Standard 60609 at 9 (2004)) (emphasis added).

Here, the parties agreed to a Cavitation Warranty only on the runners, *not* the discharge rings or any other components.   As the parties addressed in the Contract (in accordance with their mutually agreed engineering standard), "cavitation damage" is a byproduct of the service environment and operating conditions, *not* a defect in machinery that a contractor would generally warrant.   Indeed, one of Plaintiffs' proposed experts confirms that the discharge rings suffered from

cavitation long *before* the TAES overhaul and thus cavitation on that component

*cannot* constitute a defect in TAES's work:

> The previously described cavitation erosion damage to the DR in Unit 2 and Unit 4 ***is not the first occurrence of cavitation erosion damage on the DRs of the units at the Ludington Plant***. Turbine repair documents from 1992 and 1994 provide instructions for weld repair of cavitation and corrosion pitting on the DRs of the six units. Some of the revisions in documents ***date back to 1987***.

(Ex. 15 at 99-100, proposed expert report of Joseph C. Tucker) (emphasis added).

The Cavitation Warranty that the parties agreed to is expressly and solely for

the runners.  The Contract does *not* provide any general warranty for cavitation, for

precisely the reasons explained by the parties' agreed international standard, which

makes particular sense in the circumstances here given the *historical* cavitation

problems on the discharge rings at the Ludington Plant.  Notably, before this lawsuit

at least, Plaintiffs sang the praises of Toshiba's runner design, saying it has

"delivered, so far, on its design requirement to prevent cavitation damage of the

runner during operation."  (SOMF ¶ 21).

## III.   As to Count I:  Plaintiffs' Damages Under GC22(b)(ii) Are Expressly Limited to Reimbursement for Costs and Expenses that Have Been Incurred and Paid By the Plaintiffs.

In Count I, Plaintiffs seek to recover for an alleged breach of the Contract's

warranty provisions.  (Compl. ¶¶ 174-183, ECF No. 1, PageID.47-50 (invoking

GC21(b)(ii))).  As the Complaint acknowledges (Compl. ¶¶ 55, 58, ECF No. 1,

PageID.16,17-18), the warranties of GC21(b) are enforced under GC22, with

GC22(b)(i) requiring TAES to make repairs "at its own cost and expense" and, failing that, with GC22(b)(ii) giving the Owner the right to repair (or hire third parties to do so) and then seeking *reimbursement* for all reasonable costs and expenses. Defendants dispute that TAES's work was deficient or defective, but there can be no dispute that GC22(b)(ii) allows the Owner to recover for reasonable warranty costs and expenses only *after* those costs and expenses have been incurred and paid by the Owner:

> If the Contractor refuses, neglects, or is otherwise unable to take prompt action to correct any non-conformances or defects as provided in the immediately preceding clause "(i)", the Owner shall (without limiting any other rights or remedies) have the right to perform or to hire third parties to perform the corrective work . . . and the Contractor shall **reimburse** the Owner upon demand for all reasonable cost and expense of all such work.

(ECF No. 1-1, PageID.86) (emphasis added). GC22(b)(ii) does not entitle Plaintiffs to costs and expenses that Plaintiffs *may* only incur and pay in the future. Here, the overwhelming majority of Plaintiffs' claimed damages are for costs and expenses that they have *not* yet incurred or paid, but only that they *may* incur and pay in the future. (Ex. 16 at 37:18–38:17 (Emmert Dep. Tr., agreeing that "for the $690.1 million in damages that you put forward in your report . . . $655.8 million, or over 94 percent, are amounts that the owner would incur in the future"); Ex. 12 at 27 (Emmert report) ("Table 7: Summary of Damages for Work Performed as of March 2024" – Total $21,162,207); *id.* at 31 ("Table 9: Summary of Damages for TAES

Defects Not Yet Repaired" – Total $655,814,846)).   Defendants are entitled to summary judgment on Count I to the extent that Plaintiffs seek damages for costs and expenses that have *not* already been incurred and paid by Plaintiffs and thus cannot be "reimburse[d]" under the Contract.

Dictionary definitions of the word "reimburse" make clear that a preceding expenditure by one party is required before a second party can subsequently "reimburse" the first party's expenditure. *See* "Reimburse," Black's Law Dictionary (11th ed. 2019) ("To pay back, to make restoration, to repay that expended, to indemnify, or make whole."); "Reimburse," Merriam-Webster's Collegiate Dictionary (11th ed. 2003), Merriam-Webster.com ("to pay back to someone" or "to make restoration or payment of an equivalent to").   The English-language origin of "reimburse" demonstrates the same. *See* "Reimburse" – Etymology, Oxford English Dictionary, OED.com ("re-," meaning back; "-imburse," meaning put in a purse). There must be a cost incurred (coin out of a purse) before there can be a reimbursement (coin back into a purse).   Michigan courts adopt dictionary definitions of "reimburse" when interpreting contract language. *See, e.g.*, *People v. Jose*, 896 N.W.2d 491, 496 n.11 (Mich. 2016) ("[T]he definitions of 'reimburse' are: (1) 'to pay back to someone:  REPAY' and (2) 'to make restoration or payment of an equivalent to[.]'") (quoting Merriam-Webster's Collegiate Dictionary). There is no interpretation of "reimburse" that would have repayment precede payment.

