IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| CONSUMERS ENERGY COMPANY and DTE ELECTRIC COMPANY, | ) ) ) | Case No. 4:22-cv-10847 |
| *Plaintiffs*, | ) ) | Judge F. Kay Behm |
| *v.* | ) ) | Mag. Judge Curtis Ivy, Jr. |
| TOSHIBA AMERICA ENERGY SYSTEMS CORPORATION and TOSHIBA CORPORATION, | ) ) ) ) | |
| *Defendants*. | ) ) | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF NO. 217)**

Terri L. Mascherin
tmascherin@jenner.com
Daniel J. Weiss
dweiss@jenner.com
Christopher Tompkins
ctompkins@jenner.com
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654
(312) 222-9350

April 17, 2025

Patrick G. Seyferth
seyferth@bsplaw.com
Derek J. Linkous
linkous@bsplaw.com
BUSH SEYFERTH PLLC
100 West Big Beaver Road
Suite 400
Troy, Michigan 48084
(242) 822-7800

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ........................................................ iii

QUESTION PRESENTED ........................................................ viii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................. ix

COUNTERSTATEMENT OF MATERIAL FACTS ..................................... 1

Response To Defendants' Statement Of Material Facts ........................... 1

Statement Of Additional Material Facts ...................................... 1

    A.    The Ludington Plant. ......................................... 1

    B.    TAES's Promises Under The Contract. ........................... 1

    C.    Toshiba's Defective Work. ..................................... 3

    D.    Toshiba Refuses To Repair Its Defective Work. .................... 5

    E.    The Damage Worsens And The Utilities Engage A New
Contractor And Terminate The Contract For Cause. ................ 7

    F.    The Present Status Of Units 2 And 4. ............................ 9

Summary of Argument ...................................................... 10

Argument ............................................................... 11

I.    Summary Judgment Should Be Denied On Toshiba's Argument That
UIA/UFA Waived Claims. (Toshiba Argument I) ......................... 11

II.    Summary Judgment Should Be Denied On Toshiba's Argument That The
General Warranty Does Not Cover Cavitation-Related Defects. (Toshiba
Argument II) ........................................................ 13

III.    Summary Judgment Should Be Denied On Toshiba's Theory That The
Utilities Are Barred From Seeking Common Law Contract Damages.
(Toshiba Arguments III-V) ............................................ 16

    A.    The Utilities Are Entitled To Seek Common Law Contract
Damages. ............................................... 17

i

B.      The Contract Does Not Waive Common Law Damages
        Remedies. ...............................................................................20

C.      The Utilities Terminated The Contract For Default, Which
        Additionally Supports Common Law Damages. ...............................24

IV.     Summary Judgment Should Be Denied Regarding Toshiba's Arguments
        About The Contract's Limitation Of Liability. (Toshiba Argument VII).....25

A.      Toshiba's Gross Negligence Precludes Its Reliance On A
        Contractual Limitation Of Liability. ....................................................25

B.      The Terms Of GC28(a) Do Not Support Summary Judgment
        On Toshiba's Calculation Of The Limit Amount. .............................27

C.      GC28(b) Does Not Apply To Statutory Interest On A
        Judgment. ...............................................................................30

V.      Fact Issues Preclude Summary Judgment On Toshiba's Argument Regarding
        Termination For Default. (Toshiba Argument VIII) .....................................34

VI.     Toshiba's Argument Regarding The Parent Guaranty Does Not Support
        Summary Judgment. (Toshiba Argument VI) ...............................................39

Conclusion ....................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*60 Ivy St. Corp. v. Alexander*,
   822 F.2d 1432 (6th Cir. 1987) ............................................................................11

*Adamczyk v. Sch. Dist. of City of Hamtramck Pub. Schs.*,
   667 F. Supp. 3d 534 (E.D. Mich. 2023) ............................................................39

*Allison v. AEW Cap. Mgmt., L.L.P.*,
   751 N.W.2d 8 (Mich. 2008)................................................................................15

*Ambler v. Thompson*,
   No. 325042, 2016 WL 1243425 (Mich. Ct. App. Mar. 29, 2016).....................18

*Am. Mun. Power, Inc. v. Voith Hydro, Inc.*,
   636 F. Supp. 3d 838 (S.D. Ohio 2022) ..............................................................24

*Am. Seating Co. v. Transp. Seating, Inc.*,
   220 F. Supp. 2d 845 (E.D. Mich. 2002) ............................................................38

*Atlas Res., LLC v. McJunkin Redman Corp.*,
   No. 12-cv-41, 2013 WL 4786484 (W.D. Mich. Sept. 6, 2013).........................19

*Barrett-O'Neill v. Lalo, LLC*,
   171 F. Supp. 3d 725 (S.D. Ohio 2016) ..............................................................28

*Bobchick v. Grange Ins. Co. of Mich.*,
   No. 19-12467, 2021 WL 927370 (E.D. Mich. Mar. 11, 2021)..........................33

*Bonelli v. Volkswagen of Am., Inc.*,
   421 N.W.2d 213 (Mich. Ct. App. 1988).............................................................19

*In re Bradley Est.*,
   835 N.W.2d 545 (Mich. 2013)............................................................................12

*Centria Home Rehab., LLC v. Allstate Ins. Co.*,
   No. 365313, 2024 WL 4820775 (Mich. Ct. App. Nov. 18, 2024) .....................33

*Chrysler Realty Co. v. Design F. Architects, Inc.*,
   544 F. Supp. 2d 609 (E.D. Mich. 2008) ............................................................38

*City of Sterling Heights, Mich. v. United Nat'l Ins. Co.*,
    319 F. App'x 357 (6th Cir. 2009) ....................................................... 32

*Convergent Grp. Corp. v. County of Kent*,
    266 F. Supp. 2d 647 (E.D. Mich. 2008) ............................................ 38

*Cummings v. Klee*,
    410 F. Supp. 3d 837 (E.D. Mich. 2019) ............................................ 37

*Dierickx v. Vulcan Indus.*,
    158 N.W.2d 778 (Mich. Ct. App. 1968) ............................................ 18

*Edmund W. Waskin Dev. Co. v. Weyn*,
    119 N.W.2d 662 (Mich. 1963) ........................................................... 19

*Firwood Mfg. Co. v. Gen. Tire, Inc.*,
    96 F.3d 163 (6th Cir. 1996) ........................................................ 31, 32

*Forton v. Laszar*,
    609 N.W.2d 850 (Mich. Ct. App. 2000) ................................. 17, 18, 19

*Gomba Music Inc. v. Avant*,
    225 F. Supp. 3d 627 (E.D. Mich. 2016) ............................................ 22

*Gongola v. Yaksich*,
    143 N.W.2d 601 (Mich. Ct. App. 1966) .......................... 17, 18, 19, 20

*Harbor Park Mkt., Inc. v. Gronda*,
    743 N.W.2d 585 (Mich. Ct. App. 2007) ............................................ 15

*Hillman Power Co., LLC v. On-Site Equip. Maint., Inc.*,
    685 F. Supp. 3d 528 (E.D. Mich. 2023) ....................................... 30, 33

*Honigman Miller Schwartz & Cohn LLP v. City of Detroit*,
    952 N.W.2d 358 (Mich. 2020) ........................................................... 31

*Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*,
    995 S.W.2d 661 (Tex. 1999) .............................................................. 15

*Kalitta Air, LLC v. United Air Lines, Inc.*,
    No. 07-14454, 2011 WL 8146 (E.D. Mich. Jan. 3, 2011) ................. 26

*Klapp v. United Ins. Grp. Agency, Inc.*,
663 N.W.2d 447 (Mich. 2003) ........................................................................16

*Kuhens v. B & R Oil Co.*,
No. 209871, 1999 WL 33409917 (Mich. Ct. App. Nov. 30, 1999) ..................36

*Lamp v. Reynolds*,
645 N.W.2d 311 (Mich. Ct. App. 2002) ..........................................................25

*Lather v. Sch. Dist. No. 1*,
219 N.W. 700 (Mich. 1928) .......................................................................22, 23

*Mead Corp. v. ABB Power Generation, Inc.*,
319 F.3d 790 (6th Cir. 2003) ...........................................................................24

*Muskegon Cent. Dispatch v. Tiburon, Inc.*,
462 F. App'x 517 (6th Cir. 2012) ....................................................................21

*Newton v. Consolidated Const. Co.*,
150 N.W. 348 (Mich. 1915)..............................................................................20

*Osinski v. Yowell*,
354 N.W.2d 318 (Mich. Ct. App. 1984) ..........................................................30

*Patel v. FisherBroyles, LLP*,
1 N.W.3d 308 (Mich. Ct. App. 2022) ..............................................................29

*Perceptron, Inc. v. Sensor Adaptive Machs., Inc.*,
221 F.3d 913 (6th Cir. 2000) ...........................................................................30

*Richards v. City of Jackson, Mich.*,
788 F. App'x 324 (6th Cir. 2019) ....................................................................26

*Sec. & Exch. Comm'n v. Montano*,
No. 6:18-CV-1606, 2020 WL 5887648 (M.D. Fla. Oct. 5, 2020).....................39

*Short v. Hollingsworth*,
289 N.W. 158 (Mich. 1939)...................................................................21, 23, 24

*Smith v. Twp. of Prairieville*,
194 F. Supp. 3d 658 (W.D. Mich. 2016) ..........................................................26

*St. Paul Fire & Marine Ins. Co. v. Guardian Alarm Co. of Mich.*,
　　320 N.W.2d 244 (Mich. Ct. App. 1982) ........................................................28

*Stamtec, Inc. v. Anson Stamping Co.*,
　　346 F.3d 651 (6th Cir. 2003) .....................................................................32

