UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSUMERS ENERGY CO. and
DTE ELECTRIC CO.,

      Plaintiffs,

                                   Case No. 22-10847

v.

                                   Hon. F. Kay Behm

TOSHIBA AMERICA ENERGY
SYSTEMS CORP. and
TOSHIBA CORP.,

      Defendants.
_____/

**OPINION AND ORDER REGARDING
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

## I.    Procedural History

Before the court is Defendants' motion for summary judgment, which has been fully briefed. The court heard oral argument on June 11, 2025, and took the matter under advisement. The court also permitted the parties to file supplemental briefs. Having reviewed the parties' submissions, the court finds that Defendants' motion is properly denied.

## II.    Factual Background

This breach of contract action arises from repairs made to the Ludington Pumped Storage Plant, which is a hydroelectric plant consisting

of six pump-turbines. The plant is owned by DTE Electric Company and Consumers Energy Company ("Utilities" or "Owner"). They contracted with Toshiba Energy Systems Corporation ("TAES") in 2010 to overhaul the plant ("Contract"). TAES's parent company, Toshiba Corporation, provided a guaranty with respect to the Contract. The Contract provides that TAES would "return the Plant to as nearly an as new condition as possible" and allow the plant to operate with a "minimum thirty (30)-year service life" with "only minimal routine maintenance." ECF No. 217-2 at PageID.21067, 21081-82.

Plaintiffs allege that TAES's work is defective in multiple respects. One defect involves "discharge rings" and "discharge ring extensions" ("DREs"), which are large steel rings that comprise part of the water passage directing water through each unit. They form a pressure boundary holding the water inside each unit. In particular, Plaintiffs allege that TAES removed, and did not replace, a stainless-steel overlay for the discharge rings, which protected the carbon steel material. Plaintiffs also allege that the metal TAES selected for the DREs is not suitable and that TAES's construction methods placed the DREs under excessive stress, causing cracks. According to Plaintiffs, they notified TAES of this defective work with respect to Units 2 and 4 in 2019. They also allege that DREs in other Units

2

experienced cracking, leaking shaft seals, and failing motor operated disconnect ("MOD") switches. Plaintiffs asked TAES to remedy these defects, but TAES did not do so. According to Plaintiffs, TAES attempted temporary repairs that did not fix the problems. Plaintiffs contend that they continued to ask TAES to repair its defective work several times in 2021 and 2022, to no avail.

Plaintiffs allege that the problems arising from TAES's defective work have worsened since they filed this action in 2022. They have contracted with Voith Hydro to assess TAES's work and develop a repair plan. Plaintiffs contend that the damage to Units 2 and 4 is such that they have been required to significantly limit the use of those units; in 2025 their use is limited to approximately 50 hours per year.

Defendants seek summary judgment on a variety of issues, as outlined below.

## III.   Analysis

### A.   Summary Judgment Standard

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely

disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and to do so must "designate specific facts in affidavits, depositions, or other factual material

4

showing 'evidence on which the jury could reasonably find for the [non-moving party].'" *Brown v. Scott*, 329 F. Supp.2d 905, 910 (E.D. Mich. 2004). To fulfill this burden, the non-moving party only needs to demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251. The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### B.   Contract Principles and Analysis

The parties agree that Michigan law applies to their claims. The elements of a breach of contract claim are as follows: "(1) the existence of a contract between the parties, (2) the terms of the contract require performance of certain actions, (3) a party breached the contract, and (4) the breach caused the other party injury." *Burton v. William Beaumont Hosp.*, 373 F. Supp.2d 707, 718 (E.D. Mich. 2005) (citation omitted). "The primary goal of contract construction is to give effect to the parties' intent."

