UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSUMERS ENERGY CO. and
DTE ELECTRIC CO.,

     Plaintiffs,

                                    Case No. 22-10847

v.

                                    Hon. F. Kay Behm

TOSHIBA AMERICA ENERGY
SYSTEMS CORP. and
TOSHIBA CORP.,

     Defendants.
_____/

## OPINION AND ORDER REGARDING MOTIONS IN LIMINE TO EXCLUDE EXPERT TESTIMONY

Before the court are several motions in limine to exclude expert testimony filed by both sides. The parties largely challenge excerpts of testimony or opinions rather than seeking to exclude the experts entirely. In general, the court finds that the parties' criticisms of the experts are relevant to the weight and credibility of their testimony, rather than its admissibility. Provisionally, the court addresses the parties' motions as discussed below, with final rulings to be issued as necessary in the context of the evidence as it is introduced at trial.

## I.      Factual Background

This breach of contract action arises from repairs made to the Ludington Pumped Storage Plant, which is a hydroelectric plant consisting of six pump-turbines. The plant is owned by DTE Electric Company and Consumers Energy Company ("Utilities" or "Owner"). They contracted with Toshiba Energy Systems Corporation ("TAES") in 2010 to overhaul the plant ("Contract"). TAES's parent company, Toshiba Corporation, provided a guaranty with respect to the Contract. The Contract provides that the TAES would "return the Plant to as nearly an as new condition as possible" and allow the plant to operate with a "minimum thirty (30)-year service life" with "only minimal routine maintenance." ECF No. 217-2 at PageID.21067, 21081-82.

Plaintiffs allege that TAES's work is defective in multiple respects. One defect involves "discharge rings" and "discharge ring extensions" ("DREs"), which are large steel rings that comprise part of the water passage directing water through each unit. They form a pressure boundary holding the water inside each unit. In particular, Plaintiffs allege that TAES removed, and did not replace, a stainless-steel overlay for the discharge rings, which protected the carbon steel material. Plaintiffs also allege that the metal TAES selected for the DREs is not suitable and that TAES's

construction methods placed the DREs under excessive stress, causing cracks. According to Plaintiffs, they notified TAES of this defective work with respect to Units 2 and 4 in 2019. They also allege that DREs in other Units experienced cracking, leaking shaft seals, and failing motor operated disconnect ("MOD") switches. Plaintiffs asked TAES to remedy these defects, but TAES did not do so. According to Plaintiffs, TAES attempted temporary repairs that did not fix the problems. Plaintiffs contend that they continued to ask TAES to repair its defective work several times in 2021 and 2022, to no avail.

Plaintiffs allege that the problems arising from TAES's defective work have worsened since they filed this action in 2022. They have contracted with Voith Hydro to assess TAES's work and develop a repair plan. Plaintiffs contend that the damage to Units 2 and 4 is such that they have been required to significantly limit the use of those units; in 2025 their use is limited to approximately 50 hours per year. In 2024, Defendants proposed a repair plan, but the Utilities rejected it, contending that it would not address all of the problems and relied on an untested approach that would require "jacking up" the runner. ECF No. 229-24.

Both sides have identified several expert witnesses as well as challenges to those witnesses, as discussed below.

## II.    Law and Analysis

### A. Admissibility of Expert Testimony

The admissibility of expert testimony is governed by Federal Rule of

Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial judge is tasked with "ensuring that an expert's

testimony both rests on a reliable foundation and is relevant to the task at

hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597

(1993); *see also Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308,

316 (6th Cir. 2019) (noting that courts consider whether the witness is

"qualified" and whether the testimony is "relevant" and "reliable").

The relevancy threshold under Rule 702 "is low," requiring only that

the testimony "logically advances a material aspect of the proposing party's

case." *United States v. LaVictor*, 848 F.3d 428, 442 (6th Cir. 2017) (cleaned up; citation omitted); *see also United States v. Bonds*, 12 F.3d 540, 557 (6th Cir. 1993) (explaining that the relevance inquiry asks whether the evidence relates to "any issue in the case").

In *Daubert*, the Supreme Court discussed factors that may be helpful in determining the reliability of a particular scientific "theory or technique," such as testing, peer review, error rates, and "acceptability" in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. Although the specific *Daubert* factors may not be applicable with respect to non-scientific experts, the court nonetheless must exercise its "gatekeeping" function to assess the reliability of other types of expert testimony, such as that based upon "other specialized knowledge." *Id.*; Fed. R. Evid. 702. "[T]he test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999) (emphasis in original). Where non-scientific expert testimony is involved, "the *[Daubert]* factors may be pertinent," or "the relevant reliability concerns may focus upon personal knowledge or experience." *Surles ex*

*rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007) (citations omitted).