As the Sixth Circuit has recognized, advancement rights are contractually distinct from reimbursement in that advancement provides "immediate interim relief from the . . . out of pocket financial burden of paying[.]" *Tangas v. Int'l House of Pancakes LLC*, 779 F. App'x 317, 326 (6th Cir. 2019). "The same does not hold true" for reimbursement rights like those in GC22(b)(ii), which (like indemnification rights), necessarily require the expense to be paid or incurred before being reimbursed. *See Ajax Paving Indus., Inc. v. Vanopdenbosch Const. Co.*, 797 N.W.2d 704, 710  (Mich. Ct. App. 2010) ("[I]ndemnity contemplates reimbursement for injuries/losses that have already been incurred"); *Atlas Resources, LLC v. McJunkin RedMan Corp.*, 2013 WL 4786484, at *7-9 (W.D. Mich. Sept. 6, 2013) (granting summary judgment on claim for "repair/replacement" damages based on defective well casing when the plaintiff had "not, to date, incurred these costs").

While Consumers has retained Voith Hydro to perform certain future repair work, the contract between Consumers and Voith permits the owner to *unilaterally* change the scope of work to *eliminate* work to be performed.  (Ex 17, at 9 (Voith Major Project and General Services Contract dated August 13, 2021, CEC-01208995) (Section 9.1:  "The Owner may, without invalidating this Contract, at any time by written notice to the Contractor make changes in the Work to be performed hereunder, which changes may consist of additions, deletions, or other modifications.")).

Consistent with GC22(b)(ii)'s use of "reimburse," summary judgment as to Count I is additionally required on the grounds that Plaintiffs' costs and expenses to, in Mr. Emmert's words, fix "defects not yet repaired" (Ex. 12 at 31) are conjectural and speculative.  *See Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192, 201 (Mich. Ct. App. 2017) (affirming summary disposition for defendant); *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 922 (Mich. 2014) (affirming grant of defendant's motion to dismiss).  *Van Buren* is particularly instructive.  There, based on plaintiff's own cash-flow analysis caveating the inevitability of a cash-flow shortfall, the appellate court concluded "that, at least at this time, plaintiff's alleged damages are conjectural, speculative, and clearly 'dependent upon the chances of business or other contingencies.'" *Id*. at 201.  Here, Plaintiffs' damage analysis similarly demonstrates that their damages are conjectural, speculative, and dependent on future events.  (*See* Ex. 12 (Emmert report at 31) (Table 9, which are Voith *estimates* for work *not yet repaired* where the ultimate cost and expense will be determined on a time and materials basis (Ex. 17 at 012000-1–2) (Voith contract dated August 13, 2021, CEC-01209026-27))).  In other words, the *actual* cost and expense of future work, *if* undertaken at all, will differ from Mr. Emmert's estimates.

As to Count I, judgment as a matter of law is required as to Plaintiffs' asserted damages for repair work not yet performed on the grounds that GC22(b)(ii) limits monetary damages to reimbursement for costs and expenses actually incurred and

paid as well as on the separate ground that the costs and expenses of any future work to repair is conjectural, speculative, and dependent upon future events.

## IV.   As to Count II:  Plaintiffs' Warranty Rights Under Article I.1, GC15(j), and GC22(b)(ii) Are Expressly Limited to Defendants Performing Any Warranty Work and Do Not Include Costs Incurred by the Owner.

Plaintiffs' demand for monetary damages under Count II references the warranty provisions in GC22(b)(i).  (ECF No. 1, ¶ 186, PageID.50).  GC22(b)(i) does not, however, provide for monetary damages.  Instead, GC22(b)(i), in the event of a failure to comply with the warranties, requires the Contractor to "make at its own cost and expense any and all repairs or replacements necessary to remedy same . . . at its sole expense."  (GC22(b)(i), ECF No. 1-1, PageID.85).  GC22(b)(i) gives TAES — not the Owner — the initial obligation to perform warranty work at TAES's own expense.  GC22(b)(i) does *not* allow the Owner to recover damages from TAES, but simply requires TAES to perform corrective work at its own expense.  The Contract is clear and there can be no genuine dispute that the Owner cannot recover damages under GC22(b)(i).  Defendants are entitled to summary judgment on Count II to the extent it seeks damages for breach of GC22(b)(i) – as it specifically does.  (Compl. ¶ 189, ECF No. 1, PageID.51).

Viewed holistically, GC22(b) establishes a two-step process for addressing an alleged failure to comply with the warranties set forth in GC21.  *See Century Plastics, LLC v. Frimo, Inc.*, 2020 WL 504977, at *2 (Mich. Ct. App. 2020) ("The

goal of contract interpretation is to read the document as a whole and apply the plain language used in order to honor the intent of the parties."). First, if an alleged "failure to comply with the warranties appears during the Warranty Period, the Contractor shall . . . remedy same . . . at its sole expense." (GC22(b)(i), ECF No. 1-1, PageID.85). Second, "if the Contractor refuses, neglects, or is otherwise unable to take prompt action to correct any non-conformance or defects as provided in the immediately preceding clause '(i)', the Owner shall (without limiting any other rights or remedies) have the right to perform or to hire third parties to perform the corrective work . . . and the Contractor shall reimburse the Owner upon demand for all reasonable cost and expense of such work." (GC22(b)(ii), ECF No. 1-1, PageID.86). In other words, when a warranty issue arises, TAES has an obligation to correct the issue at its expense. If TAES "refuses, neglects, or is otherwise unable to take prompt action," then the Owner (or third parties hired by the Owner) may correct the defect and then seek reimbursement from TAES for the reasonable costs and expenses incurred and paid in correcting the defect. GC22(b)(i) and (ii) cannot be disconnected from one another and read as separate avenues to seek monetary damages. GC22(b)(i) gives TAES the ability to correct defective work at its own expense and GC22(b)(ii) protects the Owner from a failure of TAES to correct by requiring TAES to "reimburse" the Owner for the Owner's reasonable costs and expenses if the Owner must correct the defect itself or hire a third party to do so.