*Tangas v. Int'l House of Pancakes, LLC*,
　　779 F. App'x 317 (6th Cir. 2019) ..............................................................19

*Tann v. Allied Van Lines, Inc.*,
　　146 N.W.2d 682 (Mich. Ct. App. 1966) ....................................................17

*Taylor v. Mathews*,
　　198 N.W.2d 843 (Mich. Ct. App. 1972) ....................................................26

*Total Quality, Inc. v. Fewless*,
　　958 N.W.2d 294 (Mich. Ct. App. 2020) ....................................................12

*Transp. Ins. Co. v. Citizens Ins. Co. of Am.*,
　　574 F. App'x 607 (6th Cir. 2014) ..............................................................33

*Tweedy v. Wright Ford Sales, Inc.*,
　　357 N.E.2d 449 (Ill. 1976) ........................................................................15

*United States v. Burke*,
　　504 U.S. 229 (1992) ...................................................................................32

*Van Buren Charter Twp. v. Visteon Corp.*,
　　904 N.W.2d 192 (Mich. Ct. App. 2017) ....................................................20

*Wal-Mart Real Estate Bus. Tr. v. Eastwood, LLC*,
　　No. 13-cv-1348, 2014 WL 12637935 (Aug. 22, 2014) ..............................38

*Walker v. Underwood*,
　　No. 332129, 2017 WL 3925551 (Mich. Ct. App. Sept. 7, 2017) .........22, 24

*Wilkie v. Auto-Owners Ins. Co.*,
　　664 N.W.2d 776 (Mich. 2003) ...................................................................14

*Willett v. Charter Twp. of Waterford*,
　　718 N.W.2d 386 (Mich. Ct. App. 2006) ....................................................15

**Statutes**

MCL § 600.6013 ...............................................................................30, 31, 32, 33, 34

**Other Authorities**

Fed. R. Civ. P. 56 ...............................................................................10, 11

Fed. R. Evid. 702 ...............................................................................19

H. Legis. Analysis, H.B. 4448, 91st Leg., Reg. Sess. (Mich. 2002) ......................33

Restatement (Second) of Contracts § 253(2) (Am. Law. Inst. 1981).....................36

24 Williston on Contracts § 64:3 (4th ed. 2024).......................................................17

## <u>QUESTION PRESENTED</u>

Have Defendants carried their burden to establish that there is no genuine dispute as to any material fact such that they are entitled to judgment as a matter of law on the issues addressed in their motion?

Plaintiffs:    No.

Defendants: Yes.

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITY</u>

- Fed. R. Civ. P. 56

- *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432 (6th Cir. 1987)

- *Gongola v. Yaksich*, 143 N.W.2d 603 (Mich. Ct. App. 1966)

- *Short v. Hollingsworth*, 289 N.W. 158 (Mich. 1939)

- *Firwood Mfg. Co. v. Gen. Tire, Inc.*, 96 F.3d 163 (6th Cir. 1996)

## <u>COUNTERSTATEMENT OF MATERIAL FACTS</u>

### Response To Defendants' Statement Of Material Facts

¶¶ 1-14.  The Utilities do not dispute these statements, but submit that they are incomplete because they omit additional material facts, as set out below.

¶¶ 15-16.  These statements are incomplete because they do not include all relevant portions of the quoted provisions. (*See* Contract, ECF 217-2*, PageID.21104-105, 21107 (TR §§ 5.5, 5.9); *see also* Argument § I, below.)

¶¶ 17-23.  The Utilities do not dispute these statements, but submit that they are incomplete because they omit additional material facts, as set out below.

### Statement Of Additional Material Facts

**A.      The Ludington Plant.**

24.      The Michigan Utilities jointly own the Ludington Pumped Storage Plant, an essential part of Michigan's energy infrastructure. (Answer, ECF 17, PageID.366 (¶ 2); Walz Report, ECF 215-2, PageID.17335-337.)

25.      The Ludington Plant consists of six hydroelectric pump-turbines, each referred to as a "unit," that can each independently pump water and generate electricity. (ECF 17, PageID.369 (¶ 26).)

**B.      TAES's Promises Under The Contract.**

26.      In 2011, the Utilities and Toshiba International Corporation ("TIC") executed a contract (the "Contract") for a complete overhaul of the Plant. (*Id.* at PageID.371 (¶ 40).) TIC later assigned the Contract to Defendant Toshiba America

Energy Systems Corporation ("TAES"). (*Id.* (¶ 42).) Defendant Toshiba Corporation guaranteed TAES's performance under the Contract. (ECF 1-3, PageID.171-174.) (Defendants are collectively referred to herein as "Toshiba.")

27.     The Contract provided that TAES would "return the Plant to as nearly an as new condition as possible," and that each overhauled unit would be capable of operating with a "minimum thirty (30)-year service life" with "only minimal routine maintenance[.]" (ECF 217-2, PageID.21067, 21081-082 (TR §§ 1.0, 3.0).)

28.     The Contract contemplated that TAES would engineer, construct, or procure new components for the Plant, which would require significant changes to the Plant. (*E.g.*, *id.* at PageID.21073-074, 21081-082 (TR §§ 1.3, 3.0).) The Contract required TAES to use judgment and expertise in making changes to the Plant, including undertaking "an analysis of existing structures and/or systems . . . which may be impacted by the modification[s]" proposed by TAES, and demonstrating that any material it selected that did not "match[] what is adjoining and already in place . . . would better support the performance, longevity, and maintenance expectations stated [in the Contract]." (*Id.* at PageID.21083 (TR §§ 3.1.2, 3.1.4).)

29.     TAES warranted that its work would "be free from defects" and "conform to all of the terms, conditions and requirements" of the Contract for a specified period. (*Id.* at PageID.20950 (§ II.GC21(b)(ii), as amended by Contract

Change Order 9).) TAES further warranted that it would "ensure that all [] materials and equipment [supplied by TAES were] of suitable grade[.]" (*Id.* (§ II.GC21(b)(i)).)

30.     The Contract required TAES to make "at its own cost and expense any and all repairs or replacements" of defective work. (*Id.* at PageID.20951 (§ II.GC22(b)(i)).) The Contract further provided that "[a]ll defective work shall be promptly removed and replaced" by TAES at its own expense. (ECF 217-2, PageID.20945 (§ II.GC15(j)).) The Contract also required that Toshiba's work result in uniformity such that, if Toshiba modified any component in one unit, all such components would be similarly modified in all units. (*Id.* at PageID.21092 (TR § 3.10.6.1.).)

## C.     Toshiba's Defective Work.

31.     TAES's work was defective in multiple respects. (*E.g.*, Ex. A, Koster Decl. ¶¶ 5-12.) One defect involves components called the "discharge ring" ("DR") and "discharge ring extension" ("DRE"). (*Id.* ¶ 5.) The DR and DRE are large steel rings, about 72 feet in circumference, that comprise part of the water passage directing water through each unit. (*Id.*) They form a pressure boundary holding the water inside each unit. (*Id.*)

32.     Prior to the TAES overhaul, each Ludington unit had a DR made of carbon steel, but with a stainless-steel overlay to protect the carbon steel. (Tucker Report, ECF 209-4, PageID.13076-079.) TAES cut away portions of each DR and

attached an extension to each DR (the DRE) to lengthen the water pathway. (*Id.* at PageID.12994-996.) In performing that work, TAES removed the stainless-steel overlay on each DR. (*Id.* at PageID.13076-079; *see also* Ex. B (Toshiba's Scott Torvik: "It's difficult to explain in general refurbishment principles why no stainless overlay was applied[.]").)

33.     In fall 2019, during the warranty period, the Utilities performed an inspection of two Ludington units, Unit 2 and Unit 4, that had been overhauled by TAES. (Ex. A, Koster Decl. ¶ 6; Ex. C, Durand Decl. ¶ 5.) The Utilities identified damage on the DRs that appeared as eroded or degraded metal. (*Id.*; Exs. A-1; A-2.)

34.     The Utilities also identified cracks or crack-like marks (called "indications") on the DREs. (*E.g.*, Ex. A, Koster Decl. ¶ 11; Exs. A-3; A-4.) These flaws are classified as "defects" under the relevant technical code. (ECF 209-4, PageID.13089-099, 13104-126.) Subsequent analysis has shown that the metal TAES selected for the DREs is not suitable, and that TAES's construction methods placed the DREs under excessive stress. (*E.g.*, *id.* at PageID.13139-172; Ex. D, Lippold Report at 4-7, 12-13; Ex. E, McDonald Report at 4, 24-31.)

35.     The Utilities promptly notified TAES of these defects during the warranty period and asked TAES to remedy them. (*E.g.*, Ex. A, Koster Decl. ¶¶ 7-8, 11; Exs. A-1 to A-4.) The primary way the Utilities notified TAES of defective work was via a "nonconformance report" or "NCR." (Ex. A, Koster Decl. ¶ 7.) The

Utilities issued an NCR regarding the DR damage on Unit 4 on September 13, 2019, and regarding Unit 2 on October 11, 2019. (*Id.* ¶¶ 7-8; Ex. A-1, A-2.)

36.    The Utilities identified other defective work by TAES, including cracking on the DREs of other units, leaking shaft seals, and failing motor operated disconnect ("MOD") switches. (Ex. A., Koster Decl. ¶¶ 11-12.) The Utilities notified TAES about these defects during the warranty period and asked TAES to remedy them. (*E.g.*, *id.*; Exs. A-5; A-6.)

**D.    Toshiba Refuses To Repair Its Defective Work.**

37.    Throughout at least 2020 and 2021, the Utilities repeatedly asked TAES to repair or replace its defective work on the DRs/DREs and other defective components. (*E.g.*, Ex. A, Koster Decl. ¶ 14.)