5

*Total Quality, Inc. v. Fewless*, 332 Mich. App. 681, 694, 958 N.W.2d 294, 302-303 (2020) (citation omitted). The court reads the contract language in light of its plain and ordinary meaning. *Id.* When the language of the contract is unambiguous, the court enforces it as written. *Id.*; *Quality Prod. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375, 666 N.W.2d 251, 259 (2003). "When the contract language is subject to multiple interpretations, it is considered ambiguous. Ambiguities in a contract generally raise questions of fact for the jury; however, if a contract must be construed according to its terms alone, it is the court's duty to interpret the language." *Total Quality*, 332 Mich. App. at 302-303 (citations omitted). Summary judgment is not proper "if the words in a contract are equally susceptible to at least two reasonable interpretations." *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 314 (6th Cir. 2010) (applying Michigan law).

### 1. Whether Unit Interim Acceptance or Unit Final Acceptance forecloses Plaintiffs from bringing claims for defects or uncompleted work that were discovered prior to UIA or UFA.

The Contract sets forth a process for the Utilities to inspect and accept TAES's work on the project, referred to as "Unit Interim Acceptance," or UIA, and "Unit Final Acceptance," or UFA. ECF No. 1-1 at PageID.82 (§ GC18(d), (e)). As part of that process, the Utilities were to

"perform an inspection of the Work performed to determine if the Work has been completed in accordance with this Contract." *Id.* After "pre-operational testing," if the Utilities find "the Work to have been completed in accordance with this Contract, the Owner will advise the Contractor in writing of its acceptance thereof through issuance of the Unit Interim Acceptance." *Id.* Following UIA, the utilities conduct additional testing and "[i]f the Owner, following said Unit testing, finds the Work to have been completed in accordance with this Contract" the Owner will issue Unit Final Acceptance. *Id.*; *see also* ECF No. 217-2 at PageID. 21105, 21107 (Technical Requirements, §§ 5.5, 5.9).

Defendants allege that UIA and UFA "conclusively resolve previously identified issues and prevent Plaintiffs from later seeking compensation for any defects or uncompleted work identified during the extensive inspection and testing procedure." ECF No. 217 at PageID.20881. The Contract provides that the inspection and testing procedures shall be repeated until Plaintiffs determine "that the Work has been completed in accordance with the Contract" and issue the UIA or UFA certificates. ECF No. 1-1, PageID.82 (Contract at GC18(d), (e)).

However, as Plaintiffs point out, the provisions in the contract related to the UIA or UFA certificates do not expressly preclude Plaintiffs from

7

alleging a breach of contract or warranty for defects discovered prior to the
issuance of the UIA or UFAs. *Id.* Rather, these sections contain anti-waiver
provisions:

> [UIA and UFA] shall in no way relieve the Contractor of any
> obligations or liabilities that have arisen or may thereafter
> arise under or in connection with this Contract or the Work
> (whether in respect to the applicable Unit or otherwise),
> whether such obligations or liabilities are then known or
> unknown, accrued or not yet accrued, or deprive the
> [Utilities] of any right or remedy therefor.

ECF No. 217-2 at PageID.21104-21105, 21107. Defendants respond that
"obligations or liabilities" do not include previously identified defects or
uncompleted work, which would be "extinguished" by UIA or UFA. But the
Contract does not define "obligations and liabilities" or state that these
terms exclude previously identified defects. Nor does it say that the
Owner's granting of UIA or UFA extinguishes prior claims. Instead, it
broadly provides that UIA or UFA "*shall in no way* relieve the Contractor of
*any obligations or liabilities* that have arisen . . . in connection with . . . the
Work," whether they are "known" or "accrued" or not. *Id.* (emphasis added).

Defendants argue that there are legal consequences to Plaintiff's
acceptance of its work and Plaintiff's interpretation would render the
UIA/UFA process meaningless. In other words, Defendants suggest that
the anti-waiver provisions cannot mean what they say. At most, however,

8

their argument suggests an ambiguity rather than weighing in favor of summary judgment. Nevertheless, the language of these provisions is not ambiguous, nor does it necessarily conflict with the UIA/UFA scheme. The plain language of the agreement indicates that the parties did not intend acceptance in the form of UIA or UFA to "relieve [Toshiba] of any obligations or liabilities . . . or deprive the [Utilities] of any right or remedy therefor." ECF No. 217-2 at PageID.21104-21105, 21107. The contract does not unambiguously preclude Plaintiff's claims for defects identified prior to the issuance of UIA or UFA; rather, the anti-waiver provisions expressly provide otherwise. Defendants' motion is denied as to this issue.