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008). In considering the admissibility of expert testimony, the court bears in mind that "rejection of expert testimony is the exception, rather than the rule," and that "mere weaknesses in the factual basis of an expert witness' opinion ... bear on the weight of the evidence rather than on its admissibility." *Id.* at 530-31. Rather than exclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### B. Plaintiffs' Motion to Exclude Certain Opinions of Bernhard Bittner (ECF No. 206)

Plaintiffs seek to exclude certain testimony from Defendants' expert, Berhard Bittner, on relevancy grounds. Specifically, Plaintiffs seek to preclude Bittner from testifying that Plaintiffs improperly maintained and operated the MOD switches. Plaintiffs allege that the MOD switches are defective, have failed repeatedly, show signs of degradation, and will not

6

meet the anticipated 30-year service life of the plant overhaul. Plaintiffs argue that Bittner's opinion is not relevant because he does not identify a causal connection between the improper maintenance and the problems Plaintiffs have experienced with the MOD switches, such as the bent guide rails.

Defendants respond that Plaintiffs have mischaracterized Bittner's testimony and that his opinion on improper maintenance is relevant to both the MOD switch problems and Plaintiffs' claim that they are contractually entitled to a 30-year service life. Bittner opined that Plaintiffs 1) improperly greased the MOD switch guide rails, which "is detrimental to the rolling motion of the guide rollers"; 2) improperly used the MOD switch to set a limit switch, which resulted in "audible grinding of the drive gears," and would lead to abnormal wear of the components; 3) operated the switches in a manner "causing electric arcing and subsequent degradation on the contacts of the MODS"; and 4) could not provide records of maintenance for the MOD switches, violating the recommended practices of certain electrical codes. Defendants intend to use this testimony to rebut that of Plaintiffs' expert, Dr. John Martens, and Plaintiffs' allegation that the MOD switches are defective. Plaintiffs argue that Bittner's testimony is not relevant because he does not assert a causal connection between the

improper use and maintenance and the malfunctions experienced by
Plaintiffs.

However, Bittner need not definitively opine on causation for his
testimony to be relevant, which is a "low" bar. *See LaVictor*, 848 F.3d at
442. "*Daubert* and Rule 702 require only that the expert testimony be
derived from inferences based on a scientific method and that those
inferences be derived from the facts of the case at hand, not that they *know*
answers to all the questions a case presents—even to the most
fundamental questions." *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390
(6th Cir. 2000) (citation omitted) (emphasis in original). Dr. Martens
observed that problems with the MOD switches included excessive wear,
"bent guide rails, misaligned contacts, and mechanical instability." ECF No.
228-6 at PageID.25534-35. He also noted that the MODS "were required to
have a lifetime of 30 years." *Id.* at 25554. Defendants may use Bittner's
testimony to rebut Dr. Martens' report, provide possible alternative
explanations for problems with the MOD switches, and argue that a 30-year
service life is only possible with proper maintenance and operation.
Bittner's alleged failure to connect maintenance and operation issues to the
malfunctioning of the MOD switches may be explored on cross-examination

and goes to the weight and credibility of his testimony rather than its admissibility.

### C. Plaintiffs' Motion to Exclude Certain Testimony of William Coleman (ECF No. 207)

Plaintiffs seek to exclude certain testimony from William Coleman, a metallurgist, regarding Defendants' conduct and thought process in choosing 410 stainless steel for the project, alleging that these opinions have no reliable factual basis. Defendants offer Coleman's testimony to rebut that of Plaintiffs' expert John C. Lippold, who opined that 410 stainless was an inappropriate material selection for the DREs. *See* ECF No. 207-2. Plaintiffs take issue with Coleman's "assertions about how TAES chose 410 stainless and handled the material, and his related opinions that TAES's thinking and actions were proper."

Plaintiff contends that Coleman's opinion about how TAES selected and handled 410 stainless is not reliable because he based it upon phone calls with Toshiba employees Scott Torvik and Takeshi Hyuga, he did not conduct an independent investigation, and he merely "parrots" Defendants' factual account. However, both Torvik and Hyuga were involved in and have historical knowledge of the overhaul project. ECF No. 225-3 at 305-307; ECF No. 225-4 at 14-20. Although Plaintiffs argue that their knowledge was not firsthand and was insufficient, it is not clear that in this

9

regard Coleman's opinion veers into the territory of inadmissible

"assumptions" or "guesses." *See In re Scrap Metal*, 527 F.3d at 530.

These "weaknesses in the factual basis of an expert witness' opinion ...

bear on the weight of the evidence rather than on its admissibility." *Id.*

Plaintiffs may challenge the foundation and factual bases of Coleman's

opinions at trial, where the court is able to assess the evidence in its proper

context. *See In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 348

F. Supp. 3d 698, 721 (S.D. Ohio 2016) (explaining that unless evidence is

"clearly inadmissible," "evidentiary rulings should be deferred until trial so

that questions of foundation relevancy and potential prejudice may be

resolved in proper context").