The Contract is clear and unambiguous that GC22(b)(i) does not provide for damages, and GC22(b)(ii) requires Plaintiffs to incur and pay for repair work before seeking "reimburse[ment]."

Plaintiffs' reference to Articles I.1 and GC15(j) in Count II do not provide a separate basis for monetary damages either. Article I.1 defines the "Scope of Contract" and sets out TAES's agreement to perform the work specified in "Section III – Description of Work," to "furnish everything necessary to perform and complete such work," and to "assure all engineering and design services required to be performed by a professional engineering firm licensed in the State of Michigan will be so performed." Article GC15(j), the "Workmanship" provision contained in the "Responsibility of Contractor" Section, sets forth the obligation that TAES execute the work "in a workmanlike manner by qualified, careful, and efficient mechanics in strict accordance with the Contract, Drawings and Specifications, or subsequent modifications thereof." Article GC15(j) concludes by requiring that "All defective work shall be promptly removed and replaced by the Contractor at its expense." Any breach of a warranty related to the prefatory language in Article I.1 or the obligations in GC15(j) is, as discussed above, remedied through GC22(b) exclusively and, if TAES does not take prompt action to correct any non-conformance, Plaintiffs must incur and pay costs and expenses before TAES must "reimburse" them. Articles I.1 and GC15(j) are clear and unambiguous

- 21 -

in *not* providing a separate monetary damages remedy.  In short, Defendants are entitled to summary judgment on Count II that Plaintiffs cannot seek monetary damages for warranty claims under Articles I.1, GC15(j), or GC22(b)(i).

## V.   As to Count III:  Plaintiffs' Remedies Are Limited to Alleged Unfinished Work and Liquidated Damages for Units 1, 3, and 6.

Count III is limited to claims for alleged incomplete and untimely work on Units 1, 3, and 6.  (Compl. ¶ 195, ECF No. 1, PageID.53).  Count III cites four provisions of the Contract as providing remedies for the alleged incomplete work: GC10, GC22(b)(ii), GC18(e), and Specifications Part One, § 4.6.  (*Id.* at PageID.74, 86, 83; Ex. 1 at GR-2–3).  These four provisions of the Contract provide for relatively little or no compensable damages at this time.

*GC10* provides:  "If the Contractor shall neglect to prosecute the Work expeditiously or fail to perform any provision of this Contract, ***the Owner may***, after ten (10) Business Days written notice to the Contractor, without prejudice to any other of the Owner's rights and remedies, ***make good such deficiencies***, and further, the cost thereof shall be ***backcharged*** to the Contractor."  (ECF No. 1-1, PageID.74) (emphasis added).  GC10 is expressly limited to circumstances in which the Owner *itself* steps in to undertake work that the Owner deemed incomplete or unsatisfactory.  The exclusive language "the Owner may . . . make good such deficiencies" is in conspicuous and meaningful contrast to other provisions that expressly provide the Owner the right to assistance from third parties — such as

GC18(e), "the Owner shall, after notification to the Contractor, have the right to have such work completed or corrected by others"; and GC22(b)(ii), "the Owner shall (without limiting any other rights or remedies) have the right to perform or hire third parties to perform the corrective work . . . ."   (ECF No. 1-1, PageID.83, 86 respectively).   The express reservation in GC10 that the provision is "without prejudice to any *other* of the Owner's rights and remedies" makes unmistakable (and understandable) the limitation of Section GC10 to step-in work performed by the Owner itself.   (ECF No. 1-1, PageID.74) (emphasis added).

The other conspicuous language in GC10 is "backcharged," which is a construction industry term of art (undefined in the contract or by common-usage dictionaries) that means:   "Billings for work performed or costs incurred by one party that, in accordance with the agreement, should have been performed or incurred by the party to whom billed."   Louis P. Miaramontes & Hugh L. Rice, *Construction Accounting Deskbook*, GL-2 (2005), excerpted as Ex. 18.  The "Owner may . . . make good such deficiencies" language in GC10 aligns with "backcharged" costs being those for work that has been performed and for which costs have been incurred.  Defendants thus are entitled to a judgment as a matter of law that under Count III only costs incurred by the Owner for work already performed *by the Owner itself* on Units 1, 3, and 6 are compensable under Section GC10.

***GC22(b)(ii):***  For the reasons detailed in Argument III, Defendants are entitled to judgment as a matter of law under Count III that the Owner may only seek "reimburse[ment]" for costs that have been incurred and paid for alleged incomplete work on Units 1, 3, and 6.