38.    TAES did not agree. (*Id.*) For the DRs, TAES attempted a temporary repair by spraying a coating on the damaged metal—but TAES knew this would not work, and it did not. (Ex. F, Torvik Dep. 147:14-155:17; *see also* Ex. B at 2-3.) For the DREs, TAES attempted several temporary weld repairs, but cracks and indications continued to spread. (ECF 209-4, PageID.13104-126, 13160-163.) Toshiba offered no permanent repair or replacement for the other primary defective components. (Ex. A, Koster Decl. ¶ 14.)

39.    On July 30, 2021, after nearly two years of asking TAES for a plan to repair the defective work without a satisfactory response, the Utilities invoked the

Contract's dispute resolution process. (*Id.* ¶¶ 14-15; Ex. A-7 at 1, 3-6.) The parties had meetings and discussions in that 60-day process, and Toshiba gave assurances that a repair plan was on the way, but it never delivered one. (Ex. A, Koster Decl. ¶¶ 16-17; *see also, e.g.*, Exs. A-8; A-9.)

40.     TAES acknowledged in an October 14, 2021 letter that "the [d]ispute has not been resolved within the contractual 60-day dispute resolution period." (Ex. A, Koster Decl. ¶ 19; Ex. A-10 at 5.) Under the Contract, following the end of that period, either party "may avail itself of any process or means legally available to it to resolve the dispute." (ECF 217-2, PageID.20940 (§ II.GC9).)

41.     In December 2021, still with no repair plan from TAES, the Utilities made a demand under Toshiba Corporation's parent guaranty. (Ex. A, Koster Decl. ¶ 20; Ex. A-11.) Toshiba Corporation rejected the demand, stating that it "consider[ed] the Guaranty to be suspended." (Ex. A, Koster Decl. ¶ 21; Ex. A-12.)

42.     The Utilities continued to ask TAES to repair its defective work, including in letters dated November 4, 2021, January 13, 2022, March 8, 2022, and April 6, 2022, but TAES refused to provide any permanent repair. (Ex. A, Koster Decl. ¶¶ 22-23; Exs. A-13 at 3-5; A-14 at 3, 5-7; A-16 at 2, 4-6; A-15 at 4-5.)

43.     The Utilities filed their complaint on April 20, 2022. (ECF 1.)

**E.     The Damage Worsens And The Utilities Engage A New Contractor And Terminate The Contract For Cause.**

44.     The Utilities continued to demand that TAES repair its work, but TAES refused. (Ex. A, Koster Decl. ¶ 25.) For example, TAES refused to inspect the DR/DREs during a Plant outage in spring 2023, arguing that it was "not necessary." (*Id.*; Ex. A-17 at 2, 4, 6, 9-10.)

45.     The problems arising from TAES's defective work worsened. (*E.g.*, Ex. C, Durand Decl. ¶ 6.) For example, the Utilities observed worsening damage to the DR/DREs in Units 2 and 4 during periodic inspections. (*Id.* ¶¶ 6-9.)

46.     On April 14, 2023, the Utilities wrote to TAES, warning it that "its refusal to fulfill its obligation to promptly and fully address warranty and punch list items[] make[s] clear that TAES has repudiated" the Contract. (Ex. A, Koster Decl. ¶ 26; Ex. A-18 at 3.) The Utilities warned that they had "hired other contractors to begin addressing outstanding warranty and punch list items that TAES has failed to address." (Ex. A-18 at 3.)

47.     TAES responded on May 11, 2023. (Ex. A, Koster Decl. ¶ 27; Ex. A-19.) It provided no repair plan. (*Id.*) Instead, TAES "invite[d] the [Utilities] . . . to <u>litigate</u> these contested 'damages.'" (Ex. A-19 at 5 (emphasis in original).)

48.     The Utilities engaged another contractor, Voith Hydro, to assess TAES's defective work and develop a repair plan. (Ex. A, Koster Decl. ¶¶ 29-30.) The Utilities first engaged Voith Hydro in 2021 for the limited purpose of preparing

7

to take over TAES's work if TAES refused to complete the last unit to be overhauled. (*Id.* ¶ 28.) In the fall of 2023, the Utilities engaged Voith Hydro to investigate and develop a repair plan. (*Id.* ¶ 30.) Voith Hydro completed a plan, including substantial engineering work, in mid-2024. (*Id.* ¶¶ 30-32.) The Utilities paid Voith Hydro more than $3.6 million to develop that repair plan. (*Id.* ¶ 31.)

49.    On October 22, 2024, with still no repair plan from Toshiba, the Utilities wrote to TAES pursuant to GC7(b)(ii), which permits termination for default. (*Id.* ¶ 37; Ex. A-20.) In that letter, the Utilities identified several "Major Default[s]" supporting termination under GC7(b)(ii).  (Ex. A-20.)

50.    TAES responded on October 31, 2024, with a proposal for repairs to the DRs in Units 2 and 4, but no other components. (Ex. A, Koster Decl. ¶ 38; Ex. A-21.) TAES did not explain why it had waited nearly five years to make a repair proposal.  (*See* Ex. A-21.)

51.    The Utilities assessed TAES's proposal. (Ex. A, Koster Decl. ¶ 39.) They determined that the proposal did not cure TAES's defaults under GC7(b)(ii), for several reasons.  (*Id.*; Ex. A-22.) The proposal did not address several defective components at all. (Ex. A-22 at 3.) The proposal also relied on an untested "jacking-up" procedure that had never been attempted. (*Id.* at 3-5.) Toshiba's Mr. Torvik admitted in an internal email that the jacking-up procedure would be "first of a kind" work. (Ex. G at 2; Ex. F, Torvik Dep. 524:5-525:23, 529:7-530:1.) The Utilities

determined that the procedure could cause even more damage to the Plant and necessitate an even longer repair outage. (Ex. A-22 at 4; *see also* Crahan Suppl. Report, ECF 214-3, PageID.16895, 16898-902.)

52.     In a letter dated December 3, 2024, the Utilities described those reasons and several others showing that the proposal was unacceptable. (Ex. A-22.) That letter also confirmed that the Contract was terminated for Major Default. (*Id.* at 2.)

53.     In late 2024, the Utilities authorized Voith Hydro to commence work on the proposed repairs.  (Ex. A, Koster Decl. ¶ 33.)

**F.     The Present Status Of Units 2 And 4.**

54.     Every periodic inspection has found that the metal degradation on the Unit 2 and Unit 4 DRs has worsened. (Ex. C, Durand Decl. ¶ 7; Ex. A, Koster Decl. ¶ 9; ECF 209-4, PageID.13066-071; Tucker Suppl. Report, ECF 209-6, PageID.13244-245.) The pressure boundary created by the DR/DRE is 30 millimeters thick in some places. (ECF 209-4, PageID.13073.) The metal degradation has created holes in that pressure boundary that are 30 millimeters deep or greater—*i.e.*, the entire thickness of the boundary has been eroded in places. (*Id.* at PageID.13066-071; ECF 209-6, PageID.13244-245.)

55.     Substantial amounts of water are leaking from Unit 4. (Ex. C, Durand Decl. ¶ 8; Ex. A, Koster Decl. ¶ 10.) The volume of leaking water has increased as

the degradation to the DR/DRE pressure boundary has worsened. (Ex. C, Durand Decl. ¶¶ 7-8; Ex. A, Koster Decl. ¶¶ 9-10.)

56.     As a result of the worsening damage in Units 2 and 4, the Utilities have been required to limit their use of those units. (Ex. C, Durand Decl. ¶¶ 10-13.) In early 2023, both units were placed in a "last on, first off" status to limit their use. (*Id.* ¶ 10.) In 2025, both units were placed on a special status that limits their usage to approximately 50 hours per year. (*Id.* ¶¶ 12-13.) The Utilities thus cannot operate the Ludington Plant in the way contemplated under the Contract. (*See, e.g.*, ECF 217-2, PageID.21067, 21081-082 (TR §§ 1.0, 3.0).)

## Summary of Argument

Toshiba's motion depends on incomplete snippets of the Contract and the facts. Toshiba argues waivers based on provisions that contain *express anti-waiver clauses*. It argues exclusive remedies based on terms that *say they are not exclusive*. And it argues that it was not given a chance to "cure" its breaches without mentioning the many reasons the Utilities rejected the jacking-up proposal. Turning from snippets to the complete picture, as Rule 56(a) requires, leaves only one conclusion: this case must be tried. No amount of strained parsing can avoid the triable case that Toshiba performed defective work, failed to stand behind its obligations, and now must compensate the Utilities for the cost to make its broken promises right.

## Argument

Summary judgment is appropriate only where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role is "limited to determining whether sufficient evidence has been presented to make the issue a proper jury question." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987).

## I.   Summary Judgment Should Be Denied On Toshiba's Argument That UIA/UFA Waived Claims. (Toshiba Argument I)

In its Argument I, Toshiba contends that Contract provisions relating to "Unit Interim Acceptance" ("UIA") and "Unit Final Acceptance" ("UFA") waive claims related to TAES's defective work. (ECF 217, PageID.20880-881.) Specifically: "UIA and UFA conclusively resolve previously identified issues and prevent [the Utilities] from later seeking compensation for any defects or uncompleted work [previously] identified[.]" (*Id.* at PageID.20881.) But nothing in those provisions "resolve[s]" or "prevent[s]" any claims. In fact, they say the opposite.

Both the UIA and UFA provisions contain broad and unambiguous *anti-waiver* provisions that reject the very argument Toshiba makes here:

> [UIA and UFA] shall *in no way* relieve the Contractor of *any* obligations or liabilities that *have arisen or may thereafter arise* under or in connection with this Contract or the Work (whether in respect to the applicable Unit or otherwise), whether such obligations or liabilities are *then known or unknown, accrued or not yet accrued*, or deprive the [Utilities] of *any* right or remedy therefor.