### 2.    Whether the General Warranty covers cavitation-related defects.

Defendants argue that the contractual warranty does not cover cavitation damage to the discharge rings. Cavitation pitting is a type of erosion that occurs when metal is exposed to water, and a certain amount is tolerated or expected in hydraulic pump-turbines. *See* ECF No. 217-15. The Contract contains a general warranty provision (GC21) that represents "all Work hereunder associated with each Unit . . . be free of defects for a period of five (5) years and one hundred eighty-three days from and after the date of Unit Final Acceptance for the applicable Unit." ECF No. 1-1 at

PageID.84 (GC21(b)(ii)). The next paragraph provides a specific, shorter "cavitation warranty," applicable to the pump-turbine runners only:

> *Without limiting the generality of the Contractor's warranty as set forth in GC7(b)(ii) [GC21],* the Contractor warrants that *the pump-turbine runner* for each Unit will not show cavitation in excess of the limits and parameters set forth in [the "Cavitation Warranty"].

ECF No. 1-1 at PageID.84 (GC21(b)(iii)) (emphasis added). The warranty refers to a Design Data Sheet, which provides that the "pump-turbine runner shall be designed such that cavitation damage shall be kept to a minimum. Cavitation damage, if it occurs, shall be in an area or a magnitude that will not reduce efficiency or power output and will not weaken the pump-turbine runner."

The Cavitation Warranty, which expressly covers the pump-turbine runner, also contains language that it does not "limit[] the generality of the Contractor's warranty," which covers "all Work." ECF No. 1-1 at PageID.84. The General Warranty does not contain any express limitations, and broadly provides that "all Work . . . shall conform to all of the terms, conditions, and requirements of this Contract, and be free from defects" during the warranty period. ECF No. 1-1 at PageID.84. The Contract does not expressly exclude cavitation damage from warranty coverage.

10

Nonetheless, Defendants contend that the parties intended that only the pump-turbine runners, and no other components, would be warranted for cavitation damage. According to Defendants, because cavitation damage is a "byproduct" of the service environment and operating conditions of hydroelectric plants, it is not a "defect" that a contractor would generally warrant against and the parties must specifically agree to any cavitation performance guarantees. The parties incorporated an international standard regarding cavitation into their Contract. ECF No. 217-15 (IEC Standard 60609). This standard provides that "the guarantee for cavitation pitting can be established only by mutual agreement." *Id.*

Plaintiffs respond that IEC Standard 60609 expressly "does not cover other effects which cavitation may possibly have on the machine such as ... mechanical integrity." *Id.* According to Plaintiffs, this means that although the standard is relevant for cavitation damage to the runner, it does not apply to damage to the discharge rings/extensions, which threatens the integrity of the pressure boundary. Plaintiffs contend that the damage to the discharge rings/extensions goes beyond expected wear and tear and is the result of Toshiba's decision to remove the existing stainless-steel overlay, which they view as a design/engineering defect. Plaintiffs allege that the

discharge rings are so damaged in Units 2 and 4 that they may not be operated for more than 50 hours per year.

Given the broad, unqualified General Warranty with respect to "all Work," it is not clear that cavitation was intended by the parties to be excluded, or that IEC Standard 60609 (requiring "mutual agreement" for "cavitation pitting" warranty) was intended to override the General Warranty. IEC Standard 60609 appears to conflict with the parties' express agreement that "all Work" be free of defects. As a result, summary judgment on this issue is not appropriate. *See Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 315 (6th Cir. 2010) (ambiguities in contract are for the trier of fact).