> D. Plaintiff's Motion to Exclude Certain Testimony of
> William D. Marscher (ECF No. 208)

Plaintiffs seek to exclude certain opinions of Defendants' expert

William D. Marscher regarding Toshiba's "jacking up" proposal. Marscher is

an engineer who reviewed data produced in discovery and conducted a site

visit at the Ludington plant. ECF No. 208-7 at PageID.12593. He reviewed

Defendants' jacking up repair proposal and deemed it "appropriate, and

according to best industry practice. In particular, in my opinion, the

approach of jacking up each Unit only 400mm, rather than removal of the

rotor, to gain access for any DR or DRE remediation is an excellent

strategy, and quite practical." ECF No. 208-7 at PageID.12682. Marscher also issued a supplemental report on the issue, in response to a supplemental report from Plaintiffs' expert Marcus Crahan.

Marscher has fifty-four years of experience as a machinery engineer. ECF No. 208-7. In formulating his opinions for this case, Marscher reviewed the project documents, interviewed TAES employees, and conducted a site visit and testing at the Ludington plant. Plaintiffs challenge Marscher's opinions regarding the feasibility of the jacking up proposal, asserting that Marscher only had one day to review the plan before submitting his report and that his opinion lacks a reliable factual basis and is conclusory. However, Marscher explained his opinion regarding why repair of the DREs was preferable to replacement, which "would introduce additional heat and distortion back into the existing embedded structures and introduce additional residual stress." ECF No. 208-7 at PageID.12587-88. Moreover, Marscher's specialized engineering knowledge and experience provide a sufficiently reliable basis for his opinions. To the extent Plaintiffs claim that the factual basis of Marscher's opinion is incorrect or insufficient, such a challenge addresses credibility and weight rather than admissibility. *In re Scrap Metal*, 527 F.3d at 530.

E. Plaintiff's Motion to Exclude Certain Testimony of
   Jamie Petty-Galis (ECF No. 209)

Plaintiffs seek to exclude certain testimony from Defendants' expert Jamie Petty-Galis, an engineer with thirty years of experience in forensic metallurgical and mechanical engineering consultation. Ms. Petty-Galis was retained to rebut the expert report of Plaintiffs' expert, Dr. Tucker, who is a professional engineer with a Ph.D. in Materials Science and Engineering from Carnegie Mellon University. Dr. Tucker investigated the damage to the DRs and DREs by visiting the Ludington Plant, taking measurements, and analyzing high-resolution images. Dr. Tucker's opinions are set forth in a 425-page report, in which he concluded that damage to the DRs in Units 2 and 4 was the result of cavitation erosion and that cracks and "crack-like defects" in the DREs should be repaired under the relevant engineering code.

Petty-Galis conducted a "desktop review" of Dr. Tucker's report. Plaintiffs take issue with Petty-Galis's testimony that Dr. Tucker did not follow the "scientific method" and that his opinion is unreliable. According to Petty-Galis, the only "scientific" method to determine the cause of the damage to the DRs and DREs is to cut out the metal and analyze it in a laboratory. Plaintiffs argue that Petty-Galis's method is not the only "scientific" method. Petty-Galis also faults Dr. Tucker to failing to consider

12

"damage tolerance methodology" and whether the cracks have reached a "critical size," such that they will extend all the way through the material. Plaintiffs contend that whether the cracks have reached a "critical size" is not relevant to Dr. Tucker's opinion that they need to be repaired.

Plaintiffs essentially highlight a difference of opinion with respect to the appropriate methodology and which factors the experts should properly consider. This disagreement may be explored on cross-examination. This type of critique does not "fall outside the range where experts might reasonably differ" and goes to the weight of the testimony, to be evaluated by the jury. *See Kumho*, 526 U.S. at 153; *In re Heparin Prods. Liab. Litig.*, 803 F. Supp. 2d 712, 753 (N.D. Ohio 2011), *aff'd sub nom. Rodrigues v. Baxter Healthcare Corp.*, 567 F. App'x 359 (6th Cir. 2014) (noting that experts' "critiques of each others' methods are helpful to the jury, which must determine the weight to accord each expert's testimony").

Plaintiffs further object to Petty-Galis's testimony that cavitation erosion in hydroelectric plants is "normal," "natural," and "does not imply poor design." ECF No. 209-3 at PageID.12925. Plaintiffs contend that Petty-Galis has no basis for these opinions, which are contradicted by the literature upon which she relies. Defendants point out that Plaintiffs' expert *agrees* that cavitation erosion is a common phenomenon in hydroelectric

13

plants. The parties' disagreement appears to involve whether and how design may impact the development of cavitation. To the extent Plaintiffs argue that the factual basis of Petty-Galis's opinion in this regard is insufficient, "[v]igorous cross-examination [and] presentation of contrary evidence" is the remedy, rather than exclusion. *Daubert*, 509 U.S. at 596.