***GC18(e):***  Units 1, 3, and 6 each cleared the three milestones necessary to begin full commercial operation.   (SOMF ¶ 17).   This means that the Owner determined that each of Units 1, 3, and 6 was fit for service *in all respects* and, accordingly, each of these Units has been operating at higher output, capacity, and efficiency than prior to the overhaul by TAES.  (SOMF ¶¶ 18, 20-21).  By achieving UIA, Units 1, 3, and 6 each went through a prior period of rigorous "Punch List" scrutiny by the Owner under GC18(d):  "If the Owner determines that the Contractor has not achieved Unit Interim Acceptance, the Owner will notify the Contractor of defects or uncompleted Work on a Punch List and the Contractor shall correct same at the Contractor's expense."  (GC18(d), ECF No. 1-1, PageID.82).

Once each Unit achieves UIA, GC18(e) then provides a parallel process for the Owner to inform TAES of any items that need to be addressed for UFA, as identified in the subsequent commercial operations testing:  "[F]ollowing said Unit testing . . . [i]f the Owner determines that the Work has not been completed in accordance with this Contract, the Owner will notify the Contractor of defects or uncompleted Work and the Contractor shall correct same at the Contractor's

expense."  (GC18(e), ECF No. 1-1, PageID.83).  GC18(e) then provides for the

Owner to obtain third-party assistance, but *only* as a final recourse:

> If any such Work is not completed or corrected in a timely manner, then
> (in addition to and without limiting any other rights or remedies of the
> Owner under this Contract or at law or equity) the Owner shall, after
> notification to the Contractor, have the right to have such Work
> ***completed or corrected by others and any associated cost plus a fifteen***
> ***percent (15%) markup for administrative and related overhead***
> ***expenses*** shall be charged to the Contractor.

(ECF No. 1-1, PageID.83) (emphasis added).

The plain meaning of GC18(e) is that once the relevant work is "completed

or corrected by others," then the "associated cost plus a fifteen percent (15%)

markup" may be "charged to the Contractor."  Every phrase speaks retrospectively

about work that has been "completed or corrected by others . . . ."  Furthermore, as

a practical matter, the work would need to have been "completed or corrected by

others" *before* a final sum certain could be used to determine the "associated cost"

to be "charged to the Contractor."  An estimate would not suffice under the plain

language of GC18(e).  For example, Voith has provided certain estimates to the

Owner, but Voith's *actual* price will be determined on a time-and-materials basis.

(Ex. 17 at 012000-1–2 (Voith contract, CEC-01209026-27)).  Nothing in GC18(e)

supports imposing a 15% markup on a *mere estimate* ahead of the work being

"completed and corrected."  Accordingly, Defendants are entitled to judgment as a

matter of law that under Count III only work that *has in fact been* "completed or corrected by others" on Units 1, 3, and 6 is compensable under Article GC18(e).

***Specifications Part One, § 4.6:***  The final provision cited in Count III refers to a warranty limited to specified components.  The CCS § 4.1 provides:

> Without limiting the generality of the Contractor's warranty set forth in Article GC21(b), the Contractor shall expressly warrant and guaranty that the equipment, materials, and/or services provided **shall perform in accordance with the requirements in PART TWO, Section 3.11**, Performance Guarantee of this Conformed Contract Specification.

(Ex. 1 at GR-2) (emphasis added).  CCS § 4.6 then provides the remedy for the warranty provided under CCS § 4.1 (i.e., on the components covered under CCS PART TWO § 3.11) after TAES has *first* had an opportunity to fix the issue:

> Without limiting any other right and/or remedies of the Owner set forth in the Contract Documents, if, after due notice, the Contractor should refuse or neglect to correct any defects, errors, omissions, or any other failure of the equipment to meet the requirements of this Conformed Contract Specification, the Owner may, at the Contractor's expense, correct such defects, errors, omissions, or failures.  The Owner may deduct the reasonable amount due from any payment or monies due the Contractor.

(Ex. 1 at GR-2–3).  Like other provisions in the Contract, CCS § 4.6 applies to corrective work that has in fact already been performed: "the Owner may . . . correct such defects, errors, omissions, or failures.  The Owner may deduct the reasonable amount due . . . ."  (*Id.*).  Per CCS § 4.1, the components covered by this warranty are specified in CCS PART TWO § 3.11 and are expressly limited to (i) the "Motor-

- 26 -

Generator," and sub-components thereof (§ 3.11.1), and (ii) the "Pump-Turbine" and associated components (§ 3.11.2) (Ex. 1).

Setting aside the dispute over whether TAES's work was defective or incomplete concerning any of the components covered under CCS PART TWO § 3.11 (which, for example, does *not* include the discharge rings or discharge ring extensions), there is no genuine dispute that *neither* the Owner *nor* its replacement contractor Voith has *undertaken* the work to "correct such defects, errors, omissions, or failures" — as required for compensability under CCS § 4.6 — for *any* of the components covered under CCS PART TWO § 3.11 in Units 1, 3, or 6 (at issue in Count III) and Defendants are entitled to judgment as a matter of law as such.

***Liquidated Damages:***  The final issue under Count III is the alleged damages for delays in achieving UIA for Units 1, 3, and 6.  (Compl. ¶ 193, ECF No. 1, PageID.52).  There is no genuine dispute that the liquidated-damages provision in the Contract "is the Owner's sole and exclusive remedy for loss or damage arising from delay past the end of the applicable Unit Interim Acceptance Milestone Date . . . ."  (Contract § IV 2.B, ECF No. 1-1, PageID.99).  Plaintiffs' proposed damages expert opines that this liquidated-damages amount is $13,109,496 and Defendants are entitled to judgment as a matter of law that they cannot be liable for any higher amount or other remedy concerning delays for Units 1, 3, and 6.  (Ex. 12 at 40, Table 13 (Emmert report)).  (The parties settled liquidated damages as the sole

and exclusive remedy for any delay on other Units, so that issue is not before the Court.)