11

(ECF 217-2, PageID.21104-105, 21107 (TR §§ 5.5 (UIA), 5.9 (UFA)) (emphases added).) It is hard to imagine a clearer statement that UIA and UFA *do not* waive or release "*any* right[s] or remed[ies]" of the Utilities or "*any* obligations or liabilities" of TAES. (*Id.*) "[T]he contract must be interpreted and enforced as written." *See* *Total Quality, Inc. v. Fewless*, 958 N.W.2d 294, 302 (Mich. Ct. App. 2020).

Toshiba nonetheless insists that "previously identified defects" (*i.e.*, defects discovered before UIA or UFA) are excluded from that broad anti-waiver language. (ECF 217, PageID.20882.) But the provision itself rejects any distinction based on when defects are identified. It preserves "*all*" claims based on TAES's "obligations" and "liabilities" both "*known and unknown*" and "*accrued and not yet accrued.*" (ECF 217-2, PageID.21104-105, 21107 (TR §§ 5.5 (UIA), § 5.9 (UFA)) (emphases added).) A breach of TAES's obligations (*i.e.*, defective work) discovered before UIA or UFA is thus simply a "*known*" liability of TAES, which is preserved.[1] (*Id.*)

Even if UIA or UFA could be understood to support a waiver in some circumstance (they cannot), fact issues would still preclude finding any such waiver here. The only specific claim Toshiba contends was waived relates to damage to the DRs in Units 2 and 4. (ECF 217, PageID.20882.) As reviewed, that damage was first

---

[1] "[L]iable" simply "means to be legally responsible." *In re Bradley Est.*, 835 N.W.2d 545, 555 (Mich. 2013) (citation and quotation marks omitted). TAES was "legally responsible" to perform non-defective work at all times. (*E.g.*, ECF 217-2, PageID.20921 (§ I.1) (TAES shall perform work "in a good, substantial, workmanlike and approved manner").)

discovered in September 2019, *after* UIA for those units. (Statement of Additional Material Facts ("SAMF") ¶¶ 33-34; *see also* ECF 217, PageID.20876 (¶ 17).) The DR damage was therefore not a "previously identified defect[]" at the time of UIA. Shortly thereafter (*i.e.*, on September 13, 2019 for Unit 4 and October 11, 2019 for Unit 2), the Utilities demanded in writing that TAES take "corrective action." (*Id.* ¶ 35; Exs. A-1; A-2.) At least then, TAES had an "obligation" and a "liability" to address the defect. Both units *later* achieved UFA in December 2019, but as the Contract provides, nothing about UFA *"*relieve[d] [TAES] of any obligations or liabilities that [had] arisen" prior to that date. (ECF 217-2, PageID.21107 (TR § 5.9).) And Toshiba's warranty obligations expressly extended "*after* the date of [UFA]." (ECF 1-1, PageID.141 (Change Order 9 ¶ 6) (emphasis added).) Toshiba's Argument I thus fails to establish that the Contract unambiguously supports Toshiba's position or an absence of factual disputes. It should be rejected.

## II.    Summary Judgment Should Be Denied On Toshiba's Argument That The General Warranty Does Not Cover Cavitation-Related Defects. (Toshiba Argument II)

Toshiba contends in its Argument II that the general warranty provision, GC21(b)(ii), "does not apply to cavitation damage" on the DRs. (ECF 217, PageID.20884.) Toshiba's selective parsing again contravenes the contractual terms.

Toshiba's argument rests on GC21(b)(iii), which is a specific warranty that applies only to the "*pump-turbine runner*" and "cavitation" affecting it. (ECF 217-

2, PageID.20950 (§ II.GC21(b)(iii)), emphasis added.) In contrast, the general warranty, GC21(b)(ii), applies broadly to *all* "defects" in TAES's work, without any restriction on the component or the problem. (*Id.* (§ II.GC21(b)(ii)).) Toshiba's theory is that the parties intended the narrower provision to limit the broader provision, but the parties foresaw that incorrect reading and *expressly agreed* they had no such intent. The very first words of GC21(b)(iii) provide: "*[w]ithout limiting the generality of* [TAES's] warranty as set forth in GC7(b)(ii) . . . ." (*Id.* (§ II.GC21(b)(iii)).) The parties thus agreed that nothing in the provision regarding *runner* cavitation may be interpreted to "limit[] the generality" of the general warranty. (*Id.*) Toshiba's argument can go no further, because the plain language explicitly disallows it. *E.g.*, [Wilkie v. Auto-Owners Ins. Co., 664 N.W.2d 776, 787 (Mich. 2003)](Wilkie v. Auto-Owners Ins. Co., 664 N.W.2d 776, 787 (Mich. 2003)) (courts "first look to a contract's plain language." (citation omitted)).

Even absent the "without limiting" language, Toshiba's argument would not fly. GC21(b)(ii) is unmistakably all-encompassing. It provides that "*all Work*" under the Contract shall be "free from defects," without limitation on the type of defect or component. (ECF 217-2, PageID.20950 (§ II.GC21(b)(ii)) (emphasis added).) "Work" is defined broadly to cover every aspect of TAES's performance, including "engineering," "design," "assembly," and more. (*Id.* at PageID.20921 (§ I.1).) The plain meaning of "defect" is likewise broad, encompassing deficiencies of every kind. Michigan courts have read "defect" broadly to mean "a fault or shortcoming;

14

imperfection" when interpreting the same term in statutes. *Willett v. Charter Twp. of Waterford*, 718 N.W.2d 386, 394 (Mich. Ct. App. 2006) (citation omitted).[2] And GC21(b)(ii) covers more than "defects." It also promised that TAES's work "shall conform . . . to *all* of the terms, conditions and requirements of this Contract." (ECF 217-2, PageID.20950 (emphasis added).) Those "requirements" included a 30-year service life and more. (*E.g.*, *id.* at PageID.21067, 21081-082 (TR §§ 1.0, 3.0).)

Against that unmistakable intent that GC21(b)(ii) sweep without limitation, Toshiba's theory is that the parties intended *implicitly* to carve out all defects related in any way to cavitation, simply because they included a separate provision regarding cavitation on the *runner*. But nothing in GC21 supports that reading. GC21(b)(iii) is a specialized provision that refers to *runner-specific* "parameters" like "efficiency and power output" that do not apply elsewhere—it says nothing about any other component. (*Id.* at PageID.21329-330.) Had the parties intended to write an exclusive warranty covering all cavitation-related issues anywhere in the Plant, they would have said so. Their choice not to include such an exclusive provision "cannot be rewritten by the Court." *Harbor Park Mkt., Inc. v. Gronda*, 743 N.W.2d 585, 588 (Mich. Ct. App. 2007).

---

[2] *See also* *Allison v. AEW Cap. Mgmt., L.L.P.*, 751 N.W.2d 8, 16 (Mich. 2008) (same definition). Another common definition of "defect" applied by courts is similarly broad: "unfit for the ordinary purposes for which [it is] used." *Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*, 995 S.W.2d 661, 665 (Tex. 1999); *see also* *Tweedy v. Wright Ford Sales, Inc.*, 357 N.E.2d 449, 451 (Ill. 1976).

Toshiba's reliance on IEC Standard 60609, which is referenced in the technical details of the runner provision, does not change that result. Section 1.1 of that standard makes clear that it does not apply to the type of damage observed on the DR/DREs: "This standard *does not cover* other effects which cavitation may possibly have on the machine such as: . . . *mechanical integrity*." (ECF 217-15, PageID.21866 (emphasis added).) In other words, while the standard may be relevant for the type of damage *to the runner* addressed by GC21(b)(iii), it expressly does not apply to the damage to the DR/DRE, which threatens the "integrity" of the pressure boundary, covered by GC21(b)(ii). Toshiba's Argument II fails for multiple other reasons.[3] It does not support summary judgment.

### III. Summary Judgment Should Be Denied On Toshiba's Theory That The Utilities Are Barred From Seeking Common Law Contract Damages. (Toshiba Arguments III-V)

In its Arguments III through V, Toshiba argues that the Contract contains exclusive remedies that limit the damages the Utilities may seek. These arguments mischaracterize the Utilities' damages and misinterpret the Contract.

---

[3] Toshiba and its experts argue that the damage to the DR/DRE is *not* caused primarily by cavitation. (*E.g.*, Marscher Report, ECF 208-7, PageID.12574-575.) If so, then any alleged limitation regarding cavitation would not apply. In addition, Toshiba never previously contended that cavitation damage is excluded from the general warranty, but instead considered the DR/DRE issues as a "warranty claim within the warranty period." (Ex. F, Torvik Dep. 280:19-21.) Thus, even if there was any ambiguity, Toshiba's own conduct disproves its new interpretation. *See, e.g.*, *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 459 (Mich. 2003) (interpreting contract by reference to defendant's pre-litigation conduct).

## A. The Utilities Are Entitled To Seek Common Law Contract Damages.

Toshiba's arguments rest on a fundamental misconception of the Utilities' damages and Michigan law. Toshiba argues that the Utilities' damages are "future" damages that are "conjectural, speculative, and dependent on future events" because the Utilities have not yet fully paid for a repair of Toshiba's defective work. (ECF 217, PageID.20890.) Under this mistaken theory, the Utilities are not damaged by TAES's breaches (*e.g.*, its defective work and failure to fix it) until they *pay someone else* to perform the job they already paid TAES more than $500 million to do.

That is not how contract damages work. "The object of awarding damages in cases of breach of contract is to award a *sum which is the equivalent of performance of the bargain*[,] to place the plaintiff in the position he would be in if the contract had been fulfilled." *Gongola v. Yaksich*, 143 N.W.2d 601, 603 (Mich. Ct. App. 1966) (emphasis added, internal quotations and citation omitted); *see also Tann v. Allied Van Lines, Inc.*, 146 N.W.2d 682, 684 (Mich. Ct. App. 1966) (applying same rule); 24 Williston on Contracts § 64:3 (4th ed. 2024) (contract damages are "the value to the promisee of the promise that was broken").