Even assuming Defendants' interpretation is correct – that "cavitation pitting" is excluded from the General Warranty – they have not established that summary judgment must be granted in their favor. This is because it is not clear, as a factual matter, that "cavitation pitting," an expected byproduct of the service environment in hydroelectric plants, is the cause of the damage. The defects alleged by Plaintiffs go beyond cavitation pitting as contemplated by IEC Standard 60609. For example, the removal of the stainless-steel overlay from the discharge rings is arguably defective design/engineering work that falls under the General Warranty. The cause

12

of the damage, whether it is cavitation that could only be warranted by specific "mutual agreement," or a design defect or other condition, must be determined as a factual matter before the warranty provisions may be properly applied. In this regard, the cause of the damage to the discharge rings, and whether the warranty applies, is a matter for the trier of fact. Defendants have not sustained their burden of demonstrating that summary judgment is proper on this issue.

### 3.  Whether the Contract limits Plaintiffs' remedies.

Defendants argue that the Contract limits Plaintiffs' remedies in several respects. In Count I, Plaintiffs seek to recover for breach of warranty under the Contract. (GC21(b)(ii)). Defendants assert that the warranty provision, which gives the Utilities the right to repair any defects and seek *reimbursement* from Toshiba, does not allow for the award of damages for costs that have not yet been incurred. The warranty provision provides:

> If the Contractor refuses, neglects, or is otherwise unable to take prompt action to correct any non-conformances or defects as provided [herein], *the Owner shall (without limiting any other rights or remedies) have the right* to perform or hire third parties to perform the corrective work . . . *and the Contractor shall reimburse the Owner upon demand* for all reasonable cost and expense of all such work.

ECF No. 1-1 at PageID.86 (GC22(b)(ii)) (emphasis added). Defendants argue that, under this section, Plaintiff must *first* pay for all repairs, *then* seek reimbursement from them. (Plaintiff has obtained an estimate from Voith Hydro for repairs, but has not yet paid Voith Hydro.)

The plain language of the Contract is not consistent with Defendants' interpretation. Plaintiffs "have the right" to seek reimbursement, "without limiting any other rights or remedies." *Id.* This permissive, rather than mandatory, language and the express reservation of "any other" remedies indicates that Plaintiffs are not limited to seeking "reimbursement." Rather, as Plaintiffs assert, they may seek contract damages equivalent to the cost necessary to repair the alleged defects. *See Forton v. Laszar*, 239 Mich. App. 711, 714 (2000), *overruled on other grounds by Liss v. Lewiston-Richards, Inc.*, 478 Mich. 203 (2007).

With respect to Count II, Plaintiffs seek damages for Defendants' failure to repair its defective work, pursuant to GC22(b)(i). Defendants allege that this section does not provide for damages, but only requires Defendants to "make at its own cost and expense any and all repairs or replacements necessary to remedy" defects. ECF No. 1-1, PageID.85. However, the section does not expressly preclude Plaintiffs from seeking damages for breach. In any event, section G22(b)(ii) clearly states that

14

Plaintiffs' "any other rights or remedies" are <u>not</u> limited in the event the Contractor fails to correct defects. It appears that Defendants are making this argument as a follow up to their "reimbursement" argument: that is, according to them, Plaintiffs are not entitled to damages under GC22(b)(i) and only entitled to "reimbursement" under G22(b)(ii). Defendants' argument seems to be based on the theory that because these provisions do not expressly state that damages are available, Plaintiff's remedies are limited.

Defendants' argument is contradicted by the contract language (stating that certain remedies do not "limit[] any other rights or remedies") as well as the fact that common law remedies are presumed to be available for breach of contract, unless the parties state otherwise. *Gomba Music Inc. v. Avant*, 225 F. Supp. 3d 627, 647 (E.D. Mich. 2016) (declining to limit damages to potential royalties, noting that there was "nothing suggesting the parties intended this provision to be an exclusive remedy"); *Short v. Hollingsworth*, 291 Mich. 271, 289 N.W. 158, 159 (1939) ("If it appears to have been the intention that the remedy specified in the contract should be exclusive, the rights of the parties will be controlled thereby."). The provisions Defendants rely on to suggest an exclusive remedy are merely permissive (giving Plaintiffs the "right" to reimbursement without limiting

15

other remedies). This is in contrast to GC7, which provides that in the event of a contract termination for convenience, the Contractor shall be entitled to certain compensation "as the Contractor's sole and exclusive compensation and remedy for such termination." ECF No. 1-1 at PageID.70. Clearly the parties understood how to draft an exclusive remedy; contrary to Defendants' argument, G22 does not limit Plaintiffs' remedies or preclude contract damages.