Plaintiffs also object that Petty-Galis lacks the requisite knowledge or experience to opine regarding the terms that are "typically" included in hydropower industry contracts. *See* ECF No. 209-3 at PageID.12926 (opining that "[a] cavitation guarantee is typically part of the design specification agreements" and is a "common contractual agreement between purchasers and suppliers of hydropower systems."). Defendants respond that Dr. Tucker "opened the door" to this testimony by putting the parties' contractual terms and industry expectations at issue. They also point out that Petty-Galis testified that "she has evaluated numerous components for cavitation erosion over her 30-year career, including in hydroelectric systems." ECF No. 221 at PageID 22229.

Neither the alleged "opening of the door" nor her experience evaluating cavitation erosion addresses Petty-Galis's foundation for opining what is "typical" in hydropower industry contracts. In this regard, Plaintiffs' objection is well-taken. *See Builders Mut. Ins. Co. v. GCC Constr., LLC*,

14

711 F. Supp. 3d 899, 922 (E.D. Tenn. 2024) ("Because Willingham does not possess specialized knowledge regarding insurance policies, he cannot opine as to the insurance policy at issue or the customs or practices of the industry."). Provisionally, the court finds that Defendants have not demonstrated that Ms. Petty-Galis possesses the specialized knowledge or experience necessary to opine regarding industry customs with respect to cavitation guarantees.

F. Plaintiffs' Motion to Exclude Certain Testimony of
   Richard A. Polich (ECF No. 212)

Plaintiffs seek to exclude certain opinions of Defendants' expert Richard A. Polich regarding (1) Plaintiffs' motives in rejecting Defendants' "jacking up" repair; (2) how the Michigan Public Service Commission would rule upon or react to Plaintiffs' repair plan; and (3) how potential repair plans would impact rates paid by customers. Polich is an engineer who was retained to rebut the report of Plaintiffs' expert Dr. Brian M. McDonald, who opined on the reasonableness of Plaintiffs' repair plan. *See* ECF No. 212-2.

Plaintiffs take issue with the following from Polich's report: "The Defendants have a workable plan for repairing the Unit 2 and 4 DR/DRE . . . . The only reason for the Plaintiffs to choose replacement of the DR/DRE over repair is due to Plaintiffs' own risk aversion, their desire to operate Ludington according to their generation plans, or out of a desire to

15

have brand new components installed at Toshiba's expense." ECF No. 212-2 at ¶ 98. Plaintiffs argue that Polich impermissibly speculates regarding their motivation in rejecting Defendants' repair plan. *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (explaining that experts may not offer opinions on the "intent, motives or states of mind of corporations, regulatory agencies and others" because these opinions "have no basis in any relevant body of knowledge or expertise"). Although Defendants suggest that Polich is not attempting to engage in "corporate mind-reading," Polich admitted as much in his deposition. ECF No. 212-3 at 159 ("I admit I'm trying to put my head in the mind of the owners."). And although Defendants argue that Polich is merely rebutting Dr. McDonald's report, McDonald does not opine on Plaintiffs' specific motivations in rejecting Defendants repair plan, but he provides general background that the utility industry "has been steadily evolving towards lower overall risk tolerance and has a relatively low risk tolerance compared to other industries." ECF No. 220-2 at ¶ 29. Polich may rebut Dr. McDonald's view about the utility industry's risk tolerance in general, but he may not speculate about Plaintiffs' actual motivations. *See Waite, Schneider, Bayless & Chesley Co., L.P.A. v. Davis*, 253 F. Supp. 3d 997, 1013 (S.D. Ohio 2015) ("Expert testimony as to intent, motive, or state of mind offers

16

no more than the drawing of an inference from the facts of the case," which is "within the competence of the jury.") (citations omitted).

Similarly, Plaintiffs argue that Polich may not predict how the Michigan Public Service Commission would view its repair plan. In his report, Polich states that "[i]f the Plaintiffs' solution were presented before the MPSC, I think it is unlikely the costs would considered prudent or as meeting best utility practice thresholds." ECF No. 212-2 at ¶ 166. In his deposition, he admitted attempting to predict what the MPSC "might or might not do," but ultimately "I have no idea what they would do." ECF No. 212-3 at 304-305. Polich's view on how the MPSC "might" receive Plaintiffs' repair plan borders on speculation and will not assist the jury.

Plaintiffs also argue that Polich should not be able to testify regarding how potential repair plans may impact rates paid by customers, which are set by the MPSC. Defendants contend that Polich should be allowed to rebut McDonald's opinion that the repair plans should be assessed "considering requirements for high reliability and maintaining low cost of services." ECF No. 220-2 at ¶ 29. Polich opines that the Utilities' "preference for replacement of the Unit 2 and 4 DR/DRE is not a prudent utility decision nor is it good utility practice because of the potential cost impact on ratepayers." ECF No. 212-2 at ¶ 96. Plaintiffs argue that Polich's

17

attempt to predict the impact of the repairs on rates does not have a reliable basis, but Defendants point out that Polich has "experience in rate design and the impact of costs on rates." *See id.* at PageID.16170-74. The extent to which Polich's testimony is rebuttal and whether it has a reliable basis is more appropriately assessed in the context of the evidence at trial. In addition, this issue is the subject of a motion in limine filed by Defendants and may become moot or substantially resolved. *See* ECF No. 258.