## VI. As to Count IV:  Any Liability for Toshiba Under the Parent Guaranty Is Subject to the Limitations on TAES's Liability Under the Contract.

Count IV, Plaintiffs' only claim against Toshiba, is for breach of the Parent Guaranty of performance or indemnity based on the allegations of Counts I-III against TAES.  (ECF No. 1, PageID.53-55).  Under the express terms of the Parent Guaranty, "[n]otwithstanding any provision in this Contract to the contrary," Toshiba's liability under the Parent Guaranty is "subject to any limitations contained in the Contract on [TAES's] obligations thereunder."  (Parent Guaranty ¶ 2, ECF No. 1-3, PageID.171).  As such, Toshiba is entitled to a judgment as a matter of law that the limitations of liability included in the Contract correspondingly limit Toshiba's liability under the Parent Guaranty.

## VII. Article GC28 of the Contract Expressly Caps Defendants' Liability, Both in Total and on a Per-Unit Basis, and Bars Consequential Damages for Either Side.

### A. GC28(a) Caps the Contractor's Liability in Total and Per-Unit.

The Contract caps TAES's potential financial liability in two ways:  an absolute, maximum damages cap under the whole Contract (GC28(a), ECF No. 1-1 PageID.89-90), and a per-Unit cap determined by the "Unit Total Fixed Price" for each Unit. (GC28(a), ECF No. 1-1 PageID.89).  Under Michigan law, such caps on damages are routinely enforced as a matter of law. *See Schmidt Indus. v. Huntington*

*Nat'l Bank*, 2022 WL 2121527, at \*2 (E.D. Mich. June 13, 2022) (citing *USAA Grp. v. Universal Alarms, Inc.*, 405 N.W.2d 146, 147 (Mich. Ct. App. 1987)).

Despite the Contract's express cap on liability, Plaintiffs' proposed damages expert Mr. Emmert puts forward a (wildly inflated) total damages calculation, $690,086,549, that exceeds even his own $615,888,299 calculation of the Contract's cap on liability based on the Contract price. (*See* Ex. 12 at 25 (Emmert report, Table 4 showing total financial damages by issue as of June 30, 2025); *id*. at 45 (Table 14 showing Total Liability Limit)). Furthermore, Mr. Emmert's calculation of the total liability cap is itself inflated, as it includes $54,000,000 in potential "bonus" payments that *were not* and *cannot* be paid to TAES as well as $2,697,738 in money owed, but never paid, to TAES for work completed under Project Change Notices. *Id.* at 45.

The Contract's "Total Liability Limit" caps TAES's liability stemming from its work for the Owner under any and all circumstances:

> The Contractor's maximum liability to the Owner under this Contract, whether arising in breach of contract, tort (including negligence), strict liability, or otherwise, shall not, in the aggregate, exceed the Not-to-Exceed Total Contract Price (as hereinafter defined), as same may be amended by any Change Orders or otherwise (the "Total Liability Limit").

(GC28(a), ECF No. 1-1 PageID.89). While maintaining the Contract's explicit language that the Total Liability Limit caps TAES's liability under the Contract, Change Order 9 modified the Total Liability Limit by defining it instead as the

- 29 -

"Overall Total Fixed Price" plus "the maximum bonus amounts for all units that may be payable . . . ."  (Change Order 9, Art. 7, ECF No. 1-1, PageID.142).   Change Order 10 set the operative Overall Total Fixed Price with an increase to $559,190,561.  (Change Order 10, Art. 4, ECF No. 1-1, PageID.162-63).

GC28(a)'s "maximum bonus amounts for all units that may be payable" were set by Change Order 9, which provided for potential bonuses up to $9,000,000 per Unit to TAES *if* a Unit exceeded Performance Guaranty specifications based on agreed-upon testing parameters.   (ECF No. 1-1, at PageID.154-156).   Such Performance Guaranty testing was "at the Owner's sole option" (ECF No. 1-1, at PageID.154).

It is *undisputed* that the Owner did *not* conduct Performance Guaranty testing as to any Units other than Unit 2 (as to which the parties agreed to no bonus) and the Owner has made no bonus payments to TAES on any of the Units.  (*See* Change Order 9, ECF No. 1-1, PageID.156; *see also* Ex. 16 (Emmert Dep. Tr. at 51:22–52:5) ("Q.  And that $54 million was not, in fact, paid to Toshiba; isn't that right, Mr. Emmert?  A.  That's my – that's my understanding, sir.")).  Mr. Emmert's use of the maximum *possible* bonuses (from the face of Change Order 9 alone) as opposed to the maximum bonuses *payable* (based on the parties' undisputed implementation of the performance testing under Change Order 9) inflates Mr. Emmert's calculation of the liability cap by $54,000,000.  (In addition, Mr. Emmert's calculation of

- 30 -

$209,933,532 in damages for Unit 4 far exceeds his own calculation of Unit 4's liability cap of $174,144,598, which itself includes an unpaid bonus.) (Ex. 12 at Ex. B.2, 45).