In cases concerning breaches of construction-related contracts, Michigan courts have applied those principles to calculate damages based on "*the cost necessary to repair the defects*." *Forton v. Laszar*, 609 N.W.2d 850, 854 (Mich. Ct. App. 2000) (emphasis added). That is, where a defendant promises to deliver defect-

free work, the "sum which is the equivalent to the performance of [that] bargain," *Gongola*, 143 N.W.2d at 603, is the amount required to make the work conform to the contract. For example, in *Forton*, the plaintiff alleged that a builder breached a contract to construct a home "in a good and workmanlike manner." 609 N.W.2d at 852. At trial, the plaintiff proved its damages by submitting an "estimate . . . reflect[ing] the cost necessary to repair" the defective work. *Id.* at 854. The court affirmed. *Id.*; *see also* *Dierickx v. Vulcan Indus.*, 158 N.W.2d 778, 783 (Mich. Ct. App. 1968) (damages for breach of warranty for leak-free basement are the "cost of furnishing plaintiff a dry basement" consistent with the warranty).

Under those principles, there is no requirement that a plaintiff must *first pay someone else* to perform before recovering damages for a breach. The plaintiff must only establish the *value* of the "promise that was broken," that is, "a sum of money that will place [it] in as good a position as he or she would have been in had the contract been performed." 24 Williston on Contracts § 64:3; *see also* *Gongola*, 143 N.W.2d at 603. That amount may be proven with an "*estimate* of the cost of repair." *Forton*, 609 N.W.2d at 852 (emphasis added); *see also* *Ambler v. Thompson*, No. 325042, 2016 WL 1243425, at *3 (Mich. Ct. App. Mar. 29, 2016) (damages may be shown by "*estimated*" cost of finishing job (emphasis added)).

Applying that framework here is straightforward. The Utilities have been damaged *now*, not in the future, by Toshiba's failure to uphold its promises to

(i) deliver non-defective and conforming work, and (ii) repair or replace its defective work. The Utilities paid Toshiba more than $500 million for those promises and did not get what they paid for. Their damages are therefore properly calculated as the "sum which is the equivalent of performance of the bargain," *Gongola*, 143 N.W.2d at 603 (quotation marks and citation omitted), which may be calculated by reference to "estimates of the cost" to repair or replace Toshiba's defective work. *Forton*, 609 N.W.2d at 852. The Utilities' damages expert, Mr. Emmert, has calculated that amount in a damages report based on the Voith Hydro repair estimate that Toshiba has not questioned under Rule 702. (*See* ECF 213-4.)[4]

The Utilities' damages are thus well grounded in law. Indeed, Toshiba identifies no alleged inaccuracy in the Utilities' estimation method; it only contends that the ultimate cost may "differ." (ECF 217, PageID.20890.) That is true of *all* estimates and no basis to preclude a claim. *E.g.*, *Edmund W. Waskin Dev. Co. v. Weyn*, 119 N.W.2d 662, 665 (Mich. 1963) (damage calculations are "sufficient if a reason[ed] basis of computation be employed"); *Bonelli v. Volkswagen of Am., Inc.*,

---

[4] Toshiba's cases concerning "advancement" under indemnity contracts are therefore off-point. *E.g.*, *Tangas v. Int'l House of Pancakes, LLC*, 779 F. App'x 317 (6th Cir. 2019). Whether an indemnitor must "advance" funds depends on the scope of the indemnitor's *duty* (*i.e.*, did it agree to advance), not a calculation of *damages* for breach. The Contract here is not for indemnity, and TAES has breached. Toshiba also relies on *Atlas Res., LLC v. McJunkin Redman Corp.*, No. 12-cv-41, 2013 WL 4786484 (W.D. Mich. Sept. 6, 2013), but the contract there contained an express *exclusive remedy* provision that limited damages, which is not true here, as discussed next. *See id.* at *6 (remedy "supercede[s] all other remedies").

421 N.W.2d 213, 226 (Mich. Ct. App. 1988) (where "fact of the damage" is shown,

"mere [alleged] uncertainty as to the amount will not preclude the right of recovery"

(citation omitted)).[5] Toshiba also speculates that the Utilities might not undertake

the repair (ECF 217, PageID.20890), but there is no such evidence, and, in all events,

the *repair* is not the damage.  The *estimated cost* of repairing Toshiba's work is the

"sum which is the equivalent of performance of the bargain." Gongola, 143 N.W.2d

at 603.[6] The record amply supports calculation of those damages here.

### B.   The Contract Does Not Waive Common Law Damages Remedies.

Trying to avoid all of that, Toshiba argues that the Contract *excludes* ordinary

contract damages. (ECF 217, PageID.20886-900.) The idea here is that because the

Contract contains some remedial provisions that contemplate TAES will

"reimburse" the Utilities for certain repairs (or similar), the Contract implicitly

---

[5] Toshiba argues that *Van Buren Charter Twp. v. Visteon Corp.*, 904 N.W.2d 192 (Mich. Ct. App. 2017) is "instructive," but that case supports the Utilities. There, the plaintiff failed to establish that the defendant had yet breached the contract and thus could not show any "actual injury." *Id.* at 202. Here, Toshiba *breached* the Contract and the Utilities have been injured. (*E.g.*, SAMF ¶¶ 31-36.) As *Van Buren* recognized, where the "*fact* of damages" is shown, the "certainty requirement" for calculating damages "is relaxed." 904 N.W.2d at 200 (emphasis added).

[6] Although unnecessary to decide here, the same remedy would apply even absent proof that a repair is going forward. *Newton v. Consolidated Const. Co.*, 150 N.W. 348, 351 (Mich. 1915) ("[P]laintiffs are entitled to the benefit of their bargain [for breached homebuilding contract], whether they do or do not build the house[.]").

*waives* the Utilities' rights to seek ordinary contract damages remedies. (*Id.* at PageID.20888.)[7] But Toshiba again ignores key terms of the Contract and the law.

To begin, Toshiba's argument faces difficult legal terrain. Under Michigan law, a remedial provision is read to *supplement* rather than *exclude* common law remedies unless "the language used" by the parties "indicate[s] an intent to provide an *exclusive* remedy." *Short v. Hollingsworth*, 289 N.W. 158, 159 (Mich. 1939) (emphasis added). Conversely, when "[t]here [is] no language in the [contract] stating that [the provision] is the exclusive remedy," common law rights are not excluded. *Muskegon Cent. Dispatch v. Tiburon, Inc.*, 462 F. App'x 517, 526 (6th Cir. 2012) (applying Michigan law).[8]

For example, in *Short*, the plaintiff sold stock to the defendants under an installment contract. 289 N.W. at 158-59. The contract contained a detailed remedial provision addressing a failure to pay an installment, including that the stock would be returned and the buyers would receive refunds. *Id.* When the buyers failed to pay an installment, the plaintiff sued for common law contract damages. *Id.* at 159. The buyers argued that the remedial provision excluded such a claim, but the Michigan

---

[7] Toshiba breaks this argument into three sections (Arguments III, IV, and V), one for each count against TAES, but each argument is effectively the same.

[8] *See also Gomba Music Inc. v. Avant*, 225 F. Supp. 3d 627, 647 (E.D. Mich. 2016) (rejecting exclusive remedy argument; proponent "pointed to nothing suggesting the parties intended this provision to be an exclusive remedy").

Supreme Court disagreed. It found that the remedial provision did not exclude common law damages, including because it was "made available [to the seller] in permissive language," not "mandatory language." *Id.*[9]

Toshiba falls well short of establishing an exclusive "reimbursement" remedy that precludes common law damages under those standards. Nothing in GC22(b)(ii), the primary provision Toshiba relies upon, states that reimbursement is the "*only*" or "*exclusive*" remedy for a breach. Quite the opposite, the parties expressly agreed that the remedy was provided "*without limiting any other rights or remedies*" that could be invoked by the Utilities. (ECF 217-2, PageID.20952 (§ II.GC22(b)(ii)) (emphasis added).) In fact, in *every* provision relied upon by Toshiba, the parties took pains to make clear that "reimbursement" and similar were *not exclusive*:

- **§ II.GC22(b)(ii):** right to "reimburse[ment]" is "***without limit***[] [to] any other rights or remedies." (*Id.* (emphasis added).)

- **§ II.GC10:** right to "backcharge[]" is "***without prejudice*** to any other of the [Utilities'] rights and remedies." (*Id.* at PageID.20940 (emphasis added).)

---

[9] Likewise, in *Lather v. School Dist. No. 1*, 219 N.W. 700 (Mich. 1928), the Michigan Supreme Court held that a remedial provision providing that one party "shall have the right" to terminate a contract and pay a portion of a fee was "optional" and "in no way waived [the party's] right" to common law remedies. *Id.* at 701; *see also Walker v. Underwood*, No. 332129, 2017 WL 3925551, at *3 (Mich. Ct. App. Sept. 7, 2017) ("[N]othing in this [remedy clause] . . . provides that the two options mentioned were the only or sole remedies available").

- **§ II.GC18(e)**: right to "charge[]" TAES is "in addition to and ***without limiting*** any other rights or remedies." (*Id.* at PageID.20949 (emphasis added).)

- **GR § 4.6**: right to "deduct" amounts is "***without limit[]*** [to] any other rights and/or remedies of the [Utilities] set forth in the Contract." (*Id.* at PageID.21033-034 (emphasis added).)

Though Toshiba ignores them, those terms are unambiguous and do not allow for any finding of an "intent to provide an exclusive remedy." *Short*, 289 N.W. at 159.