In their reply brief, Defendants argue that, because other provisions of the contract contain different language ("without limiting any other rights or remedies of the Owner *under this Contract or at law or equity*")(GC18), the language in section G22(b)(ii) ("*any other* rights or remedies") in contrast only preserves rights under the Contract rather than allowing for common law contract damages. But a broad reservation of "*any other* rights or remedies" cannot reasonably be read as a limit on Plaintiff's common law remedies.

In Count III, Plaintiffs allege that Defendants failed to complete work in order to timely achieve UIA for Units 1, 3, and 6. Plaintiffs allege that they are entitled to liquidated damages ($13,109,496) as well as contract damages. The Contract provides for bonus payments for early completion

16

of UIA and liquidated damages for delays. With respect to delays in

achieving UIA, the payment of liquidated damages is

> the Owner's *sole and exclusive remedy* for loss or damage
> arising from delay past the end of the applicable Unit
> Interim Acceptance Milestone Date Deadband in achieving
> Unit Interim Acceptance for the applicable Unit; *except* that
> failure to achieve Unit Interim Acceptance for any Unit by
> the end of the applicable Unit Interim Acceptance
> Milestone Date Deadband remains subject to the Owner's
> other rights and remedies under this Contract, including
> the Owner's right to terminate this Contract for Major
> Default as described in Subarticle GC7(b) of SECTION II -
> GENERAL CONDITIONS. . . .

ECF No. 1-1 at PageID.99 (emphasis added). In other words, liquidated

damages are the sole and exclusive remedy for delays in achieving UIA,

unless Plaintiffs terminate the contract for "Major Default." Section GC7

provides that the Owner may terminate the Contract under several

circumstances, including when "the Contractor fails to achieve Unit Interim

Acceptance for any Unit by the date specified in the Contract Schedule."

ECF No. 1-1 at PageID.71.

Plaintiffs argue that they terminated the Contract in 2024, so they are

not limited by the liquidated damages provision. Defendants respond,

however, that Plaintiffs failed to satisfy the Contract's prerequisites for

termination for Major Default. As addressed in more detail below, the court

finds that Defendants are not entitled to summary judgment with respect to

17

the issue of whether Plaintiffs properly terminated the Contract for Major
Default. *See infra.*, section III(B)(6). It follows that Defendants are also not
entitled to summary judgment on the liquidated damages issue.

### 4. Toshiba's Liability under the Guaranty

Defendants argue that Toshiba's liability under the Parent Guaranty is
"subject to any limitations contained in the Contract on [TAES's] obligations
thereunder." ECF No. 1-3 at PageID.171. They contend that "Toshiba is
entitled to judgment as a matter of law that the limitations of liability
included in the Contract correspondingly limit Toshiba's liability under the
Parent Guaranty."

Plaintiffs agree that the Guaranty contains the statement above, but
disagree that this issue is ripe for consideration. "The real issue will be the
*application* of those terms (and others) to *specific damages issues* not yet
presented." ECF No. 229 at PageID.25692. For example, Plaintiffs argue
that Toshiba has an independent obligation to pay Plaintiffs' attorney fees in
this action, and that separate damages limits apply to each Defendant
under their respective agreements. *See* ECF No. 1-3 at ¶ 2. The issue of
attorney's fees and litigation expenses has been bifurcated, to be
determined after the trial on the merits. ECF No. 171. Whether Toshiba's
liability limit includes attorney's fees was not fully addressed in Defendants'

perfunctory argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96

(6th Cir. 1997) ("It is not sufficient for a party to mention a possible

argument in the most skeletal way, leaving the court to . . . put flesh on its

bones."). Moreover, this issue may be more appropriately addressed, if

necessary, after the trial on the merits, during the litigation expenses stage.

Toshiba has not carried its summary judgment burden at this time, and the

court will deny its motion on this issue without prejudice.