### G. Plaintiffs' Motion to Exclude Certain Opinions of Dakus Gunn (ECF No. 213)

Plaintiffs seek to exclude certain testimony from Defendants' damages expert, Dakus Gunn, in particular opinions that Plaintiffs characterize as legal or related to contract interpretation. First, Plaintiffs challenge Gunn's opinion that certain costs should not be included in Plaintiffs' damages calculation because the "plain language" of the contract contemplated a "major disassembly/reassembly" every ten years. ECF No. 213-2 at ¶ 38. "A '*major disassembly/reassembly'* of each Unit will therefore be due and should have always been anticipated by the Owners by the time Voith starts work." *Id.* (emphasis in original). The parties disagree about the meaning of "major disassembly/reassembly," and which costs Plaintiffs should have reasonably anticipated as "maintenance." Plaintiffs'

position is that the need to completely dissemble units to undertake repairs goes beyond normal maintenance, and they instructed their expert, Michael Emmert, to include the cost of dismantling entire units in his damages calculation. Defendants' position is that this cost would have been incurred in any event, as normal maintenance.

Plaintiffs argue that Gunn's opinion that "major disassembly /reassembly" refers to entire units, rather than components of units, is a matter of contract interpretation and is inappropriate for expert testimony. Defendants respond that Gunn is merely rebutting Emmert's report and is not providing a legal interpretation of the contract. However, Emmert included the costs of disassembling the units in his damages calculation based upon instruction from the Plaintiffs, not his interpretation of the contract. In contrast, Gunn appears to provide his own interpretation of the contract and calculate damages accordingly. ECF No. 213-3 at ¶ 175 ("[Gunn] is of the opinion that according to the Technical Requirements, the Owners were going to be required to perform a major disassembly/reassembly at 9-10 years of operation. . . . This would have necessitated the disassembly and reassembly of the units and as such [I am] of the opinion that these costs    . . . should be removed."). Generally, contract interpretation is not a proper subject of expert testimony. *See*

19

*Consol. Rail Corp. v. Grand Trunk W. R. Co.*, 2011 WL 6004275, at *5 (E.D. Mich. Dec. 1, 2011) ("[E]xpert testimony to interpret contract language is inadmissible unless there is a need to interpret an ambiguity or clarify or define terms of art, science or trade.") (citing *N. Am. Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1281 (6th Cir.1997); *TCP Indus., Inc. v. Uniroyal, Inc.,* 661 F.2d 542, 549 (6th Cir.1981)). Although Gunn's damages calculation may reflect Defendants' legal position that certain costs should not be included under the contract, he may not offer his opinion about what the "plain language" of the contract provides or what "major disassembly/reassembly" means.

Plaintiffs next argue that Gunn also impermissibly opines on the standard of proof Plaintiffs must meet to support their damages claim. However, rather than rendering a legal opinion, Gunn challenges the factual basis for Plaintiffs' damages calculation. *See* ECF No. 213-2 at ¶ 53 ("Ankura has not provided or referenced any source documentation that is typically provided to substantiate a Time and Materials claim such as signed time sheets, material purchase orders, equipment rental invoices, etc."); ECF No. 213-3 at ¶¶ 26, 30 ("There remains a substantial amount of missing information and support that Delta believes would be customary for the Owners to produce in such a dispute to validate and verify its

damages."). To the extent Plaintiffs believe that Gunn's opinions in this regard are incorrect, they may cross-examine him and present contrary evidence through their expert. *Daubert*, 509 U.S. at 596.

The parties' next disagreement involves whether Plaintiffs' damages should be discounted to net present value. Gunn's opinion is that they should be, in contrast to Emmert. *See* ECF No. 213-3 at ¶ 38 ("[Emmert] has failed to consider the requirement for these future economic damages to be adjusted to present value. To say this principle is common understates its virtually ubiquitous application throughout commercial litigation."). Plaintiffs argue that Gunn should confine his opinion to economics and not testify about the alleged "ubiquitous application throughout commercial litigation." *Id.* However, Gunn's deposition makes clear that his opinion is based upon economic principles, not litigation norms. ECF No. 222-2 at 202-208 ("It's the time value of money."). To the extent Gunn strays beyond his expertise, Plaintiffs may raise such challenges at trial.