For similar reason, Mr. Emmert's inclusion in the total liability cap of $2,697,738 in Project Change Notice ("PCN") amounts never paid to TAES or even memorialized in a contract change order contradicts GC(28)(a).   Mr. Emmert observes that Change Order 10 "increased the Contract price to $559.1 million" and makes no mention of any additional Change Orders, as there were none.  (Ex. 12 at 11).   Though further "Potential Change Notices" (referred to by Mr. Emmert as "PCOs") were issued after Change Order 10, Mr. Emmert acknowledges that they "remain outstanding and were not formalized into a change order."  *Id.*

For these reasons, Defendants are entitled to judgment as a matter of law that GC28(a) caps TAES's maximum liability at $559,190,561 and on a per-Unit basis calculated according to the amount that the Owner actually paid TAES.

## B.   GC28(b) Expressly Bars Liability for Either Party for "Cost of Money" or "Loss of Capital," Including Prejudgment Interest.

Prejudgment interest under Michigan law is *not* mandatory and is subject to contractual waiver.  *See* Mich. Comp. Laws Serv. § 600.6013(1) ("Interest is allowed on a money judgment recovered in a civil action . . . ."); *Transp. Ins. Co. v. Citizens Ins. Co. of Am.*, 574 F. App'x 607, 613 (6th Cir. 2014) (explaining that Michigan amended Section 600.6013 in 2001 to make prejudgment interest permissive rather

than mandatory).  It is settled under Michigan law that statutory remedies and rights

such as prejudgment interest can be waived by agreement.  *See Wilkes v. Allegan*

*Fruit & Produce Co.*, 206 N.W. 483, 484 (Mich. 1925)  (holding that "a contract

may waive constitutional or statutory rights or may change an established rule of

law"); *see also Bobchick v. Grange Ins. Co.*, 2021 WL 927370, at *4 (E.D. Mich.

Mar. 11, 2021) (denying award of prejudgment interest based on parties' contractual

limitation); *Nat'l Fire Ins. Co. v. Roofmaster Constr., Inc.*, 2005 WL 1030326, at *5

(E.D. Mich. April 28, 2005) (granting summary judgment on parties' contractual

exclusion of certain damages:  "Contracting parties are also free to limit remedies

by agreement and contract terms limiting damages are valid . . . .").

> The Contract's bar on "consequential" damages is both broad and specific:

> Other than with respect to the Contractor's obligations to pay liquidated damages to the Owner, ***in no event shall either Owner or Contractor be liable to the other***, whether arising under in breach of contract, tort (including negligence), strict liability, or otherwise, ***for*** loss of anticipated profits, loss by reason of plant shutdown, non-operation or increased expense of operation, service interruption, cost of purchased or replacement power, claims of customers, ***cost of money***, ***loss of capital or revenue***, or for any special, incidental, exemplary or other consequential loss or damage.

(GC28(b), ECF No. 1-1 PageID.90) (emphasis added).  The Contract's categorial

prohibition of liability for the "cost of money" and the "loss of capital or revenue"

bars the award of prejudgment interest to either side in this action.  (GC28(b), ECF

No. 1-1 PageID.90).

Under Michigan law, the primary purpose of prejudgment interest is to compensate a prevailing party for the lost use of funds. *See Gordon Sel-Way, Inc. v. Spence Bros., Inc.*, 475 N.W.2d 704, 713 (Mich. 1991) (holding Michigan's prejudgment interest statutes' purpose is to "***compensate prevailing parties for the lost use of funds*** due them during the time the amount remains unpaid") (emphasis added). Furthermore, courts in Michigan and the Sixth Circuit hold that prejudgment interest is an issue of *liability*. *See, e.g.*, *Premo v. United States*, 599 F.3d 540, 545 (6th Cir. 2010) ("[T]he government *is not liable for pre-judgment interest* or for punitive damages.") (emphasis added); *Bent v. Bostwick*, 384 N.W.2d 124, 125 (Mich. Ct. App. 1986) ("[T]his Court has refused to hold an insurer liable for prejudgment interest on judgment amounts which exceed the liability policy limit in the insurance policy.") (emphases added). GC28(b) categorically bars either party to the Contract from being "liable to the other" for "cost of money, [or] loss of capital or revenue," which must be enforced according to its terms to bar prejudgment interest, which serves precisely to compensate a party for "cost of money, [or] loss of capital or revenue." (GC28(b), ECF No. 1-1 PageID.90). Defendants are thus entitled to judgment as a matter of law that the Contract bars any award of prejudgment interest.

- 33 -

**VIII.    The Contract Has Not Been Terminated for Major Default Under GC7(b)(ii).**

The Contract provides two mechanisms for the Owner to terminate: "Termination for Convenience" and "Termination for Default." (GC7(a)-(b), ECF No. 1-1, PageID.70-73). The Contract does not provide a mechanism for TAES or Toshiba to terminate. At the outset of this action, Plaintiffs conceded that despite filing this lawsuit for breach of contract, Plaintiffs had *not* terminated the Contract: "Consumers Energy and DTE admit that the Contract provides a mechanism for termination and that they have not terminated the Contract pursuant to that mechanism." (Pls.' July 15, 2022 Ans. to TAES Countercl., ECF No. 20, PageID.431).