Moreover, as in *Short* and *Lather*, the remedial provisions Toshiba relies upon are explicitly *permissive*. For example, GC22(b)(ii) merely provides that the Utilities "*have the right*" to hire contractors to perform corrective work and obtain "reimburse[ment]" from Toshiba. (ECF 217-2, PageID.20952 (§ II.GC22(b)(ii)) (emphasis added).) In *Lather*, the Michigan Supreme Court interpreted the very same "shall have the right" phrasing to mean that the provision "was an optional one" that had no effect on common law remedies. 219 N.W. at 701; *see also Short*, 289 N.W. at 159 ("permissive language"). The other provisions Toshiba relies upon are likewise expressly "permissive" and nowhere purport to preclude other remedies.[10]

---

[10] ECF 217-2, PageID.20940 (§ II.GC10 (Utilities "*may*" perform repairs and "backcharge[]" Toshiba)); PageID.20949 (§ II.GC18(e) (Utilities "*have the right*" to complete work and "charge[]" Toshiba)); PageID.21033-034 (GR § 4.6 (Utilities "*may*" deduct amounts) (emphasis added)).

The Contract also leaves no doubt that the parties knew how to write an exclusive remedy provision if they chose. GC7(a)(ii) provides that certain compensation will be TAES's "*sole and exclusive compensation and remedy*" if the contract is terminated without cause. (ECF 217-2, PageID.20936 (§ II.GC7(a)(ii)) (emphasis added).) The parties' use of express "mandatory language" to describe that "sole and exclusive" remedy further confirms that they did not intend to displace common law remedies by implication. *See Short*, 289 N.W. at 159*; see also Walker, 2017 WL 3925551, at \*3* (parties could have provided "[n]o other remedies are permitted" if they intended an exclusive remedy).[11] Toshiba thus fails to identify any exclusive remedy that precludes common law damages.

### C. The Utilities Terminated The Contract For Default, Which Additionally Supports Common Law Damages.

Toshiba's exclusive remedy arguments fail for an independent reason: the Utilities terminated the Contract for "Major Default" in 2024. (SAMF ¶¶ 49-52.)

---

[11] Nor is it any answer to argue (as Toshiba may on reply) that the *warranties* in the Contract are exclusive. (*See* ECF 217-2, PageID.20950 (§ II.GC21(b)).) Warranties, even exclusive ones, "merely establish a specific contractual duty and corresponding right to rectify [certain] defects"; they do *not* establish "*exclusive remedies*" for breach. *See Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 796 (6th Cir. 2003) (emphasis added, applying Ohio law, collecting cases from multiple states). Likewise, here, the remedies in the Contract are not exclusive, as shown. Toshiba may also rely on *American Municipal Power, Inc. v. Voith Hydro, Inc.*, 636 F. Supp. 3d 838 (S.D. Ohio 2022), but the contract in that case contained a "*sole and exclusive remedy*" provision, which is the opposite of the Contract here. *Id.* at 848 & n.5 (emphasis added). That case thus cannot support finding an exclusive remedy here.

The Contract recognizes that the Utilities have multiple possible remedies following a termination for default, including that they may "exercise any other rights or remedies available to [them] at law or in equity (including *collecting damages* from [TAES])." (ECF 217-2, PageID.20938-939 (§ II.GC7(b)(iii)), top paragraph, emphasis added.) Thus, having terminated the Contract for default, there is no question the Utilities may seek common law damages for TAES's breaches. Toshiba ignores termination in its Arguments III-V. For that reason, and the others above, those arguments do not support summary judgment. At a minimum, Toshiba fails to establish that the Contract unambiguously supports its position.

## IV.   Summary Judgment Should Be Denied Regarding Toshiba's Arguments About The Contract's Limitation Of Liability. (Toshiba Argument VII)

In its Argument VII, Toshiba argues that the Contract's limitation of liability provision, GC28, caps TAES's liability at $559,190,561 and precludes statutory judgment interest. Neither argument supports summary judgment.

### A.   Toshiba's Gross Negligence Precludes Its Reliance On A Contractual Limitation Of Liability.

Toshiba's arguments fail at the outset because it is "well established" that a party "may not insulate himself against liability for gross negligence" by contract. *Lamp v. Reynolds*, 645 N.W.2d 311, 314 (Mich. Ct. App. 2002) (collecting cases). Gross negligence can be proven with evidence that the defendant failed to exercise "ordinary care and diligence to avert injury to another" where the result was "likely

to prove disastrous to another." *Taylor v. Mathews*, 198 N.W.2d 843, 851 (Mich. Ct. App. 1972). Whether conduct rises to that level is a fact issue. *Id.* at 852; *see also Smith v. Twp. of Prairieville*, 194 F. Supp. 3d 658, 675 (W.D. Mich. 2016).[12]

Here, there is at least a triable issue whether TAES's defective work stemmed from a failure to exercise ordinary care in circumstances where it should have known that a significant injury to the Utilities was likely. For example, the evidence shows that TAES's work departed from basic professional and industry standards, such as failing to analyze whether the modifications it made at Ludington would result in cavitation erosion of the DRs. (*See* Ex. H, Owens Report at 63 ("[a] prudent approach would have been to identify the risk of cavitation erosion in the seal passage and then take steps to address it.").) Hydroelectric engineering expert Marcus Crahan will testify that TAES deviated from industry engineering standards in multiple ways, including by removing the stainless steel overlay from the DRs. (*See* ECF 214-2, PageID.16841-845.) Structural engineer Dr. Brian McDonald will testify that TAES failed to perform industry-standard stress calculations when designing the DREs. (Ex. E, McDonald Report at 24, 28.) Reasonable jurors could

---

[12] *See also Kalitta Air, LLC v. United Air Lines, Inc.*, No. 07-14454, 2011 WL 8146, at *6 (E.D. Mich. Jan. 3, 2011) (whether defendant's failure to perform repairs constituted gross negligence was a fact issue that precluded summary judgment); *Richards v. City of Jackson, Mich.*, 788 F. App'x 324, 336-37 (6th Cir. 2019) (whether police officer's failure to follow professional standards constituted gross negligence was a fact issue precluding summary judgment).

thus conclude that TAES's work so far deviated from professional standards, in so many ways, that TAES was indifferent to the harm its work would cause. Summary judgment is therefore inappropriate on the application of GC28.

### B. The Terms Of GC28(a) Do Not Support Summary Judgment On Toshiba's Calculation Of The Limit Amount.

To the extent GC28's limit applies, Toshiba has miscalculated it. Toshiba argues "that GC28(a) caps TAES's maximum liability at $559,190,561 and on a per-Unit basis calculated according to the amount the [Utilities] *actually paid* TAES." (ECF 217, PageID.20903, emphasis added.) But that is not what GC28(a) says.

The main problem with Toshiba's reading concerns the treatment of $54 million in potential bonuses. The parties agreed in GC28(a), as amended in Change Order 9, that TAES's "maximum liability" would be calculated as "the Overall Total Fixed Price," plus "the *maximum bonus amounts for all units* that *may be payable*[.]" (ECF 1-1, PageID.142 (Change Order 9 ¶ 7) (emphasis added.)[13] Toshiba attempts to read that language to mean the parties only intended to include in the limit the bonuses *actually paid* to TAES, not the "*maximum*" possible bonuses, which total $54 million. (ECF 217, PageID.20902.) Toshiba thus removes $54

---

[13] The per-unit maximum liability (*i.e.*, the "Unit Liability Limit") is similarly calculated based on the sum of the "Unit Total Fixed Price" plus "the *maximum* bonus amount per unit that *may be payable* . . . ." (*Id.* (emphasis added.))

million from its calculation of the liability limit, because Toshiba was not paid those bonuses.

Toshiba's argument again founders on the plain text of the Contract. Toshiba conflates two different types of liability limitations: an *adjustable* limitation that is tied to the amount *actually paid*, which can change over the course of a contract; and a *fixed* limitation tied to a figure set in advance, like an overall anticipated contract value.[14] Here, the parties plainly chose the latter. They set the liability limit by reference to the total values established in the Contract, regardless of what might actually be paid—*i.e.*, the "Overall Total Fixed Price" and the "*maximum* bonus amounts that *may be payable*," neither of which were guaranteed to be paid. (ECF 1-1, PageID.142 (Change Order 9 ¶ 7) (emphasis added).) That choice made sense for a project of this nature. For example, TAES could have caused damage to the Plant that exceeded the value TAES had been paid at any given time.

If the parties had intended to create an adjustable limit based on payments to TAES, they simply would have said so—*i.e.*, "liability will be limited to the amount [the Utilities] have paid [TAES]." *See Barrett-O'Neill*, 171 F. Supp. 3d at 733.

---

[14] Example of an adjustable limit: "[Company's] liability will be limited to the amount that you have paid." *Barrett-O'Neill v. Lalo, LLC*, 171 F. Supp. 3d 725, 733 (S.D. Ohio 2016) (capitalization altered). Example of fixed limit: "liability [limited] to a refund of an amount equal to the aggregate of six monthly payments or the sum of $250, whichever is less[.]" *St. Paul Fire & Marine Ins. Co. v. Guardian Alarm Co. of Mich.*, 320 N.W.2d 244, 246 (Mich. Ct. App. 1982).

GC28(a) says no such thing. Toshiba nonetheless attempts to isolate the word "payable" in "maximum bonus amounts . . . that *may be payable*," to suggest that the parties only intended to include the value of bonuses that actually became "payable" and thus were paid. (ECF 217, PageID.20902.) But if that is what the parties meant, they simply would have referred to bonuses that "*became* payable," or "*were* paid," or similar. Further, Toshiba's reading ignores the parties' use of the word "*maximum*" in the same phrase, which makes clear that the parties were referencing an amount set in advance—*i.e.*, the *maximum* bonus—without regard to what was actually paid. Toshiba's interpretation would impermissibly treat the parties' phrasing as "surplusage." *Patel v. FisherBroyles, LLP*, 1 N.W.3d 308, 313 (Mich. Ct. App. 2022). At a minimum, GC28(a) does not unambiguously support Toshiba's reading, so summary judgment must be denied.