### 5. Whether GC28 caps Defendants' liability and precludes prejudgment interest.

The Contract includes a clause limiting the Contractor's liability:

> The Contractor's maximum liability to the Owner under this
> Contract, whether arising in breach of contract, tort
> (including negligence), strict liability, or otherwise, shall not,
> in the aggregate, exceed an amount ("Total Liability Limit")
> equal to the sum of: the overall Total Fixed Price. . . . plus
> the maximum bonus amounts for all Units that may be
> payable per the terms and conditions. . . .

ECF No. 1-1 at PageID.142 (Change Order 9, amending GC28(a)). There

is also a "Unit Liability Limit." *Id.* Contractual limits of liability are generally

enforceable. *See Schmidt Indus. Inc. v. Huntington Nat'l Bank*, 2022 WL

2121527, at *2 (E.D. Mich. June 13, 2022) (citing *USAA Grp. v. Universal

Alarms, Inc.*, 158 Mich. App. 633, 405 N.W.2d 146, 147 (Mich. App. 1987)).

Defendants allege that based upon Change Order 10, the Overall Total Fixed Price was $559,190,561, limiting their liability to that amount. ECF No. 1-1 at PageID.162.

Plaintiffs allege that the contractual limitation of liability does not apply because Defendants were grossly negligent in how they conducted the repairs and a party "may not insulate himself against liability for gross negligence" by contract. *Lamp v. Reynolds*, 249 Mich. App. 591, 594 (2002). This argument is unavailing for two reasons. First, Plaintiffs have not pleaded a negligence claim, and they may not do so now in response to a motion for summary judgment. *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). Second, to state a negligence claim, Plaintiffs would have to allege the Defendants breached a legal duty separate and distinct from their contractual obligations. *See, e.g., Neibarger v. Universal Cooperatives, Inc.*, 439 Mich. 512, 521 (1992). Here, it does not appear that Plaintiffs are alleging anything more than a breach of contract; the concept of gross negligence does not apply to this case. *Id.* ("[T]ort law is a superfluous and inapt tool for resolving purely commercial disputes."); *see also Henry v. Dow Chem. Co.*, 473 Mich. 63, 75 (2005) ("A financial 'injury' is simply not a present physical injury, and

thus not cognizable under our tort system."). The contractual limit of liability is enforceable; however, the parties disagree as to the amount of that limit.

The primary disagreement is whether $54 million in potential bonuses, which were not paid to TAES, should be included in the total limit. Change Order 9 provided for potential bonuses of up to $9 million per Unit to TAES if a Unit exceeded Performance Guaranty specifications based upon certain testing parameters. ECF No. 1-1 at PageID.154-56. Plaintiffs conducted Performance Guaranty testing on one Unit and did not make a bonus payment with respect to any of the Units. Defendants argue that the $54 million in potential bonuses should not be included in the Total Liability Limit.

The Total Liability Limit includes "the maximum bonus amounts for all Units that may be payable." Defendants interpret this to mean that, in order for the bonus amounts to be included in the Total Liability Limit, they must have been actually paid to TAES. But the provision refers to the *maximum* bonus amounts that *may be payable*, suggesting that the maximum possible bonus amounts are to be included in the Total Liability Limit. If only the actual bonus amounts were to be included, the word "maximum" would be surplusage. *See Patel v. FisherBroyles, LLP*, 344 Mich. App. 264, 272 (2022) ("The words of a contract are interpreted according to their plain and

21

ordinary meaning, and this Court gives effect to every word, phrase, and clause while avoiding interpretations that would render any part of the document surplusage or nugatory."). The contract language does not unambiguously support Defendants' interpretation.

Defendants also argue that the total liability amount should exclude $2,697,738 reflected in Project Change Notices, but never paid to TAES. The Project Change Notices were not formalized into a Change Order. As Plaintiffs point out, however, Defendants seek payment for work under the Project Change Notices in their counterclaim. If Defendants were to prevail, that would arguably increase the Overall Total Fixed Price of the Contract and correspondingly increase the Total Liability Limit in GC28. Defendants argue that the parties never agreed to increase the Overall Total Fixed Price, which seems to be a prerequisite for increasing the Total Liability Limit under the Contract. Given this dispute, whether the $2.6 million *should* have been included in the total price, and whether the liability limit should be correspondingly increased, is a matter for trial.