### H. Defendants' Motion to Exclude Certain Testimony of Marcus Crahan (ECF No. 214)

Defendants seek to exclude certain testimony from Plaintiffs' expert Marcus Crahan. Crahan is a professional engineer with more than thirty years of experience as an engineering consultant specializing in the failure

analysis and performance testing of large rotating machinery, particularly in the hydroelectric industry. Crahan opined that TAES should have placed the lower wear ring seal (also known as annular seal) at the bottom of the runner, rather than above the bottom of the runner. He relied in part on a paper written in 1965 by Toshiba engineers Hisao Tomita and Mitsuo Kawamura, which appeared in the *Toshiba Review* (the "Tomita paper"). According to Crahan, TAES deviated from a design principle, first established by the Tomita paper, that the lower annular seal should be located "at the very bottom of the runner"; when the seal is located above the bottom of the runner, the result is abnormal shaft vibration. Units 2 and 4 at the Ludington Plant experienced abnormal shaft vibration, which Crahan opines was the result of the location of the seal.

Defendants argue that the Tomita paper does not state that the seal must be placed at the bottom of the runner, as opposed to elsewhere. But Crahan explained in his report and deposition why he believes a design principle flows from Tomita's work. *See* ECF No. 214-2 at PageID.16764-65; ECF No. 223-2 at 86-87, 91-99 ("Mr. Tomita is opining that if you want to have a stable rotordynamic Francis turbine of medium or moderate specific speed, you want the annular seal at the bottom of the runner band."). Crahan's interpretation of the Tomita paper, which is informed by

his knowledge and experience, does not appear to be so unsupported as to be unreliable. *Cf. In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 346 (6th Cir. 2024) (affirming exclusion of medical causation expert who relied upon one study to opine that the drug caused heart failure, a connection not made in the study). Indeed, Toshiba engineers co-wrote a paper regarding shaft vibration at the Ludington Plant that recognized that "[t]he outlet seal of new runner was not located at the bottom of the runner band . . . in case of which the upstream seal clearance is narrower than the downstream seal clearance, generally known as a cause of self-excited vibration." ECF No. 223-4 at PageID.23905. For this proposition, the paper cited the Tomita paper. *Id.* at PageID.23918. Defendants' expert also acknowledged that normally the wear ring is designed to be "right at the end" of the runner. ECF No. 223-3 at 223-28. To the extent Defendants disagree with Crahan's interpretation of the Tomita paper, they may highlight that difference through cross-examination and the presentation of contrary evidence.

Defendants also seek to exclude Crahan's opinion that the placement of the wear ring seal caused "foreseeable self-excited vibrations and cavitation erosion of the discharge ring," arguing that Crahan did not test this theory. However, under the circumstances of this case it is not fatal that

Crahan did not conduct his own tests. "[A]n expert need not actively

conduct his or her own tests to have a valid methodology": "either 'hands

on testing' or 'review of experimental, statistical, or other scientific data

generated by others in the field' may suffice as a reasonable methodology

upon which to base an opinion." *Buck v. Ford Motor Co.*, 810 F. Supp. 2d

815, 844 (N.D. Ohio 2011) (citing *Clark v. Takata Corp.,* 192 F.3d 750, 758

(7th Cir.1999)); *cf. Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426,

431 (6th Cir. 2007) (excluding expert who proposed an alternative,

allegedly safer design in product liability case without testing it).

Crahan relied on evidence in the record to support his conclusions

regarding vibration, including a paper published by Toshiba regarding the

Ludington plant. The paper "takes the reader through, step by step, the

finding of the self-excited vibration, the testing that was done both at the

site and back in Japan at the model lab to verify that, in fact, the Tomita

effect is the root cause of the self-excited vibration at -- at Ludington." ECF

No. 223-2 at 126-27. As for his opinion regarding cavitation, Crahan

supports it with engineering calculations ("the Brennen equation") and his

analysis of hydrodynamic testing of a model of the Ludington units that was

done in a laboratory in 2010. ECF No. 214-2 at PageID.16774-79. Although

Defendants disagree with Crahan's conclusions, they have not

24

demonstrated that Crahan's approach is unreliable under the circumstances.

   I.   Defendants' Motion to Exclude Certain Testimony of
        <u>Sara T. Walz (ECF No. 215)</u>

Defendants object to the testimony of Plaintiffs' expert Sara T. Walz, arguing that her opinions are not relevant or reliable and that she lacks the necessary qualifications. Walz has prepared models estimating the cost impact to Consumers if the Ludington Pumped Storage Plant is unable to generate electricity. She is the Director of Electric Supply Planning for Consumers Energy; her background includers a bachelor's degree in mathematics from Michigan State University and a master's degree in applied mathematics, where she focused in mathematical modeling.

Walz provides an opinion regarding the value of the Ludington plant's capacity and energy generation, and the loss of value Plaintiffs could expect to incur if the plant is taken offline for repairs. Walz prepared these calculations using mathematical models that she employs in the ordinary course of her work at Consumers. ECF No. 215-2 at 1. She calculated the daily value of the Ludington plant in terms of capacity and energy production, then assumed certain outage periods, given information supplied by other Consumers employees. In Scenario 1, Walz assumes that Units 2 and 4 are offline for 600 days, which is the length of time that it

is estimated the Voith Hydro repair will take. This outage results in an estimated capacity loss of $145.8 million. In Scenarios 2A and 2B, Walz assumes longer, more expensive outages based upon the need to undertake future, unplanned repairs. Walz also estimates the costs of replacing the two units with a similar battery storage facility.