More than two years later, after the close of fact discovery, Plaintiffs for the first time purported to invoke a termination provision of the Contract. On October 22, 2024, the Owner sent out-of-court correspondence to TAES, stating: "This letter provides notice with respect to termination of the Contract for Major Default as described in GC7(b)(ii) of Section II of the Contract." (Ex. 19). The Owner's October 22, 2024 letter cited three grounds of supposed "Major Default": GC7(b)(i)(1), –(b)(i)(2), and –(b)(i)(10). (Ex. 19 at 2).

Under the express language of GC7(b)(ii), however, the Owner's October 22, 2024 letter could *not* terminate the Contract for the Owner's asserted grounds of "Major Default" without *first* providing TAES notice and an opportunity to cure:

- 34 -

In the event that the Owner intends to terminate this Contract for a Major Default as described in subparagraphs (1), (2), (3), (4) or (10) of clause "(i)" above of this Subarticle GC7(b), the Owner shall first provide the Contractor with **_written notice_** of such Major Default. The Contractor will commence implementation of all necessary corrective action **_to cure_** such Major Default within ten (10) days of the Owner's said written notice, and shall implement a recovery plan acceptable to the Owner and diligently and continuously pursue actions in accordance with such recovery plan **_to cure_** such Major Default within thirty (30) days of the Owner's aforesaid written notice.

(GC7(b)(ii), ECF No. 1-1, PageID.72) (emphasis added).

Flouting the express requirement for notice under GC7(b)(ii), the Owner's October 22, 2024 letter stated: "The Owner believes that notice is not required because TAES has materially breached its obligations under the Contract in multiple respects, has failed to rectify those breaches after many written demands, and has repudiated and abandoned all remaining obligations under the Contract." (Ex. 19).

It is *undisputed* that prior to the October 22, 2024 letter, Plaintiffs had *never* sought to terminate the Contract. (Ex. 20 at 20 (Plaintiffs conceding that their October 22, 2024 letter was their first mention of termination: "Plaintiffs terminated the Contract per § II.GC7(b), as memorialized in letters dated October 22, 2024 and December 3, 2024.") (Pls.' Feb. 26, 2025 Second Suppl. Ans. to Interrog. No. 15)).

On October 31, 2024 (within the 10-day period provided under GC(7)(b)(ii)), TAES responded to the Owner's October 22, 2024 letter with a detailed, 91-page corrective action and recovery plan, as provided under GC7(b)(ii). (Ex. 21).

The Owner responded to TAES's corrective action and recovery plan, more than a month later, in correspondence dated December 3, 2024, stating:  "***The Owner does not agree that TAES is entitled to 'cure' its multiple Major Defaults under the Contract***, including because TAES has materially breached the Contract, has failed to correct its breaches after many prior notices, and has repudiated and abandoned its remaining obligations under the Contract."  (Ex. 22 at 1) (emphasis added).  After disputing that the Contract provides TAES a cure period — despite the plain language of GC7(b)(ii) stating the opposite — the Owner's December 3, 2024 correspondence added:  "Nonetheless, for the avoidance of doubt, TAES' purported recovery plan is not reasonable and not acceptable to the Owner . . . ."  *Id.* The Owner's December 3, 2024 correspondence never mentions that more than *three years before* first sending TAES any purported notice of termination and unilaterally denying TAES's express contractual right to notice and an opportunity to cure, the Owner *already* had entered into an agreement with a replacement contractor to undertake the repair work.  (Ex. 17 (Voith contract, CEC-01208979)).

The Owner's December 3, 2024 correspondence thus expressly denied any opportunity to cure pursuant to GC7(b)(ii) and confirmed that the Owner's election to terminate the Contract had been made as of the Owner's *initial* letter sent on October 22, 2024:  "The Owner *again* confirms [i.e., the first time being the October 22, 2024 letter] that the contract is terminated pursuant to Contract Section

II, GC7(b)." (Ex. 22 at 5) (emphasis added); *see also* (Ex. 23) (January 31, 2025 letter from TAES responding to the Owner and objecting to denial of right to cure).

Critically, however, GC7(b)(ii) expressly provides that notice and an opportunity to cure is a prerequisite *before* the Owner can terminate the Contract under the Owner's asserted grounds of "Major Default":

> ***In the event that*** the Contractor does not commence implementation of reasonable corrective action, or if the Contractor does not thereafter diligently and continuously pursue corrective actions to cure such Major Default and in fact cure such Major Default, within the time periods specified in the preceding sentence, ***then the Owner may terminate*** this Contract by written notice to the Contractor.

(GC7(b)(ii), ECF No. 1-1, PageID.72) (emphasis added).

The intentionality of the cure period as a *prerequisite* for the Owner's asserted grounds of "Major Default" is unmistakable — particularly when juxtaposed to the final sentence of GC7(b)(ii), which contrastingly provides for termination *without a cure period* for other grounds of "Major Default" that are *not* at issue here (and that the Owner has never claimed) such as the contractor's insolvency, material misrepresentation, or failure to maintain insurance.  (GC7(b)(i), ECF No. 1-1, PageID.71-72).  And termination for convenience by the Owner also does *not* require notice and an opportunity to cure because the financial consequences are quite different (i.e., within 90 days of termination for convenience, the *Owner* must pay the contractor for all work up to that time, and the parties effectively part ways through a no-fault exit of the contract).  (GC7(a)(i)-(ii), ECF No. 1-1, PageID.70).