Toshiba similarly argues that the liability limit should not include the value of certain project change notices ("PCNs") that amount to $2,697,738 because TAES was not paid those sums. (ECF 217, PageID.20903.) However, in its counterclaim, TAES seeks payment for work it says it performed under those same PCNs. (ECF 17, ¶¶ 47-53.) TAES alleges that those amounts should have been included in "a Contract Change Order." (*Id.* ¶ 50.) If TAES prevails on that claim, the effective result will be an increase to the "Overall Fixed Price" and "Unit Total Fixed Price," which would increase the liability limits set out in GC28(a). (*See* ECF 1-1,

PageID.142 (Change Order 9 ¶ 7) ("Change Orders" are included in the limitations).)
There is thus no basis to exclude the PCN amount prior to trial.

### C.    GC28(b) Does Not Apply To Statutory Interest On A Judgment.

Summary judgment should also be denied on Toshiba's attempt to use GC28 to escape statutory judgment interest. By statute, a prevailing party in Michigan is entitled to interest on a judgment accrued from the date the complaint was filed. Mich. Comp. Laws §§ 600.6013(1), (8).[15] The purpose of interest under Section 600.6013 is to compensate the prevailing party for delay in recovery and "to offset the costs of bringing the action and to provide an incentive for prompt settlement." *Perceptron, Inc. v. Sensor Adaptive Machs., Inc.*, 221 F.3d 913, 923 (6th Cir. 2000). Statutory judgment interest is "mandatory." *Osinski v. Yowell*, 354 N.W.2d 318, 322 (Mich. Ct. App. 1984).[16] The "statute is remedial in nature and is to be construed liberally in favor of the prevailing party." *Perceptron*, 221 F.3d at 923.

Toshiba's attempt to avoid Section 600.6013 hinges on GC28(b), which expressly addresses only "Liability for *Consequential Damages*." (ECF 217-2, PageID.20956 (§ II.G28(b)) (emphasis added).) The provision bars recovery for various forms of consequential damages, including for "service interruption,"

---

[15] Section 600.6013 applies in a federal diversity jurisdiction case. *Hillman Power Co., LLC v. On-Site Equip. Maint., Inc.*, 685 F. Supp. 3d 528, 539 (E.D. Mich. 2023).
[16] *See also Perceptron*, 221 F.3d at 922 (6th Cir. 2000) ("In Michigan, prejudgment interest is not discretionary[.]").

"claims of customers," and any "special, incidental, exemplary or *other consequential loss or damage*." (*Id.* (emphasis added).)[17] Among that list, GC28(b) includes consequential damages related to the "cost of money" and "loss of capital." (*Id.*) Toshiba seizes upon those terms to argue that, by waiving *consequential damages* related to the "cost of money" or "loss of capital," the Utilities also waived their statutory right to judgment interest under Section 600.6013. (ECF 217, PageID.20904.) Toshiba is wrong.

Interest under Section 600.6013 is not "consequential damage," and therefore is not precluded by GC28(b), full stop. The Sixth Circuit has twice held that interest under Section 600.6013 is not consequential damages. In *Firwood Manufacturing Company v. General Tire, Inc.*, 96 F.3d 163 (6th Cir. 1996), the Sixth Circuit held that the plaintiff was prohibited from recovering "consequential damages" because of a provision of the Uniform Commercial Code. *Id.* at 169-71. Nonetheless, the Sixth Circuit affirmed the plaintiff's recovery of interest under Section 600.6013, holding that "statutory and mandatory" interest under that provision is *not* a form of "interest allowed *as damages*." *Id.* at 173 (emphasis added, citation omitted).

---

[17] Toshiba acknowledges that GC28(b) covers "'consequential' damages." (ECF 217, PageID.20904.) The principle of *noscitur a sociis* (*i.e.*, "words grouped in a list should be given related meaning") leaves no doubt about that limited scope. *Honigman Miller Schwartz & Cohn LLP v. City of Detroit*, 952 N.W.2d 358, 376 n.32 (Mich. 2020) (citation omitted).

Similarly, in *City of Sterling Heights, Michigan v. United National Insurance Company*, 319 F. App'x 357, 364 (6th Cir. 2009), the Sixth Circuit considered a judgment that awarded a plaintiff *both* consequential damages based on the costs of taking on debt to cover money owed by the defendant *and* statutory interest under Section 600.6013. The defendant argued on appeal that the judgment represented a "double recovery," but the Sixth Circuit disagreed. It held that "[c]onsequential damages and prejudgment interest compensate plaintiffs *for different forms of loss*." *Id.* at 364 (emphasis added). Unlike consequential damages, interest under Section 600.6013 is intended to "encourag[e] settlement," among other purposes. *Id.*

Applied here, those cases instruct that interest under Section 600.6013 is not consequential damages and therefore not barred by GC28(b), which precludes only consequential damages, including those related to "cost of money" and "loss of capital." (ECF 217-2, PageID.20956 (§ II.G28(b)).) Such consequential damages could include, for example, the cost of a loan needed to finance repairs to TAES's work,[18] or higher borrowing costs because of financial problems caused by TAES.[19] Those consequential damages are not the same as *judgment interest* under Section 600.6013. *E.g.*, *Firwood*, 96 F.3d at 170.

---

[18] *E.g.*, *Stamtec, Inc. v. Anson Stamping Co.*, 346 F.3d 651, 659 (6th Cir. 2003) ("interest paid to a third party" is consequential damage).

[19] *E.g.*, *United States v. Burke*, 504 U.S. 229, 239 (1992) (harm to "credit rating" is consequential damage).

Toshiba does not identify *a single case* finding a contractual waiver of Section 600.6013 interest, much less one finding that such interest is consequential damages. The closest it comes is *Bobchick v. Grange Insurance Company of Michigan*, No. 19-12467, 2021 WL 927370, at *3 (E.D. Mich. Mar. 11, 2021), but the contract in that case expressly addressed "pre-judgment interest" (not consequential damages), and, even then, the Court *denied* summary judgment because the provision was unclear. GC28(b) does not address prejudgment interest at all. Toshiba also argues that Section 600.6013 was amended in 2001 to make it "permissive rather than mandatory" (ECF 217, PageID.20903-904), but the case it cites does not say that.[20] Courts applying Michigan law continue to understand Section 600.6013 as "mandatory."[21] Toshiba thus fails to establish that GC28(b) waives Section

---

[20] *Transportation Insurance Company v. Citizens Insurance Company of America*, 574 F. App'x 607, 613 (6th Cir. 2014) noted that the statutory language was changed from "interest shall be allowed" to "interest is allowed," and suggested this means the statute is "less mandatory" than before. *Id.* at 613. Whatever the meaning of "less mandatory," the court overread the significance of that change. The Legislature amended the statute to change the interest rate applicable to insurance cases. *See generally* H. Legis. Analysis, H.B. 4448, 91st Leg., Reg. Sess. (Mich. 2002). In that process, it modernized other language, including replacing "shall be allowed" with "is allowed." *See* Mich. Comp. Laws § 600.6013. Nothing in that history suggests this was intended to make the statute "less mandatory."

[21] *Centria Home Rehab., LLC v. Allstate Ins. Co.*, No. 365313, 2024 WL 4820775, at *4 (Mich. Ct. App. Nov. 18, 2024) ("Interest under MCL 600.6013 is mandatory"); *Hillman*, 685 F. Supp. 3d at 539 (plaintiff "is entitled to prejudgment interest" pursuant to Section 600.6013).

600.6013(1) interest. At a minimum, Toshiba fails to establish that the unambiguous terms support its position. Argument VII does not support summary judgment.

## V.   Fact Issues Preclude Summary Judgment On Toshiba's Argument Regarding Termination For Default. (Toshiba Argument VIII)

In its Argument VIII, Toshiba does not dispute that the Contract has been terminated, but argues that termination was "for convenience" rather than "for cause." (*See* ECF 217, PageID.20912.) The thrust is that the Utilities supposedly did not provide TAES an opportunity to cure its breaches. But Toshiba again ignores the parts of the record and the Contract that contradict its theory.

The Contract required only two things from the Utilities to terminate for default. <u>First</u>, if the Utilities "intend[ed] to terminate [the] Contract for a Major Default," they had to provide "written notice of such Major Default" to TAES. (ECF 217-2, PageID.20938 (§ II.GC7(b)(ii)).) TAES could respond by "commenc[ing] implementation of *all necessary corrective action* to cure such Major Default within ten (10) days," and by "implement[ing] a recovery plan *acceptable to [the Utilities]* . . . to cure such Major Default within thirty (30) days." (*Id.* (emphasis added).) <u>Second</u>, if TAES failed to "commence implementation of *reasonable corrective action*" or "d[id] not thereafter *diligently and continuously* pursue corrective actions to cure such Major Default and in fact cure such Major Default" in the required timeframes, the Utilities could "terminate [the] Contract by written notice[.]" (*Id.* (emphasis added).)

The Utilities did exactly that. On October 22, 2024, they provided TAES with a notice invoking "GC7(b)(ii) of Section II of the Contract." (SAMF ¶ 49; Ex. A-20.) In that notice, the Utilities identified multiple "Major Default[s]" under GC7(b)(i), including defective work in connection with the DRs, DREs, shaft seals, MOD switches, and other components. (*Id.*) The Utilities also referred to the "voluminous technical detail" regarding those defects previously shared with TAES via NCRs. (Ex. A-20.) The notice thus contained everything required by GC7(b)(ii).