Defendants also argue that the parties waived the right to seek prejudgment interest, because the parties agreed that there would be no liability for "consequential damages." ECF No. 1-1 at PageID.90 (GC28(b)).

> Other than with respect to the Contractor's obligations to pay liquidated damage to the Owner, in no event shall

> either Owner or Contractor be liable to the other . . . for loss of anticipated profits, loss by reason of plant shutdown, non-operation or increased expense of operation, service interruption, cost of purchased or replacement power, claims of customers, *cost of money, loss of capital or revenue*, or for any special, incidental, exemplary, or other consequential loss or damage.

*Id.* (emphasis added). Defendants argue that by waiving damages based upon the "cost of money" or the "loss of capital or revenue," Plaintiffs also waived their statutory right to prejudgment interest under M.C.L. 600.6013. Defendants emphasize that the statute is meant "to encourage prompt payment" of the judgment and "compensate prevailing parties for the lost use of funds," so "cost of money" must include prejudgment interest. *Gordon Sel-Way, Inc. v. Spence Bros.*, 438 Mich. 488, 504 (1991).

The language of the contract, however, indicates that liability is precluded for *consequential damages*, not prejudgment interest. The "cost of money," such as interest payments on a loan, is generally considered to be in the category of consequential damages. *See Firwood Mfg. Co. v. Gen. Tire, Inc.*, 96 F.3d 163, 171 (6th Cir. 1996) ("Examples of consequential damages include lost profits and interest paid on loans taken out to maintain business operations.") (citing Michigan law). In *Firwood*, the Sixth Circuit determined that the plaintiff could not recover interest or loss

23

of the use of its funds as consequential damages under the UCC, but it could recover statutory interest under M.C.L. 600.6013.

Underscoring the difference between interest as consequential damages and statutory interest under Michigan law, the Sixth Circuit affirmed a judgment awarding both. *City of Sterling Heights, Mich. v. United Nat. Ins. Co.*, 319 Fed. Appx. 357, 364 (6th Cir. 2009). The court rejected the defendant's argument that awarding both would result in a windfall. "Consequential damages and prejudgment interest compensate plaintiffs for different forms of loss: Consequential damages reimburse parties for the additional, reasonably foreseeable costs they incur as a result of a breach of contract, while prejudgment interest – besides offsetting the costs of litigation and encouraging settlement – compensates plaintiffs for the 'delays in recovering money damages.'" *Id.* (citations omitted).

The Contract precludes recovery of consequential damages, and lists various categories of consequential damages, but does not specifically mention prejudgment interest. Given that prejudgment interest is not considered to be in the category of consequential damages, the Contract does not waive Plaintiffs' right to statutory prejudgment interest (calculated from the date the complaint was filed), which is otherwise mandatory. *Centria Home Rehab., LLC v. Allstate Ins. Co.*, 2024 WL 4820775, at *4

(Mich. App. Nov. 18, 2024) ("Interest under MCL 600.6013 is mandatory in all cases in which the statute applies.") (citing *Farmers Ins Exch v Titan Ins Co*, 251 Mich App 454, 460 (2002)).

### 6. Whether Plaintiffs properly terminated the Contract for Major Default

Defendants argue that Plaintiffs did not properly terminate the contract for cause because they did not give TAES the opportunity to cure its breaches. According to Defendants, they are entitled to dismissal of Plaintiffs' claims based on the alleged failure to adhere to the notice and cure provision. "Courts have recognized that where a contract expressly includes a notice and cure provision, a party failing to provide such is precluded from then subsequently suing for the other party for breaching the agreement." *Chrysler Realty Co., LLC v. Design F. Architects, Inc.*, 544 F. Supp. 2d 609, 616 (E.D. Mich. 2008), *aff'd,* 341 Fed. Appx. 93 (6th Cir. 2009).