Defendants challenge the admissibility of Walz's testimony on several grounds. First, they argue that her estimates are not relevant, as they are not used as a basis for Plaintiffs' damages calculation. (According to Defendants, the contract excludes losses incurred as a result of a plant shutdown.) Plaintiffs counter that the bar for relevancy is "low," and that Walz's testimony will provide context and otherwise assist the trier of fact to understand issues in the case. *See LaVictor*, 848 F.3d 428 at 442 (explaining that to be relevant, the testimony must "logically advance[] a material aspect of the proposing party's case"). For example, Plaintiffs contend that Walz's testimony will help illustrate the risks of Toshiba's approach to operate with defective components "as is" and "wait and see" if problems develop, and to rebut Defendants' argument that the costs of repairs undertaken by Plaintiffs outweigh the benefits. Plaintiffs also assert that Walz's calculations support their decision to reject Defendants' "jacking up" repair proposal, which they believe creates the risk of an extended

outage. At this stage, it appears that Walz's testimony meets the relatively low relevancy threshold.

Defendants next argue that Walz's testimony is unreliable because it is based upon assumptions with no factual support in the record. They challenge Walz's assumptions that Units 2 and 4 will fail within the next few years and that this failure will result in outages spanning three to six years. These assumptions, which Walz did not independently validate, were provided by other Consumers employees. Plaintiff responds that support for Walz's assumptions will be adduced at trial, including testimony from Kristopher Koster, the principal project manager for the Ludington Plant repair, who will testify regarding the outage timing and duration for the Voith Hydro repair and the lead time necessary to plan for a repair outage. Plaintiffs also note that Units 2 and 4 are presently restricted in their operation. In this regard, there is "some support" for Walz's assumptions in the record; an ultimate assessment of whether Walz's assumptions are supported by the evidence is more appropriately undertaken at trial. *See Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1224 (6th Cir. 2025) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record.") (citation omitted).

27

Defendants also challenge Walz's qualifications, arguing that she may not opine on technical issues because she is not an engineer. It does not appear, however, that Walz offers opinions requiring engineering knowledge, as she does not predict whether outages will occur, but assumes that they will occur and then uses her expertise to calculate the cost. Defendants further argue that Walz's experience with modeling is "limited," and that she has not published articles, taught courses, subjected her work to peer review, or served as an expert in other cases. However, Walz has a master's degree in applied mathematics with a focus in mathematical modeling. For seventeen years, she has engaged in mathematical modeling as part of her work for Consumers and Consumers relies upon her modeling in the normal course of its business. In this regard, her education and experience are sufficient; she is not required to be a professor or professional litigation expert to be qualified. *See Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208-209 (6th Cir. 2015) (noting that the court takes "a liberal view of what 'knowledge, skill, experience, training, or education' is sufficient").

### J. Defendants' Motion to Exclude Certain Opinions of Joseph C. Tucker (ECF No. 216)

Defendants seek to exclude certain opinions of Dr. Joseph Tucker that "impermissibly parrot" and bolster that of Plaintiffs' other experts with

respect to "DR damage" and "DRE indications." With respect to these issues, Defendants argue, Dr. Tucker relied upon the opinions of Dr. Zachary Owens and Dr. Brian McDonald "rather than conducting any independent scientific evaluation of his own." ECF No. 216 at PageID.19637.

Although experts "may rely on the opinions and conclusions of other experts when forming their own independent conclusions throughout their own independent investigation," they may not "simply 'parrot,' 'echo,' 'regurgitate,' or 'bootstrap' the opinion or conclusion of another expert without any independent evaluation or analysis." *Saginaw Chippewa Indian Tribe of Michigan v. Blue Cross Blue Shield of Michigan*, 745 F. Supp.3d 524, 534 (E.D. Mich. 2024) (citing cases).

Dr. Tucker is a licensed professional engineer with degrees in materials science and engineering, including a Ph.D. from Carnegie Mellon University. He investigated the damage of the DR/DREs at the Ludington plant in person, spending at least 25 days at the plant gathering data, including taking photos with a borescope (a tiny camera on a flexible tube) and obtaining measurements of material loss. See ECF No. 216-2 at PageID.19667-68, 19900-923. He also considered the history and

operation of the plant, as well as the scientific literature, in reaching his opinions. *See* ECF No. 227-3.