Under Michigan law, the consequences are settled for a plaintiff who files a breach-of-contract action *before* allowing the defendant to exercise a contractually provided cure period:   dismissal or summary judgment for the defendant.   *See Chrysler Realty Co., LLC v. Design Forum Architects, Inc.*, 544 F. Supp. 2d 609, 616 (E.D. Mich. 2008) (granting summary judgment on breach-of-contract claim under Michigan law:   "Courts have recognized that where a contract expressly includes a notice and cure provision, a party failing to provide such is precluded from then subsequently suing the other party for breaching the agreement."); *Convergent Grp. Corp. v. County of Kent*, 266 F. Supp. 2d 647, 658 (W.D. Mich. 2003) (same:   "Parties must adhere to contractually-secured cure provisions regarding contract termination when the cause for the termination is the very situation to which the cure provision was intended to apply.") (citations and internal quotation marks omitted), *followed by Detroit IT, LLC v. LS Inv. Advisors, LLC*, 2024 Mich. Cir. LEXIS 599, at *23-25 (Oakland County Cir. Ct. Aug. 23, 2024) (granting summary judgment against breach-of-contract claim filed as a counterclaim because the counter-claimant failed to allow a contractually required cure period); *Am. Seating Co. v. Transp. Seating, Inc.*, 220 F. Supp. 2d 845, 848 (W.D. Mich. 2002) (granting summary judgment on breach-of-contract claim under Michigan law:   "Plaintiff's notification to terminate the Agreement is effective only if its initial notification of the alleged breach provided Defendant with an

opportunity to cure.  The concept of cure implies that once notified of an alleged breach, the party having allegedly breached the agreement will have an opportunity, *unfettered by the injured party*, to properly fulfill its obligations thereunder.  In this respect, *initiating legal action regarding the subject of the alleged breach constitutes an impairment of the opportunity to cure*, as has been recognized.") (emphasis added); *see also Wal-Mart Real Estate Bus. Trust v. Eastwood, LLC*, 2014 WL 12637935, at *5 (W.D. Mich. Aug. 22, 2014) (dismissing breach-of-contract claim under Michigan law:  "Courts have recognized that where a contract expressly includes a notice and cure provision, a party is precluded from suing the other party for breaching the agreement without first complying with the provision.").

Under these authorities, Defendants here are entitled to judgment as a matter of law that Plaintiffs have *not* effectuated termination of the Contract for the asserted grounds of "Major Default" due to Plaintiffs' failure to adhere to the notice and opportunity-to-cure period expressly provided under GC7(b)(ii).  Plaintiffs' express circumvention of the cure procedure under GC7(b)(ii) cannot be rectified by a dismissal without prejudice and potential repleading after a cure period because "initiating legal action regarding the subject of the alleged breach constitutes an impairment of the opportunity to cure, as has been recognized."  *Am. Seating*, 220 F. Supp. 2d at 848, *cited in Chrysler Realty*, 544 F. Supp. 2d at 616, *and Wal-Mart*, 2014 WL 12637935, at *5.

Confirming that the toothpaste cannot be put back into the tube here, Article GC7(b)(iv) of the Contract expressly provides that an attempt by the Owner to terminate for "Major Default" that is ineffective "shall be deemed a termination for convenience by the Owner pursuant to Subarticle GC7(a)[.]" (ECF No. 1-1, PageID.73); *see DaimlerChrysler Corp. v. Wesco Distrib.*, 760 N.W.2d 880, 833 (Mich. Ct. App. 2008) ("An unambiguous contract must be enforced according to its terms.") (citations and internal quotation marks omitted); *see also JD Norman Indus., Inc. v. Am. Axle & Mfg. Inc.*, 2023 WL 3030069, at *2 (Mich. Ct. App. Apr. 20, 2023) (applying plain-meaning rule under Michigan contract law to affirm grant of summary judgment for breach-of-contract defendant where the plaintiff did *not* provide notice and opportunity to cure as a prerequisite to alleging breach). Thus, Defendants are entitled to judgment as a matter of law that the Owner's termination of the Contract is one for convenience pursuant to GC7(a).

## CONCLUSION

For the foregoing reasons, under the Rule 56 of the Federal Rules of Civil Procedure, the Court should grant summary judgment in favor of TAES and Toshiba in accordance with the points above and the accompanying proposed order.

Dated: March 20, 2025

FOLEY & LARDNER LLP

Nicholas J. Ellis (P73174)
500 Woodward Avenue, Suite 2700
Detroit, MI 48226-3489
(313) 234-7100

Respectfully submitted,

**WHITE & CASE**

By:  */s/ Christopher M. Curran*
Christopher M. Curran

Christopher M. Curran

- 40 -

nellis@foley.com

Tony Tootell
555 South Flower Street, Suite 3300
Los Angeles, CA  90071-2418
(213) 972-4796
ttootell@foley.com

Kelsey Leiper Imam
1000 Louisiana Street, Suite 2000
Houston, TX  77002
(713) 276-5039
kimam@foley.com

Eric Grannon
J. Frank Hogue
Holly Tao
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600
ccurran@whitecase.com
egrannon@whitecase.com
fhogue@whitecase.com
holly.tao@whitecase.com

*Attorneys for Toshiba America
Energy Systems Corporation and
Toshiba Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 20, 2025, I filed the foregoing document and this Certificate of Service with the Court using the ECF system, which sent notice of filing to all attorneys of record.

*/s/ Christopher M. Curran*

Christopher M. Curran