Toshiba responded on October 31, 2024, with its jacking-up proposal. (SAMF ¶ 50.) The Utilities promptly analyzed the proposal, including the technical and engineering aspects, and determined that it was unacceptable and did not meet the requirements of GC7(b)(ii). The Utilities explained those deficiencies in a detailed letter dated December 3, 2024. (*Id.* ¶¶ 51-52.) Among other problems, TAES's purported plan would not "fully repair even one defect," "ignore[ed]" multiple defective components, and relied on the untested jacking-up approach and other methods that risked inflicting even more damage. (Ex. A-22.) The Utilities then "confirm[ed]" that "the Contract is terminated pursuant to Contract Section II, GC7(b)." (*Id.*)

The Contract required nothing more. Toshiba nonetheless makes three arguments attempting to suggest that the termination was defective, but none supports summary judgment.

<u>First</u>, Toshiba focuses on portions of the Utilities' letters stating that the Utilities "[did] not agree that TAES is entitled to 'cure' its multiple [m]ajor [d]efaults," and similar. (Exs. A-20; A-22.) As the Utilities explained in those letters (and in prior letters), TAES had "repudiated and abandoned [its] remaining obligations under the Contract," which would forfeit any right to cure. (*Id*.; *see also* SAMF ¶ 46.) Repudiation is a fact issue for trial.[22] But even putting that aside, nothing in those comments deprived TAES of a contractual right. In both the October 22 and December 3 letters, the Utilities noted TAES's repudiation and then, "for the avoidance of doubt," provided everything required by GC7(b)(ii). (*Id*.) Toshiba simply ignores everything that follows "for the avoidance of doubt," which is *most* of the substance of each letter. And Toshiba does not quarrel with that substance: it does not argue that the October 22 letter failed to provide notice of Major Defaults; it does not dispute the December 3 letter's reasons for rejecting TAES's purported plan; and it cannot deny that the December 3 letter plainly told TAES that "the Contract is terminated pursuant to Contract Section II, GC7(b)." (Ex. A-22.) Any argument otherwise would represent, at most, a fact issue for trial.

---

[22] A contractual repudiation "discharges the other party's remaining duties to render performance." Restatement (Second) of Contracts § 253(2) (Am. Law. Inst. 1981). Whether a party "unequivocally declared [its] intent not to perform the contract [is] a question of fact for the jury[.]" *Kuhens v. B & R Oil Co.*, No. 209871, 1999 WL 33409917, at *2 (Mich. Ct. App. Nov. 30, 1999).

Second, Toshiba purports to know the Utilities' minds, arguing that their "election to terminate the Contract had been made as of [their] *initial* letter sent on October 22, 2024." (ECF 217, PageID.20908 (emphasis in original).) This argument is misguided, because the very premise of an initial notice under GC7(b)(ii) is that the Utilities "*intend*[] to terminate [the] Contract for a Major Default." (ECF 217-2, PageID.20938 (§ II.GC7(b)(ii)) (emphasis added).) But in all events, there is no evidence (much less undisputed evidence) that the Utilities' December 3 reasons for rejecting TAES's proposal were pretextual. Indeed, Toshiba's only supposed "proof" is its tortured reading of the last paragraph of the Utilities' December 3 letter, in which the Utilities "again confirm[ed] that the Contract is terminated." (Ex. A-22.) Toshiba tries to contort that phrase to mean that the "first" confirmation occurred in the October 22 letter. But in fact, the phrase "again confirms" in the December 3 letter merely refers to the confirmation of termination that appears on *the first page* of the same December 3 letter. (Ex. A-22 at 1.)[23]

Third, Toshiba suggests that the Utilities were required to invoke the GC7(b)(ii) process before filing this lawsuit in 2022. (ECF 217, PageID.20910-911.) But Toshiba has never before argued—including in its motion to dismiss (ECF 15)— that the Utilities failed to take any required pre-litigation step. That is because

---

[23] Moreover, any questions of state of mind are classic trial issues. *E.g.*, *Cummings v. Klee*, 410 F. Supp. 3d 837, 846 (E.D. Mich. 2019) ("[h]ow [party's] statements pertained to her state of mind is a fact question").

nothing in GC7(b)(ii) states a condition precedent to filing a lawsuit. The Contract

is clear that the *only* prerequisite to suit is the GC9 dispute resolution process. (ECF

217-2, PageID.20940 (§ II.GC9).) After that process is exhausted, "either party may

avail itself of *any process or means legally available to it* to resolve the dispute."

(*Id.* (emphasis added).) Here, prior to the suit, the parties *agreed* they had exhausted

the GC9 process. (SAMF ¶¶ 39-40.) Then *both parties* filed claims. (ECF 1, 17.)

This case is thus entirely unlike cases cited by Toshiba, in which a party failed to

engage in a mandatory pre-suit process.[24] Nor does Michigan law require parties to

terminate their contracts before filing a suit; the cases Toshiba relies on concerned

parties that made claims explicitly *based on a termination*, but failed to follow the

steps to terminate before suit.[25] Here, in contrast, the Utilities followed the

Contract's pre-suit procedure, provided TAES with *years* of notice regarding its

breaches, and warned Toshiba at every step that they would assert their legal rights

---

[24] *E.g.*, *Chrysler Realty Co. v. Design F. Architects, Inc.*, 544 F. Supp. 2d 609, 611-
12 (E.D. Mich. 2008) (contract required pre-suit process as a "condition precedent"
to suit; plaintiff did not follow it); *Wal-Mart Real Estate Bus. Tr. v. Eastwood, LLC*,
No. 13-cv-1348, 2014 WL 12637935, at *5 (Aug. 22, 2014) (contract required notice
period before party could "act on [a] breach"; plaintiff did not provide notice).

[25] In *American Seating Co. v. Transportation Seating, Inc.*, 220 F. Supp. 2d 845
(E.D. Mich. 2002), the plaintiff sought a declaratory judgment that its termination
was "proper and effective," but it had not provided any notice of breach before filing
suit. *Id.* at 847-48. In *Convergent Group Corp. v. County of Kent*, 266 F. Supp. 2d
647 (E.D. Mich. 2008), the plaintiff's claim was premised on a "termination for
cause" but the plaintiff had not followed the termination procedures. *Id.* at 655, 657.

without a repair. (SAMF ¶¶ 35-46.) Toshiba identifies no case with similar facts.

Toshiba's Argument VII does not support summary judgment.

## VI. Toshiba's Argument Regarding The Parent Guaranty Does Not Support Summary Judgment. (Toshiba Argument VI)

Finally, Toshiba includes in its motion a one-paragraph Argument VI stating

that it is "entitled to judgment" that the limitations of liability contained in the

Contract "correspondingly limit [Toshiba Corporation's] liability under the Parent

Guaranty." (ECF 217, PageID.20900.) This stub of an argument does not support

any meaningful judgment and thus should be denied.[26] It is correct that the Parent

Guaranty contains a statement that it is "subject to any limitations contained in the

Contract on [TAES]'s obligations thereunder." (ECF 1-3, PageID.171.) But a

judgment that the Parent Guaranty contains those words would decide nothing. The

real issue will be the *application* of those terms (and others) to *specific damages

issues* not yet presented. Toshiba's motion identifies no such issue to decide.

As an example, the Guaranty sets out obligations for Toshiba Corporation that

have no "corresponding" obligation for TAES, like the obligation to pay the

---

[26] *E.g.*, *Adamczyk v. Sch. Dist. of City of Hamtramck Pub. Schs.*, 667 F. Supp. 3d 534, 553 (E.D. Mich. 2023) ("two-sentence, conclusory" summary judgment argument denied because "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (citation omitted)); *Sec. & Exch. Comm'n v. Montano*, No. 6:18-CV-1606, 2020 WL 5887648, at *6 (M.D. Fla. Oct. 5, 2020) ("[P]artial summary judgment [that] does not advance the ultimate resolution of a case . . . may be denied on that basis[.]").

Utilities' "expenses and attorney fees" in this litigation. (*Id.* (¶ 2).) The TAES limitation of liability in GC28 does not limit Toshiba Corporation's *independent* obligation to pay litigation expenses in this matter. As the litigation expenses issue has been bifurcated (ECF 171), that issue can be taken up after the primary trial. The parties likely will have other disputes regarding the application of any limitations on the Parent Guaranty.[27] Toshiba's requested judgment does not support a decision on any such substantive issue, and thus should be denied.

## <u>Conclusion</u>

This case must be tried. The Michigan Utilities respectfully request that the Court deny Toshiba's motion for summary judgment.

CONSUMERS ENERGY COMPANY
and DTE ELECTRIC COMPANY

Dated: April 17, 2025

By:  /s/ *Terri L. Mascherin*
     One of Their Attorneys

Terri L. Mascherin
tmascherin@jenner.com
Daniel J. Weiss
dweiss@jenner.com
Christopher Tompkins
ctompkins@jenner.com
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654

Patrick G. Seyferth
seyferth@bsplaw.com
Derek J. Linkous
linkous@bsplaw.com
BUSH SEYFERTH PLLC
100 West Big Beaver Road
Suite 400
Troy, Michigan 48084
(242) 822-7800

---

[27] For example, the fact that *separate* damages limits apply to TAES and Toshiba Corporation under the respective agreements.

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on April 17, 2025, I caused a true and correct copy of the foregoing *Plaintiffs' Brief In Opposition To Defendants' Motion For Summary Judgement (ECF No. 217)* to be electronically filed with the Clerk of the Court using the CM/ECF system, which will then send a Notice of Electronic Filing to all counsel of record.

/s/ *Terri L. Mascherin*
Attorney for Plaintiffs