Under the Contract, the Owner "may terminate the Contractor's performance" for a "Major Default," including if "the Contractor delivers defective or non-conforming equipment or portions thereof or otherwise performs defective Work." ECF No. 1-1 at PageID.71 (GC7(b)). "In the event that the Owner intends to terminate this Contract for a Major Default

25

. . . the Owner shall first provide the Contractor with written notice of such

Major Default. The Contractor will commence implementation of all

necessary corrective action to cure such Major Default within ten (10) days

of the Owner's said written notice, and shall implement a recovery plan

acceptable to the Owner . . .[and] cure such Major Default within thirty (30)

days of the Owner's aforesaid written notice." ECF No. 1-1 at PageID.72. If

the Contractor does not cure, the Owner "may terminate this Contract by

written notice to the Contractor." *Id.*

Plaintiffs contend that they provided the required notice on October

22, 2024, giving Defendants notice of the claimed defects that constitute

"Major Defaults." In the letter, Plaintiffs stated that they believe "that notice

is not required because TAES has materially breached its obligations under

the Contract in multiple respects, has failed to rectify those breaches after

many written demands, and has repudiated and abandoned all remaining

obligations under the Contract. The Owner nonetheless provides this notice

for the avoidance of doubt, and reserves all rights." ECF No. 229-22. The

letter noted that Defendants have been aware of its complaints since July

2021, and stated that "[t]he Owner has made repeated demands upon

TAES to rectify its incomplete, nonconforming, and defective Work, but

TAES has repeatedly denied its Work is defective and has refused to provide any comprehensive or permanent repair." *Id.*

Defendants responded to Plaintiffs' letter on October 31, 2024, with a proposal that Plaintiffs found unacceptable because it would not "fully repair" defects and relied upon an "untested jacking-up approach" that risked further damage to the plant. ECF No. 229-24. Plaintiffs confirmed in a December 3, 2024 response that the "Contract is terminated." *Id.*

Defendants suggest that Plaintiffs were required to provide notice and an opportunity to cure before filing this lawsuit. Plaintiffs respond that nothing in the "termination for default" provision (GC7) indicates that notice of a Major Default or termination for default are prerequisites to filing suit. Section GC9 addresses disputes and provides that the parties shall first attempt to resolve disputes through negotiation. If that process fails, "either party may avail itself of any process or means legally available to it to resolve disputes." ECF No. 1-1 at PageID.74.

Defendants have not demonstrated that notice and an opportunity to cure were contractual prerequisites to filing this action. Plaintiffs allege, moreover, that they provided notice of defective work several times in 2020 and 2021 and asked TAES to repair it, but TAES refused. Plaintiffs argue that TAES repudiated the Contract, forfeiting any right to cure, and that

27

repudiation is a jury question. *See Kuhens v. B & R Oil Co.*, 1999 WL 33409917 at *2 (Mich. App. Nov. 30, 1999) (Whether a party "unequivocally declared [its] intent not to perform the contract [is] a question of fact for the jury.").

Defendants respond that by filing this lawsuit, Plaintiffs interfered with their ability to cure and therefore cannot avail themselves of a termination for Major Default, because that requires an opportunity to cure. But Defendants ignore Plaintiffs' contention that they provided repeated notice of defective work prior to filing this action and Defendants declined to make repairs; this lawsuit could not have interfered with those opportunities to cure. *See* ECF No. 229-2. Plaintiffs further informed Defendants that they considered the contract to be repudiated, and that they intended to hire others to perform repairs. Whether Defendants repudiated the contract or whether Plaintiffs interfered with Defendants' ability to cure are factual issues that are not amenable to summary judgment. Defendants have not demonstrated that they are entitled to summary judgment on the issue of whether Plaintiffs properly terminated the agreement for a Major Default.

## IV.  Conclusion

In sum, Defendants have not sustained their burden of demonstrating that they are entitled to summary judgment, which is precluded either by

the plain language of the Contract or material factual disputes. Therefore, it is **ORDERED** that Defendants' motion for summary judgment (ECF No. 217) is **DENIED.**

     **SO ORDERED.**


Dated: August 6, 2025            <u>s/F. Kay Behm</u>
                                       F. Kay Behm
                                       United States District Judge