Among other conclusions, Dr. Tucker opined that damage to the DRs in Units 2 and 4 was the result of cavitation erosion. ECF No. 216-2 at PageID.19757. His report described his "observations regarding the DR damage and my opinion that this damage is consistent with cavitation erosion, not galvanic corrosion." *Id.* He also stated that "[o]bservations of the damage are consistent with the results of CFD [computational fluid dynamic] simulations in Section 5 of Dr. Owens's report which predict cavitation erosion as the primary damage mechanism." *Id.*

Contrary to Defendants' argument, it is clear from Dr. Tucker's report and deposition that he conducted his own investigation and analysis and did not merely adopt Dr. Owen's opinion wholesale. *See* ECF Nos. 227-2 at 23-31. His partial reliance on Dr. Owens's findings is not impermissible. *See, e.g., Modern Holdings, LLC v. Corning, Inc.*, 2022 WL 2910005, at *6 (E.D. Ky. July 22, 2022) ("While it is true that one expert may not simply 'adopt another expert's opinions wholesale,' it is firmly established under Rule 703 that an expert's testimony may be formed using the conclusions and opinions of other experts.") (citation omitted; collecting cases). To the extent Defendants identify other alleged flaws in Dr. Tucker's investigation

or analysis – that he did not conduct laboratory testing or that he "cherry-picked" photos – that is grist for cross-examination, not exclusion.

Defendants also challenge Dr. Tucker's opinion that cracks and crack-like flaws or "indications" in the DREs create the risk of structural failure. In particular, Defendants contend that Dr. Tucker is merely regurgitating Dr. McDonald's opinion. ECF No. 216-2 at 129 ("As discussed in Section 5.1 of Dr. McDonald's report, this can create considerable risk and uncertainty regarding structural condition of the DRE and may even compromise achieving the CCS-specified service life of at least 30 years.").

Plaintiffs respond that Dr. Tucker conducted his own investigation of the alleged defects in the DREs, including analyzing liquid penetrant or "PT testing." They contend that PT testing is a "well-accepted" method to identify cracks and other flaw in metal components. When flaws are identified using PT testing, engineering codes provide criteria to determine whether a flaw should be repaired based upon its size and shape. Dr. Tucker also took photographs of the flaws and analyzed the images with reference to the relevant engineering code (BPVC), performed field tests of the DRE metal, and conducted laboratory testing of an exemplar DRE that had cracked beyond repair. ECF No. 227-2 at 204-209; ECF No. 216-2 at

PageID.19970-20065. Defendants' argument that Dr. Tucker relies solely on Dr. McDonald's report is unavailing. *See* ECF No. 227-2 at 240-47.

Defendants argue that because Dr. Tucker did not measure the depth of the cracks or find them to be of "critical" size, he has no basis to opine regarding structural integrity or whether the cracks should be repaired. Plaintiffs assert that whether the cracks are "critical" is not relevant to Dr. Tucker's opinion that the cracks meet BPVC criteria and should be repaired or a fitness-for-service ("FFS") analysis performed. Dr. Tucker further opines that, for various reasons, an FFS analysis may not be reliably performed under the circumstances, the defects continue to grow, and thus frequent monitoring is necessary to address the "risk and uncertainty," including the risk of failure. Dr. Tucker's opinion rests upon sufficiently reliable grounds; to the extent there are matters or data that Dr. Tucker failed to consider, they go to weight and credibility rather than admissibility.

## III.   Conclusion

It is **ORDERED** as follows: 1) Plaintiffs' Motion to Exclude Certain Opinions of Bernhard Bittner (ECF No. 206) is **DENIED WITHOUT PREJUDICE**; 2) Plaintiffs' Motion to Exclude Certain Testimony of William Coleman (ECF No. 207) is **DENIED WITHOUT PREJUDICE**; 3) Plaintiffs' Motion to Exclude Certain Testimony of William D. Marscher (ECF No. 208)

is **DENIED WITHOUT PREJUDICE**; 4) Plaintiffs' Motion to Exclude Certain Testimony of Jamie Petty-Galis (ECF No. 209) is **GRANTED IN PART AND DENIED IN PART, WITHOUT PREJUDICE**; 5) Plaintiffs' Motion to Exclude Certain Testimony of Richard A. Polich (ECF No. 212) is **GRANTED IN PART AND DENIED IN PART, WITHOUT PREJUDICE**; 6) Plaintiffs' Motion to Exclude Certain Testimony of Dakus Gunn (ECF No. 213) is **GRANTED IN PART AND DENIED IN PART, WITHOUT PREJUDICE**; 7) Defendants' Motion to Exclude Certain Testimony of Marcus Crahan (ECF No. 214) is **DENIED WITHOUT PREJUDICE**; 8) Defendants' Motion to Exclude Testimony of Sara T. Walz (ECF No. 215) is **DENIED WITHOUT PREJUDICE**, and 9) Defendants' Motion to Exclude Certain Testimony of Joseph C. Tucker (ECF No. 216) is **DENIED WITHOUT PREJUDICE.**

 **SO ORDERED.**

Dated: September 26, 2025    <u>s/F. Kay Behm</u>
             F. Kay Behm
             United States District Judge