IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSUMERS ENERGY COMPANY
and DTE ELECTRIC COMPANY,

     Plaintiffs/Counter-Defendants,

     v.

TOSHIBA AMERICA ENERGY
SYSTEMS CORPORATION and
TOSHIBA CORPORATION,

     Defendants/Counter-Plaintiffs.

Case No: 4:22-cv-10847

Hon. F. Kay Behm

Mag. Judge Curtis Ivy, Jr.

**Oral Argument Requested**

### TOSHIBA AMERICA ENERGY SYSTEMS CORPORATION'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW A NEW TRIAL

Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, Defendant Toshiba America Energy Systems Corporation ("TAES") moves for judgment as a matter of law against Plaintiffs Consumers Energy Company ("Consumers") and DTE Electric Company ("DTE") (collectively "Plaintiffs") or, in the alternative, for a new trial under Rule 59 of the Federal Rules of Civil Procedure, on all claims. In support of its Motion, TAES relies on the trial record and the facts, legal argument, and authorities set forth in the accompanying brief.

As the accompanying brief shows, the trial was contaminated by fundamental defects, including that a jury trial was not proper and that ratepayers of the Plaintiffs should not have been seated on the jury. In addition, TAES is entitled to judgment as

a matter of law on a number of grounds, including under the Overhaul Contract's cavitation warranty and TAES's affirmative defenses.  Furthermore, the verdict form misled the jury as to the scope of those affirmative defenses.  TAES is also entitled to relief because Plaintiffs did not present sufficient evidence to support the damages award.  Accordingly, TAES respectfully requests that the Court grant its Motion.

On January 8, 2026, counsel for TAES and Toshiba conferred with Plaintiffs' counsel, pursuant to L.R. 7.1(a)(1), and explained the nature and legal basis of this Motion.  TAES did not obtain concurrence in the relief sought.

Dated:  January 15, 2026

Respectfully submitted,

**WHITE & CASE**

By:   */s/ Christopher M. Curran*
        Christopher M. Curran

**FOLEY & LARDNER LLP**

Nicholas J. Ellis (P73174)
500 Woodward Avenue, Suite 2700
Detroit, MI  48226-3489
(313) 234-7100
nellis@foley.com

Jennifer M. Luther
150 East Gilman Street, Suite 5000
Madison, WI 53703
(608) 258-4215
jluther@foley.com

Christopher M. Curran
Eric Grannon
J. Frank Hogue
Holly Zheng
701 Thirteenth Street, NW
Washington, DC  20005
(202) 626-3600
ccurran@whitecase.com
egrannon@whitecase.com
fhogue@whitecase.com
holly.zheng@whitecase.com

*Attorneys for Toshiba America
Energy Systems Corporation and
Toshiba Corporation*

ii

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSUMERS ENERGY COMPANY
and DTE ELECTRIC COMPANY,

     Plaintiffs/Counter-Defendants,

     v.

TOSHIBA AMERICA ENERGY
SYSTEMS CORPORATION and
TOSHIBA CORPORATION,

     Defendants/Counter-Plaintiffs.

Case No: 4:22-cv-10847

Hon. F. Kay Behm

Mag. Judge Curtis Ivy, Jr.

**Oral Argument Requested**

**TOSHIBA AMERICA ENERGY SYSTEMS CORPORATION'S
BRIEF IN SUPPORT OF ITS RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL**

## <u>QUESTION PRESENTED</u>

1. Whether the Court should grant TAES's renewed motion for a judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, or for a new trial under Rule 59.

Defendants:       Yes.

Plaintiffs:       Plaintiffs' counsel stated that they did not concur with the motion and planned to oppose it.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Fed. R. Civ. P. 50

Fed. R. Civ. P. 59

MCR 2.611

*Dupree v. Younger*,
     598 U.S. 729 (2023)

*Gilbert v. DaimlerChrysler Corp.*,
     685 N.W.2d 391 (Mich. 2004)

*MSC.Software Corp. v. Altair Eng'g, Inc.*,
     No. 07-12807, 2014 WL 6485492 (E.D. Mich. Nov. 13, 2014)

*Palenkas v. Beaumont*,
     443 N.W.2d 354 (Mich. 1989)

# **TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................1

ARGUMENT ................................................................................................3

I.  The Overhaul Contract Bars Any Jury Trial, Let Alone a Jury Trial
    Infected by a Financially Interested Jury............................................6

II. The Evidence at Trial Was Insufficient as a Matter of Law to Establish
    TAES's Liability............................................................................ 11

    A.  Plaintiffs Failed to Prove Breach of Any Cavitation Warranty ..........11

    B.  Conditions Known Prior to the Grant of Unit Interim Acceptance
        or Unit Final Acceptance Cannot Form the Basis of a Warranty
        Claim 20

III. The Verdict Form Gave Short Shrift to TAES's Affirmative Defenses ....... 22

IV. The Evidence Does Not Support the Largest Civil Jury Verdict in
    Michigan History ........................................................................ 24

    A.  Plaintiffs' Alleged Damages Are Inaccurate, Speculative, Inflated,
        and Unsupported.......................................................................24

    B.  The Voith Budgetary Estimates that Mr. Emmert Relied Upon
        Were Not Admitted for Truth of the Matter Asserted ........................26

    C.  TAES Was Not Permitted to Question Witnesses from Voith,
        Whose Budgetary Proposals Formed the Basis for Plaintiffs'
        Damages Estimates....................................................................27

    D.  Voith's Estimates Are Unreliable, Expressly Non-binding, and
        Subject to Cancelation ...............................................................30

        1.  Voith's Cost Proposals Are Not Binding on the Plaintiffs ........30

        2.  Voith Was Incentivized to Submit Inflated Cost Proposals
            to Increase the Budget for its Work and to Injure a Direct
            Competitor ..................................................................33

        3.  It Is Undisputed that Voith's Estimates Underlying the

Jury's Damages Award Were Not Subject to Competitive Bidding ........................................................................................34

4.    Voith's Budgetary Proposals Are Entirely Unsupported and Do Not Meet Industry Standards ................................................36

5.    The Evidence Showed that Voith's Budgetary Proposals Were Wildly Excessive ..............................................................37

6.    Plaintiffs Can Change or Cancel Voith's Scope of Work .........39

7.    Beyond Mr. Emmert Serving Merely as a Conduit for Voith's Budgetary Estimates, No Reasonable Jury Could Have Credited Mr. Emmert's Testimony for Purposes of Calculating Reasonably Certain Damages................................40

8.    Voith's Proposed Solution Includes Work that is Not Even Necessary ..................................................................................43

V.    The Jury's Damages Award of $383,136,736, the Largest in Michigan History, is "Excessive" Under MCR 2.611 and *Palenkas* ........................... 45

A.    Plaintiffs Sought to Circumvent the Contractual Limitation on Liability to Play on the Passion and Sympathy of the Jurors and Confound the Jurors' Quantification of Damages .............................46

B.    Infected by Plaintiffs' Purported $790 Million in "Full Damages," the Jury's Award of $383 Million is Grossly Disproportionate to the Roughly $526 Million that Plaintiffs Paid TAES for Ten Years of Work on All Six Units at Ludington and Unsupportable by the Record................................................................................................48

C.    The Jury's Award of $383,136,736 is a Demonstrable Outlier ...........50

CONCLUSION ...................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*American Ordinance LLC v. U.S.*,
  83 Fed. Cl. 559 (2008) ......................................................................... 16

*Auto Indus. Supplier Emp. Stock Ownership Plan v. Ford Motor Co.*,
  435 F. App'x 430 (6th Cir. 2011) ......................................................... 28

*Bank of America, N.A. v. Moglia*,
  330 F.3d 942 (7th Cir. 2003) ................................................................ 15

*Bodnar v. St. John Providence, Inc.*,
  933 N.W.2d 363 (Mich. Ct. App. 2019) ............................................... 17

*Capital Traction Co. v. Hof*,
  174 U.S. 1 (1899) .................................................................................... 5

*City of Cleveland v. Peter Kiewit Sons' Co.*,
  624 F.2d 749 (6th Cir. 1980) .................................................................. 9

*Comerica, Inc. v. Dept. of Treasury*,
  984 N.W.2d 1 (Mich. 2022) .................................................................. 13

*Cummins v. BIC USA, Inc.*,
  727 F.3d 506 (6th Cir. 2013) .................................................................. 5

*Doe v. Henry Ford Health Sys.*,
  865 N.W.2d 915 (Mich. Ct. App. 2014) ............................................... 24

*Dupree v. Younger*,
  598 U.S. 729 (2023) ................................................................................ 4

*Engebretsen v. Fairchild Aircraft Corp.*,
  21 F.3d 721 (6th Cir. 1994) .................................................................. 26

*Felton v. Spiro*,
  78 F. 576 (6th Cir. 1897) ........................................................................ 4

*Freedom's Path at Dayton v. Dayton Metro. Housing Auth.*,
  605 F. Supp. 3d 1042 (S.D. Ohio 2022) ................................................ 8

*Fryman v. Fed. Crop Ins. Corp.*,
    936 F.2d 244 (6th Cir. 1991) ................................................................ 4

*Genna v. Jackson*,
    781 N.W.2d 124 (Mich. Ct. App. 2009) ................................................ 4

*Getter v. Wal-Mart Stores*,
    66 F.3d 1119 (10th Cir. 1995) ............................................................... 8

*Gilbert v. DaimlerChrysler Corp.*,
    685 N.W.2d 391 (Mich. 2004) ................................................. 46, 47, 48

*Hanover Ins. Co. v. Am. Eng'g Co.*,
    105 F.3d 306 (6th Cir. 1997) ................................................................ 8

*Hastings Mut. Ins. Co. v. Safety King, Inc.*,
    778 N.W.2d 275 (Mich. Ct. App. 2009) .............................................. 17

*Herrin v. Dunham*,
    No. 05-10245, 2008 WL 2718802 (E.D. Mich. July 10, 2008) ............. 8

*Hickson Corp. v. Norfolk Southern Railway Co.*,
    260 F.3d 559 (6th Cir. 2001) .............................................................. 23

*Hoerstman General Contracting, Inc. v. Hahn*,
    711 N.W.2d 340 (Mich. 2006) ............................................................ 13

*Johnson v. Ford Motor Co.*,
    No. 24-1550, 2025 WL 1070297 (6th Cir. Apr. 9, 2025) ..................... 6

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013) ............................................................... 28

*McCoy v. Goldston*,
    652 F.2d 654 (6th Cir. 1981) .............................................................. 11

*McDonough Power Equip., Inc. v. Greenwood*,
    464 U.S. 548 (1984) ............................................................................ 45

*MSC.Software Corp. v. Altair Eng'g, Inc.*,
    No. 07-12807, 2014 WL 6485492 (E.D. Mich. Nov. 13, 2014) ..... 5, 45

*Murphy v. Vaive Wood Prods. Co.*,
  No. 2:17-11513, 2019 WL 117337 (E.D. Mich. Jan. 7, 2019)............................. 5

*Napier v. Am. Econ. Ins. Co.*,
  No. 3:22-318, 2025 WL 2687605 (S.D. Ohio Sep. 19, 2025)........................... 28

*Palenkas v. Beaumont*,
  443 N.W.2d 354 (Mich. 1989)............................................................... 46

*Richardson v. Wright*,
  No. 361841, 2024 WL 302155 (Mich. Ct. App. Jan. 25, 2024).......................... 17

*Roche Diagnostics Corp. v. Shaya*,
  No. 19-10264, 2023 WL 7412918 (E.D. Mich. Nov. 9, 2023) .......................... 26

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
  697 F.3d 387 (6th Cir. 2012) ............................................................... 23

*Sterling National Bank v. Block*,
  984 F.3d 1210 (7th Cir. 2021) ............................................................. 15

*Sundance, Inc. v. Demonte Fabricating, LTD.*,
  No. 02-73543, 2007 WL 2287829 (E.D. Mich. Aug. 1, 2007) ........................... 5

*United States v. Callahan*,
  801 F.3d 606 (6th Cir. 2015) ............................................................... 6

*United States v. Tipton*,
  269 F. App'x 551 (6th Cir. 2008) .......................................................... 28

*United States v. Trutenko*,
  490 F.2d 678 (7th Cir. 1973) ............................................................... 8

*Webster v. Edward D. Jones & Co., L.P.*,
  197 F.3d 815 (6th Cir. 1999) ............................................................... 4

*Welker v. Goodyear Tire Co.*,
  117 F.3d 1421 (6th Cir. 1997) ............................................................. 4

*Willkie v. Auto-Owners Ins. Co.*,
  664 N.W.2d 776 (Mich. 2003)............................................................. 21

## STATUTES AND RULES

Fed. R. Civ. P. 50(a) ............................................................................ 4

Fed. R. Civ. P. 59 ................................................................................ 5

MCLS § 460.6s .................................................................................. 65

MCR 2.611 ........................................................................................ 46

## **INTRODUCTION**

On December 18, 2025, a twelve-person jury — composed entirely of Plaintiffs' ratepayers — issued a verdict against TAES in the amount of $383,136,736. According to Plaintiffs' counsel, this verdict is "the largest civil jury verdict in Michigan history." Jenner & Block Secures Largest Civil Jury Verdict in Michigan History for Consumers Energy and DTE Electric, Jenner & Block News and Insights (Jan. 5, 2026) (https://www.jenner.com/en/news-insights/news/jenner-and-block-secures-largest-civil-jury-verdict-in-michigan-history-for-consumers-energy-and-dte-electric). Notwithstanding that jury verdict — including its outsized damages award — TAES is entitled to judgment as a matter of law in its favor under Rule 50(b) or, at a minimum, to a new trial under Rule 59.

As an initial matter, a jury trial never should have been held, given the jury-trial waiver set forth in the parties' contract documents. The factual record at trial reinforces the applicability of the jury-trial waiver to the claims against TAES and invites this Court to reconsider its ruling to the contrary. Furthermore, even if a jury trial had been proper, utility ratepayers — direct customers of the Plaintiffs — never should have been seated on the jury given their pecuniary interest in the outcome of the trial, a pecuniary interest exploited repeatedly by Plaintiffs' witnesses and counsel at trial. These circumstances require a new trial, before the Court (or at least a jury of disinterested persons).

Beyond the issues of the jury-trial waiver and the composition of the jury, judgment as a matter of law in TAES's favor is required on a number of grounds, including because the Overhaul Contract provides a cavitation warranty only on the runner and not on other components, such as the discharge rings. Judgment as a matter of law is also required on TAES's hugely important affirmative defenses of waiver, modification, and release. And, at a minimum, a new trial is warranted on those affirmative defenses because the verdict form erroneously and prejudicially presented these defenses as all-or-nothing, available only as "entire[]" defenses, rather than defenses that could reduce rather than eliminate TAES's liability.

Last but not least — indeed, of utmost importance — judgment as a matter of law, or at least a new trial, is required because Plaintiffs' evidence of damages was legally insufficient to support the jury's award, or any award of damages. The Plaintiffs' damages case rested on mere non-binding "estimates" provided by Voith, a substitute contractor. These "estimates" — really budgetary proposals — were not verified or even supported by any witness from Voith. Nor were they the result of competitive bidding or any other form of arms'-length negotiation. No technical expert opined that Voith's "estimates" were reasonable or even that they addressed work required to be done to correct alleged defective work by TAES. Instead, these "estimates" are made-for-litigation contrivances. They are binding on neither Plaintiffs nor Voith. They address work that is cancelable and de-scopeable. They

do not consider what is or is not covered by applicable warranties or warranty periods. They include betterment. The Voith "estimates," in short, do not constitute a sufficient or reasonable quantification of any damages, let alone the excessive damages awarded by the jury.

All told, the jury verdict cannot stand. The jury was constituted unlawfully. And its verdict — delivered with extreme haste despite a huge trial record — is not supported by sufficient evidence. Indeed, the verdict amount, historic in its magnitude, bears no relationship to any evidence or advocacy presented at trial. Perhaps understandably, the jury was exhausted by the lengthy trial and determined to finish its job as quickly as possible without regard to thoughtful deliberation or sound reasoning.

## **ARGUMENT**

Under Rule 50(b) of the Federal Rules of Civil Procedure, a party that previously moved for judgment as a matter of law under Rule 50(a) may renew that motion after a jury verdict. Rule 50(b) expressly authorizes the party to include in such a renewed motion an alternative or joint request for a new trial. Having previously moved under Rule 50(a) (ECF 389), TAES now renews that motion and includes a request for a new trial.

Under Rule 50(b), as under Rule 50(a), the relevant question is whether "a reasonable jury would not have a legally sufficient evidentiary basis to find for the

party" on a particular issue.  Fed. R. Civ. P. 50(a).  Michigan uses the same standard. *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 818 (6th Cir. 1999) ("Because this is a diversity case, this Court applies Michigan law, which states that 'a judgment notwithstanding the verdict is appropriate only if the evidence is insufficient as a matter of law . . . .'"); *Genna v. Jackson*, 781 N.W.2d 124, 128 (Mich. Ct. App. 2009) (denoting "insufficient evidence" standard).

While the Rule 50 standard "largely 'mirrors' the summary-judgment standard," the difference is "that district courts evaluate Rule 50[] motions in light of the trial record rather than the discovery record." *Dupree v. Younger*, 598 U.S. 729, 731-32 (2023).  Thus, "[t]he district court is simply not bound by its pretrial denial of a summary judgment after it actually considers the evidence ultimately presented at trial." *Welker v. Goodyear Tire Co.*, 117 F.3d 1421, 1421 (6th Cir. 1997).

As to the alternative remedy of a new trial under Rule 59, the Sixth Circuit has long recognized that the remedy is "one of the most important rights which a party to a jury trial has." *Felton v. Spiro*, 78 F. 576, 581 (6th Cir. 1897) (W.H. Taft, J.).  Trial courts have broad discretion to grant a new trial, and a new-trial grant "will not be reversed unless the reviewing court has a definite and firm conviction that the trial court committed a clear error of judgment." *Fryman v. Fed. Crop Ins. Corp.*, 936 F.2d 244, 248 (6th Cir. 1991).  As this Court has put it, quoting a Supreme Court

case from over a century ago:

> "Trial by jury," in the primary and usual sense of the term at the common law and in the American constitutions, is not merely a trial by a jury of 12 men . . . ; but it is a trial by a jury of 12 men in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict, if, in his opinion, it is against the law or the evidence.

*MSC.Software Corp. v. Altair Eng'g, Inc.*, No. 07-12807, 2014 WL 6485492, at *3 (E.D. Mich. Nov. 13, 2014) (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 13 (1899)); *see also Sundance, Inc. v. Demonte Fabricating, LTD.*, No. 02-73543, 2007 WL 2287829, at *3 (E.D. Mich. Aug. 1, 2007) (same, also noting "[t]he judge is not obligated to accept a jury's verdict willy nilly").

A new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Among those reasons are where the jury "reaches a 'seriously erroneous result as evidenced by (1) the verdict being against the clear weight of evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias.'" *Murphy v. Vaive Wood Prods. Co.*, No. 2:17-11513, 2019 WL 117337, at *2 (E.D. Mich. Jan. 7, 2019) (quoting *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 509 (6th Cir. 2013)). In addition, a court may order a new trial on any basis, including one not raised by the parties. *See* Fed. R. Civ. P. 59(d). In its review of a new-trial motion,

5

"the district court 'may act in the role of a "thirteenth juror" and consider the credibility of the witnesses and the weight of the evidence.'" *Johnson v. Ford Motor Co.*, No. 24-1550, 2025 WL 1070297, at *3 (6th Cir. Apr. 9, 2025) (quoting *United States v. Callahan*, 801 F.3d 606, 616-17 (6th Cir. 2015)).

## I.   The Overhaul Contract Bars Any Jury Trial, Let Alone a Jury Trial Infected by a Financially Interested Jury

TAES (and Toshiba) previously moved — unsuccessfully — to strike Plaintiffs' jury demands; that issue was fully aired, addressed by this court, and preserved for appeal.  ECF 158; ECF 164; ECF 242.  TAES will not reiterate all of its arguments here.  That said, as the Court well knows, the basis for TAES and Toshiba's argument arose from a jury-trial waiver, included in both Exhibit L to the Overhaul Contract (the negotiated form of Parent Guaranty required under GC26) and the executed Parent Guaranty itself, bilaterally barring a jury trial as to any claims "ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS GUARANTY AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH . . . ." (PTX-0001 at 89).  The jury-trial waiver adds that it is "A MATERIAL INDUCEMENT FOR THE OWNER ENTERING INTO THE [OVERHAUL] CONTRACT." *Id.*  In denying the motion to strike Plaintiffs' jury-trial demands, however, this Court appeared to place considerable weight on the view that the Overhaul Contract was separate and distinct from the Parent Guaranty.  ECF 242 at 5-10, PageID.26763-68.

6

The evidence at trial confirmed the close connection between TAES and Toshiba in the contracting and performance of the overhaul.  (*See, e.g.*, ECF 358, Tr. 255:17-22, PageID.41190 (Plaintiffs' witness, Mr. Degenfelder, testifying that Toshiba "had many executives from Japan" come into Michigan to negotiate the Overhaul Contract in person)).  Toshiba is the first in the Overhaul Contract's list of "Major Subcontractors," included for their "design engineering and procurement of pump-turbine and generator motor components . . . ." (PTX-0001 at 5).  Throughout the trial Plaintiffs' witnesses described work done by engineers employed by Toshiba's ESS or communications directly with Toshiba.  (*See, e.g.*, ECF 341, Tr. 14:5-9, PageID.35359 (Mr. Koster describing an engineering communication from "Toshiba engineering Japan"); *id.* Tr. 129:25–130:16, PageID.35474-75 (Mr. Koster describing PTX-1021, a letter "addressed to both Toshiba America Energy Systems, to Ken Takagi, as well as Toshiba Corporation in Japan" regarding "Outstanding resolution of defective work")).  And during closing arguments, Plaintiffs' counsel explicitly stated that TAES and Toshiba were a package deal.  (ECF 393, Tr. 29:5-7, PageID.44385 ("Consumers Energy and DTE hired TAES because TAES, leaning heavily on the experience of its parent company, Toshiba Corporation, claimed to be experts.")).  The integration of TAES and Toshiba without differentiation underscores that the jury-trial waiver should be taken by its literal terms and applied to both TAES and Toshiba.

This Court is of course free to revisit its previous, interlocutory decision denying application of the jury-trial waiver to the claims against TAES.  *See Herrin v. Dunham*, No. 05-10245, 2008 WL 2718802, at *7 (E.D. Mich. July 10, 2008) (citing *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997)) ("A court may 'reconsider a ruling: (1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice.'").  In light of the factual record developed at trial, this Court should reconsider its prior ruling and give full effect to the jury-trial waiver.

Despite the jury-trial waiver, TAES was not only tried by a jury, but one made up entirely of Plaintiffs' ratepayers.  (*See, e.g.*, ECF 338, Tr. 42:18-24, PageID.34780; *id.* Tr. 25:23–26:7, PageID.34763-64).  These jurors had a direct financial interest in minimizing what they pay for electricity and necessarily understood that a verdict against TAES and in favor of Plaintiffs will minimize what they (and fellow Michiganders) will pay.  Potential jurors with even a minor financial interest in the outcome of an action normally are excluded from service. *See, e.g.*, *Freedom's Path at Dayton v. Dayton Metro. Housing Auth.*, 605 F. Supp. 3d 1042, 1049-50 (S.D. Ohio 2022) (holding that "pecuniary interest would necessarily disqualify a prospective juror from service") (quoting *United States v. Trutenko*, 490 F.2d 678, 679 (7th Cir. 1973)); *Getter v. Wal-Mart Stores*, 66 F.3d

1119, 1122 (10th Cir. 1995) (holding potential jurors should be removed for cause where their "financial well-being [is] to some extent dependent upon [a party's]"). TAES's motion in limine to address this issue was denied, but it should not have been. (*See* ECF 264; ECF 297). The outcome of the trial confirms the prejudice to TAES and Toshiba; even if the Court will not reconsider the jury-trial waiver, a new trial untainted by financially interested jurors is a matter of justice.

Not only was the jury made up of Plaintiffs' ratepayers, Plaintiffs exploited the jurors' financial interest. Despite a Court order prohibiting references to this action's outcome affecting utility rates, Plaintiffs' damages expert Michael Emmert explicitly stated that Plaintiffs took on costs "on behalf of Michigan rate- -- and folks in Michigan who get electricity and that kind of thing." (ECF 352, Tr. 201:20–202:4, PageID.37716-17). While the Court instructed the jury to disregard Mr. Emmert's comments, the effectiveness of that instruction was dubious. *See City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 759 (6th Cir. 1980) ("[C]autionary instructions are effective only up to a certain point."). And, undaunted, Plaintiffs' counsel began and ended closing arguments with thinly veiled references to the financial interest of the Michigan-ratepayer jurors. (ECF 393, Tr. 28:11-14, PageID.44384 ("And it's an important case to the state of Michigan. It's important to the state of Michigan because the Ludington Power Plant is a unique asset that provides renewable energy to the state of Michigan and beyond."); *see also*

9

*id.* Tr. 144:24-25, PageID.44500 (referring to Plaintiffs as "[c]ompanies that have been good civic citizens of the state of Michigan for more than 100 years")).

The media, in articles before, during, and after trial, referenced the verdict's impact on ratepayers.  (Lucas Smolcic Larson, *Big utilities locked in court battle over pricey overhaul of power plant on Lake Michigan*, MLive.com (May 3, 2025) (https://www.mlive.com/environment/2025/05/big-utilities-locked-in-court-battle-over-pricey-overhaul-of-power-planton-lake-michigan.html);   Lucas   Smolcic Larson, *Big utilities claim botched rebuild of Lake Michigan power plant in $600M trial*, MLive.com (Nov. 7, 2025) (https://www.mlive.com/news/2025/11/big-utilities-claim-botched-rebuild-of-lake-michigan-power-plant-in-600m-trial.html); Lucas Smolcic Larson, *Utilities win $383M verdict in trial claiming botched rebuild of Lake Michigan power plant*, MLive.com (Dec. 19, 2025) (https://www.mlive.com/news/2025/12/utilities-win-383m-verdict-in-trial-claiming-botched-rebuild-of-lake-michigan-power-plant.html)).   In admonishing the jurors not to view any media discussing the trial, the Court referred the jury to the second of these articles:  "Newspapers, television, radio — there was an article about this, by the way.  I don't know if you guys heard that.  I hope you didn't.  I'm hoping.  There was an article about it when it first started."  (ECF 393, Tr. 155:21-24, PageID.44511).  That article, published on November 7, 2025, includes a section entitled "Rate questions surround trial outcome" devoted entirely to the possibility

that the verdict would affect electricity rates for Plaintiffs' customers.  (Larson, *supra*, Nov. 7, 2025).  The article cites a Michigan energy consultant for the point that "[i]n theory, if [Plaintiffs] are awarded damages in court, that will help offset the cost of additional investments at the plant and could even bring savings to customers." *Id.*  An article by the same outlet regarding the jury's verdict confirms Plaintiffs' belief that this action impacts ratepayers, having quoted the Plaintiffs as saying they "always go to bat for [their] customers."  (Larson, *supra*, Dec. 19, 2025).

The right to an impartial jury is guaranteed by the U.S. Constitution as a matter of due process.  *McCoy v. Goldston*, 652 F.2d 654, 657 (6th Cir. 1981) ("The right to an impartial jury in civil cases is inherent in the Seventh Amendment's preservation of a 'right to trial by jury' and the Fifth Amendment's guarantee that 'no person shall be denied of life, liberty or property without due process of law.'").  Here though, ratepayers with a direct financial stake, through their electricity bills, were allowed to sit as jurors.

## II.   The Evidence at Trial Was Insufficient as a Matter of Law to Establish TAES's Liability

### A.   Plaintiffs Failed to Prove Breach of Any Cavitation Warranty

At trial, the centerpiece of Plaintiffs' case was their argument that the discharge rings in Units 2 and 4 suffered from cavitation erosion caused by the absence of a lower seal.  (*See, e.g.*, ECF 330, Tr. 54:11-12, PageID.33048 (arguing during the opening statement "the evidence will show that the cause of the damage

11

[on the discharge rings] is that force called cavitation erosion"); ECF 393, Tr. 37:3–42:16, PageID.44393-98 (arguing throughout the closing argument that cavitation was the cause of the material loss); ECF 343, Tr. 160:11-23, PageID.36029 (Dr. Tucker testifying that "The DRs in Units 2 and 4 have failed. They have sustained material loss primarily from cavitation erosion, which has resulted in deep locations of material loss at the location of the DR . . . ."); ECF 348, Tr. 207:16-21, PageID.36686-87 (Dr. Tucker testifying that Units 2 and 4 not having the lower seal ring was a design difference "relevant to the condition of the discharge ring[s] in those units"); ECF 349, Tr.29:23–30:14, PageID.36755-56 (Dr. Owens testifying that cavitation erosion damage allegedly seen on Units 2 and 4 is caused by the lack of a "pinch point" that would be created by the lower seal); ECF 351, Tr. 165:21–166:10, PageID.37443-44 (Marcus Crahan testifying about "the root cause for the cavitation erosion in the machine, "which is that the discharge wearing ring seal is in the wrong location for the upgrade pump-turbine."")).  But this argument fails as a matter of law for at least two independent reasons:  (i) the Overhaul Contract does not contain any warranty against cavitation erosion on the DRs and (ii) Plaintiffs waived any claim based on the design of Units 2 and 4.

The record is devoid of any evidence on which a reasonable jury could find that TAES provided a warranty against cavitation erosion on non-runner components.  The only cavitation warranty in the Overhaul Contract, set out by

Article GC21(b)(iii), provides that:

> Without limiting the generality of the Contractor's warranty as set forth in GC[21](b)(ii), the Contractor **warrants that the pump-turbine runner** for each Unit will not show cavitation in excess of the limits and parameters set forth in the Conformed Contract Specification, PART TWO, Design Data Sheet ME-11450.2, Section 3.3 (the "Cavitation Warranty").

(GC21(b)(iii), PTX-0001 at 33 (emphasis added)).  That warranty, which has its own specified period, is accompanied by elaborate detail in Section 3.3 of the Conformed Contract Specifications.  (*See* PTX-0002 at 304-05).

The cavitation warranty in GC21(b)(iii) plainly states that it applies to the pump-turbine runner, and not to any other component.  *See Hoerstman General Contracting, Inc. v. Hahn*, 711 N.W.2d 340, 346 (Mich. 2006) (discussing the legal maxim of *expressio unius est exclusio alterius* as a "rule of construction that is a product of logic and common sense" and noting that "no maxim is more uniformly used to properly construe statutes"); *Comerica, Inc. v. Dept. of Treasury*, 984 N.W.2d 1, 7 (Mich. 2022) (noting that the canon "properly applies only when the *unius* (or technically, *unum*, the thing specified) can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved") (internal quotations and citation omitted).  Mr. Hyuga, a senior-level engineer, who personally negotiated GC21(b)(iii), confirmed what the Contract states on its face when he testified that "the only cavitation warranty that is . . . being made is for the

pump-turbine runner."  (ECF 368, Tr. 135:2-3, PageID.42188).

In contrast to the express and elaborate cavitation warranty on the runner, as to other components (such as the DRs) the Overhaul Contract is conspicuously devoid of any cavitation warranty, or elaborate parameters for determining what is an acceptable amount of cavitation erosion.  This contrast, standing alone, indicates that the DRs are not subject to a cavitation warranty.   And that indication is powerfully confirmed by IEC Standard 60609-1, incorporated into the Overhaul Contract in many places (including in the Pump-Turbine Section addressing the DRs (*see e.g.*, PTX-0002 at 413; PTX-0002 at 321)), which states that cavitation warranties can be established only by "mutual agreement" between the parties.  (*See* D-2500 at 11).

Notably, the IEC Standard 60609-1 could not be more on point.  It addresses cavitation pitting, which it defines as "loss of material caused by cavitation." (D-2500 at 1, 15, 19).  That is the precise phenomenon described by Plaintiffs' experts.  *See, e.g.*, ECF 349, Tr. 72:13-15, PageID.36798 (Dr. Owens testified, "You can see a rough surface. You can see that that surface is pitted. That rough, pitted surface is, is characteristic of cavitation erosion."); ECF 349, Tr. 177:1-4, PageID.36903 (Dr. McDonald testified about "measur[ing] the depths of these pits - - you can see there is a very rough surface, like a moonscape.")).

Plaintiffs seek to shoehorn a cavitation warranty into the general warranty of

14

GC21(b)(ii), but that cannot work.  That provision shows no "mutual assent" to provide a cavitation warranty.  Cavitation at a hydroelectric power plant is not even a defect, but an endemic condition.   (*See, e.g.*, ECF 368, Tr. 165:25–166:4, PageID.42218 (Mr. Hyuga testifying that "cavitation in hydro equipment is not something that is unusual" and "is relatively common"); PTX-0014 at 12 (Change Order 9 referring to cavitation damage as "wear and tear")).

Mr. Hyuga testified that a cavitation warranty "is a very, very important thing" and the terms of the cavitation warranty were heavily negotiated between the parties. (ECF 368, Tr. 135:11-22, PageID.42188; *see Sterling National Bank v. Block*, 984 F.3d 1210, 1217 (7th Cir. 2021) ("With contracts with substantial stakes, negotiated between commercially sophisticated parties, we interpret contracts 'literally' because such parties 'know how to say what they mean and have an incentive to draft their agreement carefully.'") (quoting *Bank of America, N.A. v. Moglia*, 330 F.3d 942, 946 (7th Cir. 2003))).   Mr. Hyuga also testified that, during those negotiations, Plaintiffs requested (i) that the cavitation warranty apply for a longer period of time to the pump-turbine runners; and (ii) that the cavitation warranty include "nonrotating parts" — a category under which the discharge rings would fall.  (ECF 368, Tr. 135:12-22, PageID.42188; *id.* 138:22-24, PageID.42191).  The Toshiba entities rejected those requests, and Mr. Hyuga testified that the proposed provision applying the cavitation warranty to nonrotating parts was deleted from the

draft in its entirety.  (*See* ECF 368, Tr. 153:12-21, PageID.42206).   The final Contract contains only the more narrow cavitation warranty on the runner.  (PTX-0001 at 33).

Plaintiffs presented no evidence at trial contrary to Mr. Hyuga's testimony: for example, although Mr. Degenfelder negotiated this provision on behalf of Plaintiffs and proffered trial testimony on other negotiated provisions, Plaintiffs did not present any testimony from Mr. Degenfelder inconsistent with Mr. Hyuga's recounting of the negotiations on GC21(b)(iii) in their case-in-chief or in their rebuttal.  Accordingly, because the only evidence presented at trial regarding the negotiation of the cavitation warranty reflects that TAES rejected the Plaintiffs' broader warranty with respect to nonrotating parts, such as the discharge rings, the Contract's general warranty cannot be interpreted to encompass that expressly negotiated and removed provision:  a cavitation warranty for nonrotating parts.  *See American Ordinance LLC v. U.S.*, 83 Fed. Cl. 559, 571 (2008) (finding government's rejection of terms related to equipment ownership just prior to signing definitive contract reflective of the agreement between the parties and noting that the government's post-agreement change of position 11 years later was tantamount to trying to "pull a fast one" on the contractor).  Furthermore, Mr. Degenfelder and Mr. Hyuga, the only witnesses at trial who negotiated the Overhaul Contract, testified that cavitation is not considered a "defect" under the general warranty.  (*See,*

16

*e.g.*, (ECF 368, Tr. 134:22–136:3, PageID.42187-89; *Id.* Tr. 165:15–166:4, PageID.42218-19 (Mr. Hyuga testified that cavitation is not considered a "defect" under the general warranty); *see also* ECF 337, Tr. 118:8-12, PageID.34594 (Mr. Degenfelder only testified that "cavitation can be damage"); PTX-0014 at 12 (Change Order 9 expressly addressed "damage" alongside "wear and tear").  And the lead-in phrase of GC21(b)(iii) does not help Plaintiffs, as it merely confirms that the runner is subject to GC21(b)(ii)'s general warranty provision, in addition to the cavitation warranty in (b)(iii).  (*See* PTX-0001 at 33).

Plaintiffs' argument that the general warranty should apply to material loss on the DRs due to cavitation results in the absurdity that a silent and *broader* cavitation warranty exists for the discharge rings under the umbrella of the general warranty than for the runner, because the general warranty would not be restricted to the specific terms of the pump-turbine cavitation warranty.  *See Richardson v. Wright*, No. 361841, 2024 WL 302155, at *5 (Mich. Ct. App. Jan. 25, 2024) (discussing cases that "rejected a litigant's proposed interpretation of a contract on the basis that the interpretation would lead to unreasonable conditions or an absurd outcome"); *Bodnar v. St. John Providence, Inc.*, 933 N.W.2d 363, 375 (Mich. Ct. App. 2019) ("[C]ourts avoid interpreting contracts in a manner that would impose unreasonable conditions or absurd results") (citing *Hastings Mut. Ins. Co. v. Safety King, Inc.*, 778 N.W.2d 275, 281 (Mich. Ct. App. 2009)).

To the extent that Plaintiffs assert the material loss was the result of the design issues for Units 2 and 4, that argument is foreclosed as a matter of law as well. The trial produced overwhelming evidence that the parties reached an agreement under which Plaintiffs received consideration in exchange for their waiver of claims relating to the designs of Units 2 and 4. (*See, e.g.*, D-1626 at 1 (Matthew Ray writing that Change Order 9 was "the resolution to all claims from TAES to the Owner and the Owner to TAES"; this included retaining the design of Units 2 and 4 and "install[ing] the additional seal in all future units" in exchange for "the retention of specialty tools by the owner . . . to allow the additional seal to be installed at a later date"); D-1530 at 5 (email from Mr. Torvik to Mr. Hyuga noting that "[o]wner will require no additional performance guarantees . . ."); PTX-0254 at 5 ("CEC: Additionally, the Owner is in need of a Work Order Package and all necessary drawings and tooling details necessary to perform the lower band seal modification on Units 2 and 4 during a future major unit overhaul."); PTX-1491 at 1-2 (PCN 409:: "It is understood that the attached list of tools and equipment, which has been paid for by the owner as part of the contract price, shall upon completion or termination of this contract be left at the job site and become the property of the owner. . . . List of devices provided by Toshiba during the overhauls. . . . Discharge ring machining device/arms and platforms."); D-2887 at 52 ("Modification of Units 2 and 4: CEC will own equipment and plans to perform modifications on Unit 2 and 4 during next

18

major overhaul for the installation of the supplemental seal (passive countermeasure."); D-973 at 1 (Mr. Hyuga notifying Plaintiffs on Dec. 21, 2019 that "We are uploading to Unifier the attached ESS drawings. Those provide fieldwork and material detail for CEC to install U2 and U4 discharge ring lower seals in the future should you choose to do so."); PTX-989 (letter memorializing UFA for Unit 2 "effective December 21, 2019[,]" the same day as Mr. Hyuga's email); PTX-990 (letter memorializing UFA for Unit 4 effective on Dec. 21, 2019)). The majority of evidence reflecting this agreement is from contemporaneous documents written by or agreed to by Plaintiffs' employees and listed trial witnesses. *Id.*

Plaintiffs place great weight on negotiation history showing that a proposal for a complete bilateral release was not agreed to in Contract Change Order 9. (ECF 337, Tr. 60:18–64:20, PageID.34536-40). But evidence of a rejection of a complete bilateral release does not negate evidence that the parties ultimately agreed to something less: a release or waiver of any Plaintiffs' claims based on the absence of a lower seal band in Units 2 and 4. (ECF 365, Tr. 91:25–121:3, PageID.41369-99; ECF 369, Tr. 75:19–81:9, PageID.42317-23).

Furthermore, the record reflects that this waiver was the result of *Plaintiffs'* strategic decision at that time, after Plaintiffs concluded that this arrangement would be economically advantageous to Plaintiffs. (D-1626 at 1 ("The economics behind this decision is that the cost and duration of the outage time required to install the

19

additional seal prior to the next major overhaul of the unit would never be recouped by the limited unavailability of the units due to this issue."); D-2887 at 52 ("No economic basis to perform modification prior to next major overhaul. . . . Ownership of equipment and plan to perform modification during future major overhaul (to install passive system) (Change Order 9).")).

Accordingly, Plaintiffs' central theory of liability at trial is foreclosed as a matter of law because (i) the undisputed evidence is that the parties agreed to a cavitation warranty only on the runners, not any other components and (ii) Plaintiffs waived any claim based on the absence of a lower band seal in Units 2 and 4.  As such, TAES is entitled to judgment as a matter of law on Plaintiffs' claims regarding cavitation and, given the impossibility of segregating the jury's verdict among components, a new trial on Plaintiffs' other claims.

**B.  Conditions Known Prior to the Grant of Unit Interim Acceptance or Unit Final Acceptance Cannot Form the Basis of a Warranty Claim**

Under the express terms of the Contract, UIA and UFA are milestones (i) at which Plaintiffs certify that a Unit complies with contractual requirements, (ii) follow after rigorous inspection and testing procedures detailed in the Contract, and (iii) provide Plaintiffs the right to require TAES to correct defective or uncompleted work at TAES's expense.  (PTX-0002 at 78-82).  Through such certification, UIA and UFA conclusively resolve previously identified issues and prevent Plaintiffs from later seeking compensation for any defects or uncompleted

20

work identified during the extensive inspection and testing procedure.

Plaintiffs have previously insisted that UIA and UFA do not in fact constitute acceptance of a Unit as complete in accordance with the Contract and do not waive any claims they may have, even as to incompletions or defects that they identified prior to their award of UIA or UFA.  (*See* ECF 229 at 11-12, PageID.25664-65). They base their argument on a single sentence in the Contract's Technical Requirements that preserves certain "obligations or liabilities" notwithstanding an award of UIA or UFA.  (PTX-0002 at 80, 82).  Although the sentence in question is an understandable reservation of rights, for the avoidance of doubt, as to various surviving contractual "obligations or liabilities" (e.g., liquidated damages or indemnification obligations) it cannot reasonably (or harmoniously) be read to nullify awards of UIA and UFA.  *See Willkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 796 n.11 (Mich. 2003) ("We read contracts as a whole, giving harmonious effect, if possible, to each word and phrase.").

Evidence presented at trial bears this out.  The warranty period set by the original Overhaul Contract did not begin until a grant of UFA.  (*See* ECF 337, Tr. 13:19-22, PageID.34489 (Mr. Degenfelder testifying that the original Overhaul Contract's general warranty ran "about 5 and a half years from a unit final acceptance")).  Therefore, the "obligations or liabilities" provision could not have operated to preserve known warranty claims, as no warranty claims could have

21

arisen prior to UFA.  While the start of the warranty period was moved up to UIA by Change Order 9, the definitions of UIA and UFA (and the meaning of the sentence Plaintiffs embrace) were unchanged.  (PTX-0014 at 7).  UFA continued to signify Plaintiffs' acceptance of TAES's performance.  To be clear, and contrary to Plaintiffs' repeated suggestion otherwise, TAES does not contend that the grant of UIA or UFA forecloses warranty claims altogether, but only those based on conditions known to Plaintiffs at the time they chose to certify UIA or UFA.

Therefore, TAES is entitled to judgment as a matter of law on claims for: (i) alleged defects or uncompleted work on Units 1-6 that had been identified when Plaintiffs issued UIA on those Units; and (ii) alleged defects or uncompleted work on Units 2, 4, and 5 that had been identified when Plaintiffs issued UFA on those Units.  For example, Plaintiffs' most significant claim — relating to alleged cavitation erosion on discharge rings in Units 2 and 4 — must be dismissed as a matter of law because Plaintiffs admit to discovering the cavitation erosion months before they granted UFA certificates on those Units.

## III.  The Verdict Form Gave Short Shrift to TAES's Affirmative Defenses

The verdict form asked the jury whether TAES's affirmative defense barred Plaintiffs' damages "entirely."  ECF 391.  The verdict form did not ask the jury whether TAES's affirmative defenses barred the Plaintiffs' damages in part.  The form thus severely prejudiced TAES by negating a central aspect of TAES's defense.

For example, TAES's position at trial was that Plaintiffs waived parts of their claimed damages through their grants of UIA and UFA and through their agreement that TAES need not add a lower band seal in Units 2 and 4. Those positions were undermined by the verdict form's instruction that the affirmative defense of waiver was relevant only if it barred Plaintiffs' damages "<u>entirely</u>."

The verdict form's error was only compounded by jury instructions that did not address the possibility that waiver could be a partial defense. (ECF 393, Tr. 165:19–166:20, PageID.44521-22). *Hickson Corp. v. Norfolk Southern Railway Co.*, 260 F.3d 559, 568 (6th Cir. 2001) (holding that jury instructions and the verdict form are to be "considered together to determine whether they presented the issues to the jury in a clear and fair manner"). (In contrast, the instructions on "release" address the possibility that "the utilities released TAES from all or some obligations under the contract." ECF 393, Tr. 166:21-23, PageID.44522.)

Even though the final form of the verdict form, and its question 3, was sprung on TAES just before closing arguments began, TAES's counsel immediately objected to the verdict form and proposed a remedy; the proposal was to add in a reference to "partial" application of affirmative defenses in question 4, as was included in a previous draft of the verdict form. That proposal was denied. (ECF 393, Tr. 23:3–25:4, PageID.44379-81). A new trial is now the only remedy for the seriously flawed verdict. *See Static Control Components, Inc. v. Lexmark Int'l, Inc.*,

23

697 F.3d 387, 414 (6th Cir. 2012) ("A new trial is appropriate when the jury reaches a 'seriously erroneous result as evidenced by . . . the trial being unfair to the moving party in some fashion[.]'").

## IV. The Evidence Does Not Support the Largest Civil Jury Verdict in Michigan History

Under Michigan law, "damages are not presumed in relation to contracts." *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 922 (Mich. Ct. App. 2014). Plaintiffs have the burden to "prove the measure of damages with 'reasonable certainty.'" *Id.* (citation omitted). The jury may "not award damages on the basis of guess, speculation or conjecture." *Id.* at *5. TAES is entitled to judgment under Rule 50 because no reasonable jury could find that Plaintiffs' damages evidence — based solely on the testimony of Mr. Emmert — met Plaintiffs' burden to "prove the measure of damages with 'reasonable certainty.'" *Id.*, 865 N.W.2d at 922. Absent sufficient evidence of reasonably certain damages, Plaintiffs' breach-of-contract claims fail as a matter of law.

### A. Plaintiffs' Alleged Damages Are Inaccurate, Speculative, Inflated, and Unsupported

Plaintiffs' sole damages expert, Mr. Emmert, provided unsupported testimony on damages — acting as little more than a conduit for Voith's non-binding, budgetary "estimates." Plaintiffs have presented no evidence that Voith's non-binding, budgetary proposals constitute the type of competitively bid, binding

24

estimates required, at a minimum, to prove reasonably certain damages.  Mr. Emmert also conceded that he relied on Voith's estimates without knowing whether Plaintiffs' technical experts — Dr. Tucker, Dr. McDonald, Mr. Fecke, and Dr. Martens — endorsed Voith's plan.  (ECF 354, Tr. 53:25–54:1-13, PageID.37900-01).

Mr. Emmert was unbothered that Voith did not include any source documentation to substantiate a time-and-materials claim, such as time sheets, material purchase orders, and equipment rental invoices, the usual prerequisites for a contractor to obtain payment on a time-and-materials basis.  (ECF 387, Tr. 95:23–96:4, PageID.43754-55 (Mr. Gunn:  "We have no idea what's in that number.")).

Mr. Emmert nonetheless relied solely on Voith's prospective, budgetary proposals.  (ECF 354, Tr. 105:9-14, PageID.37952).  Mr. Emmert also never addressed the substantial costs that Plaintiffs would incur in any event in performing the Plant's inevitable maintenance and operations or any costs relating to repairs that were necessitated by Plaintiffs' own operation of the facility.  (ECF 387, Tr. 120:12-16, PageID.43779 (Mr. Gunn:  "One of the largest reductions I make is the fact . . . DTE and Consumers was also going to have to maintain this facility.  And they were always going to have to perform some kind of disassembly and reassembly in order to get to the things you need to maintain.")).  Five of the six Units will have been operating for 9-12 years by the time Voith will supposedly start work.  (*See* D-2273).

25

**B.   The Voith Budgetary Estimates that Mr. Emmert Relied Upon Were Not Admitted for Truth of the Matter Asserted**

It is undisputed that Voith's BSD Proposals and SOWs relied on by Mr. Emmert were *not* entered into evidence for the truth of the matter asserted: "They are being offered to show that an estimate was made.  This is the estimate. If we want to argue about the estimate or quality of the estimate, *I assume that's what's being reserved, and I understand that*." (*See* ECF 352, Tr. 136:21-25, PageID.37651 (Plaintiffs' counsel) (emphasis added)).  Instead, Voith's estimates were admitted only "for the purposes of establishing what's a contract, a business action or agreement between two parties" or "as the basis for which the expert is relying upon to make their opinion." (*Id.* Tr. 135:17–136:25, PageID.37650-51).  But "inadmissible evidence relied on by the expert is not somehow transmogrified into admissible evidence simply because an expert relies on it." *Roche Diagnostics Corp. v. Shaya*, No. 19-10264, 2023 WL 7412918, at *6 (E.D. Mich. Nov. 9, 2023).  When otherwise inadmissible materials are admitted for explanatory purposes, the jury must be instructed to consider the evidence "solely as a basis for the expert opinion and not as substantive evidence." *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728-29 (6th Cir. 1994).

The jury therefore had *no evidence* beyond Mr. Emmert's opinion upon which to base damages for any of the repairs at issue.  No one from Voith vouched for or explained any of the Voith estimates to the jury, despite TAES's attempt to include

26

two Voith witnesses on its pre-trial witness list.   While Mr. Koster may have "negotiated" with Voith (*see* ECF 341, Tr. 161:11-15, PageID.35506), his input did not change the scope of the Voith estimates.  (*See, e.g.*, PTX-1244 at 4 (Voith SOW-4 100% proposal, denoting that at the time it was written, CEC's comments were under review by Voith and that "the prices presented in Section 6 [Pricing Summary] do *not* take into consideration comments made by CEC on the 90% and 100% Proposals submitted by Voith") (emphasis added)).

And Mr. Emmert was not a percipient witness, nor is he a technical expert. (*See* ECF 354, Tr. 23:6-11, PageID.37870).  Mr. Emmert merely accepted Voith's budgetary proposals and adopted them as his damages estimates.  Take, for instance, BSD-005 regarding PPT excitation supply wiring, which Mr. Emmert included in his original opinion adopting all of the hours proposed by Voith "hour for hour." (*Id.* Tr. 239:2-14, PageID.38086).  Later, when Plaintiffs decided to remove PPT wiring from Voith's scope, Mr. Emmert reduced Plaintiffs' damages estimate by the same amount.  (*Id.* Tr. 238:24–239:1, PageID.38085-86).  Mr. Emmert's treatment of the PPT wiring based on the *ipse dixit* direction of Plaintiffs demonstrates his methodology:  take a scope dictated by Plaintiffs and apply a cost provided by Voith.

## C.   TAES Was Not Permitted to Question Witnesses from Voith, Whose Budgetary Proposals Formed the Basis for Plaintiffs' Damages Estimates

Plaintiffs did not present any testimony, or even a declaration, from a Voith

27

witness to lay any foundation for the budgetary proposals that underlay Mr. Emmert's damages estimate.  Absent testimony from Voith witnesses, the jury had no evidence on which to evaluate the "quality" of the estimates.  With no sponsoring witness for reliability, the Voith proposals constitute inadmissible hearsay that should not have been admitted through Mr. Emmert as the conduit, effectively, for out-of-court testimony.  *See United States v. Tipton*, 269 F. App'x 551, 560 (6th Cir. 2008) (rejecting the use of an expert "as a 'conduit' for the admission of the Defendants' otherwise inadmissible hearsay statements"); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("Although the Rules permit experts some leeway with respect to hearsay evidence, Fed. R. Evid. 703, a 'party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony.'") (cleaned up); *Napier v. Am. Econ. Ins. Co.*, No. 3:22-318, 2025 WL 2687605 (S.D. Ohio Sep. 19, 2025) (finding that a plaintiff could not introduce an estimate of costs to repair without a witness from the company providing the estimate to testify regarding record-keeping practices).  In *Auto Indus. Supplier Emp. Stock Ownership Plan v. Ford Motor Co.*, the Sixth Circuit held that the district court properly struck the testimony of an expert witness who did not himself prepare the estimates on which his damages calculations were based — because, as here, the plaintiff failed to specify fact witnesses who could lay the foundation to admit the estimates.

435 F. App'x 430, 457 (6th Cir. 2011).

Furthermore, when TAES proposed two witnesses from Voith in the Joint Final Pretrial Order to enable TAES to examine them on the validity of the estimates, the Court struck the proposed Voith witnesses, finding that they were added too late, despite Plaintiffs' de facto control of those Voith witnesses. (Order on Mot. in Limine, ECF 313 at 5-6, PageID.31249-50). But, in fact, there was no visibility prior to the close of fact discovery that Voith witnesses would be key to testing Plaintiffs' asserted damages at trial. Plaintiffs did not disclose any Voith witnesses. (*See* ECF 39, ECF 49, ECF 76). It was only after Mr. Emmert's report in June 2024 and deposition in January 2025 that it became clear that Voith witnesses would be key to Plaintiffs' theory of damages. And, as late as July 17, 2025, Plaintiffs produced documents authored by the two Voith witnesses whom TAES sought to call at trial. (*See* Resp. to Mot. in Limine, ECF 272 at 4-5, PageID.28965-66).

TAES raised these concerns about the importance of Voith witnesses during the Final Pretrial Conference on September 26, 2025, arguing that without the ability to call Voith witnesses at trial, TAES would have no way to test the validity of the estimates that were the basis of Mr. Emmert's report. (*See* ECF 295, Final Pretrial Conference Tr. 56:9–57:16, PageID.30800-01). TAES also explained the timing of seeking to add the Voith witnesses to the witness list: namely, that TAES was unaware of the importance of the Voith estimates *until after* the close of fact

discovery and into expert discovery because Plaintiffs *never* identified the Voith personnel as knowledgeable persons, thus TAES had no basis to seek depositions of anyone from Voith.   (*Id*. Tr. 60:24–61:16, PageID.30804-05).   TAES was nonetheless willing to examine the Voith witnesses at trial, without the benefit of depositions, which the Court denied.

By not presenting any Voith witnesses at trial and by preventing TAES from doing so, the Plaintiffs failed to lay any foundation for the Voith estimates from which the jury could have found reasonably certain damages.  It was undisputed at trial that the estimates were non-binding on the Plaintiffs and subject to change. (ECF 354, Tr. 185:18-25, PageID.38032 ("[The estimate] can change and go up; it can go down.")).

### D.   Voith's Estimates Are Unreliable, Expressly Non-binding, and Subject to Cancelation

#### 1.  Voith's Cost Proposals Are Not Binding on the Plaintiffs

At trial, Mr. Emmert and the Plaintiffs repeatedly characterized the Voith proposals as *contractual*.  (*E.g.*, ECF 354, Tr. 224:19–225:3, PageID.38071-72; PI-103-15 (describing Voith's proposals as the "Voith Contracted Repair Damages")). The impression given to the jury was that the Voith proposals could be relied upon, as the Plaintiffs were somehow contractually bound to pay Voith the estimated amounts.  The estimates themselves say the opposite, however.

The scope of Voith's repair work is set out in six "SOW" documents (the

30

"SOW-5" documents) issued under the "Contract for Major Project and General Services" entered into between the Plaintiffs and Voith on August 13, 2021. Each SOW-5 document divides Voith's scope of work into two parts: a lump-sum component and a time-and-materials ("T&M") component. As shown in the table below, in every SOW-5 document, the vast majority of Voith's work is priced on a T&M basis, with the lump-sum components making up no more than 24%, and as little as 9%, of the total:

| Unit | Total Purchase Order Value | Lump Sum | Lump Sum % of Total | T&M | T&M "Bonds" | T&M "Option" | Reference |
|------|----------------------------|----------|---------------------|-----|-------------|--------------|-----------|
| 1 | 37,305,278 | 5,090,626 | 14% | 15,747,419 | 208,380 | 16,258,853 | PTX 1292-0032 |
| 2 | 157,067,623 | 26,356,468 | 17% | 100,700,499 | 1,270,570 | 28,740,086 | PTX 1293-0032 |
| 3 | 24,562,417 | 5,930,468 | 24% | 14,290,050 | 202,205 | 4,139,694 | PTX-1294-0031 |
| 4 | 189,933,222 | 30,451,624 | 16% | 122,935,801 | 1,533,874 | 35,011,923 | PTX-1295-0032 |
| 5 | 41,446,371 | 5,090,626 | 12% | 27,896,437 | 329,871 | 8,129,438 | PTX-1296-0031 |
| 6 | 57,814,379 | 5,090,626 | 9% | 31,776,046 | 368,667 | 20,579,040 | PTX-1297-0032 |

By definition, the Plaintiffs' obligation to pay for work that is priced on a T&M basis cannot be established until the work has been performed. Voith is paid for the T&M work on the basis of hourly rates for the time its personnel spend on the repair project, and the total number of hours they will spend cannot be known in advance. Voith's SOW-4 combined pricing proposal states this explicitly: "Time

31

and Material prices presented in this Section 6.2 *are provided for reference only*. The actual costs and hours will be controlled and charged on a monthly basis throughout the project execution[.]"   (PTX-1244 at 6 (emphasis added)). Accordingly, Mr. Emmert conceded that Voith's budgetary proposals "can change and go up" or "can go down."  (ECF 354, Tr. 185:18-25, PageID.38032).

In addition, significant portions of Voith's overall T&M pricing are expressly designated in the SOW-5 documents as "Total Owner Time & Materials *Option (not for charges by Contractor)*."  (PTX-1292 at 32, PTX-1293 at 32, PTX-1294 at 31, PTX-1295 at 32, PTX-1296 at 31, PTX-1297 at 32 (emphasis added)).   These amounts, which make up as much as 43% of the total T&M component on certain Units, were included without deduction in Mr. Emmert's damages — even though they expressly *cannot* be charged by Voith.

The SOW-5 documents suggest that Voith's lump-sum pricing is also subject to change.  They state that the lump-sum component "is *anticipated to include* the scope applicable to each BSD as defined in the Task Orders of this SOW and as defined in *Attachment E.b*[,]" but Voith's lump-sum "deliverables" remain subject to further definition "throughout the detailed design phase" of Voith's work.  (*See, e.g.*, PTX-1293 at 12).  The Plaintiffs also stated in the SOW-5 documents that, while they are "aware that [Voith] may have evaluated several options or design variations available to fulfil the requirements and correction of BSD items[,]" the Plaintiffs

32

nonetheless "maintain[] that [Voith] shall utilize a 'best value technically acceptable' methodology for the basis of their Work."  Whether Voith's proposed solutions *ever* in fact meet this "best value" standard will be confirmed "by [Plaintiffs] through [Voith's] formal submittals and associated [Plaintiffs'] approval (if provided)."  (PTX-1292 at 9, PTX-1293 at 9, PTX-1294 at 9, PTX-1295 at 9, PTX-1296 at 9, PTX-1297 at 9).  While Mr. Emmert characterized the Voith proposals as "[a] very detailed, you know, thick, complete analysis" (ECF 352, Tr. 140:19-21, PageID.37655), the undisputed evidence expressly states that Voith's proposals, including the lump-sum components of those proposals, are still under development, and the Plaintiffs have not yet accepted them as meeting the required "best value" standard.  (ECF 352, Tr. 113:17-20, PageID.37628).

### 2. Voith Was Incentivized to Submit Inflated Cost Proposals to Increase the Budget for its Work and to Injure a Direct Competitor

The reliability of the Voith budgetary proposals is further undermined by evidence showing that Voith had every incentive to inflate them.  Voith was instructed to prepare the proposals under the SOW-4 instructions, which asked Voith to "*provide a budget* and schedule" for its repair work (PTX-1176 at 5 (emphasis added)).  SOW-4 expressly states that Voith's proposals would be used "for various purposes including, but not limited to, budget authorization."  (*Id*. at 9).  It should go without saying that a budget proposal is *not* the same thing as a cost estimate — one sets a ceiling on costs, while the other aims to accurately predict them — yet

33

Mr. Emmert and the Plaintiffs presented the Voith budget proposals throughout trial as "estimates," rather than budget proposals (e.g., ECF 352, Tr. 108:21–109:4, PageID.37623-24).  The undisputed fact that Voith knew its proposals would be used to set a budget for its work gave Voith a clear incentive to inflate its budgetary proposals — making more money available to pay for its services.

Adding insult to injury, Voith is a direct competitor of TAES.  Mr. Emmert testified that Voith was one of the original bidders for the Overhaul Contract, which was ultimately awarded to TAES.  (ECF 354, Tr. 51:4-13, PageID.37898).  When Voith was instructed to prepare its budget proposals, it was fully aware that they would be used in ongoing litigation against TAES, because litigation support was *expressly* part of Voith's scope of work under SOW-4 (PTX-1176 at 11 ("[Plaintiffs'] legal counsel may request that [Voith] provide technical consulting services or analyses from time to time . . . to facilitate [Plaintiffs'] review and evaluation of legal matters related to work performed by Toshiba America Energy Systems Corporation . . . including potential claims and defenses [Plaintiffs] may have in connection with such work.  Such work shall be directed by [Plaintiffs'] internal or external legal counsel . . . .")).  Voith thus knew full well that padding its own budget would, as a bonus, tend to injure TAES, its direct competitor.

### 3. It Is Undisputed that Voith's Estimates Underlying the Jury's Damages Award Were Not Subject to Competitive Bidding

Mr. Maddipati testified that, while Voith's original contract for Major Project

and General Services was competitively bid, Voith's actual repair proposals —
worth around $500 million, on their face — were not competitively bid; Voith was
the *only contractor* asked to prepare proposals for the actual repair work that was
ultimately included in SOW-5, and Plaintiffs made no effort to obtain alternative
quotes from other contractors, even as a check on the Voith proposals.  (ECF 355,
Tr. 255:21-23, PageID.38357; *id.* Tr. 261:13–262:11, PageID.38363-64).  Michigan
law requires electricity providers to solicit competitive bids for large contracts.  (*See,
e.g.*, MCLS § 460.6s(4)(c) (requiring competitive bidding in the "engineering,
procurement, and construction contracts" attendant in building new electricity
capacity)).  And the Plaintiffs committed in settlements with the MPSC to use
competitive bidding.  (Settlement Agreement, *In re Consumers Energy Company
Integrated Resource Plan*, No. U-21090, (Mich. Pub. Serv. Comm'n Apr. 20, 2022)
(U-21090-0777); Settlement Agreement, *In re DTE Electric Company Integrated
Resource Plan*, No. U-21193, (Mich. Pub. Serv. Comm'n July 12, 2023) (U-21193-
0527)).  They may well still do so going forward.

The lack of competition for Voith's services may explain the supposedly high
price tag for Voith's proposed repair work (principally on two Units) as compared
to the $529 million price of the original TAES Overhaul Contract (for ten years of
work on all six units).  (ECF 355, Tr. 178:22-24, PageID.38280; PTX-1 at 53).

### 4. Voith's Budgetary Proposals Are Entirely Unsupported and Do Not Meet Industry Standards

Mr. Gunn testified that, in his entire career, he had never seen a construction estimate as lacking in support as the Voith proposals. (ECF 387, Tr. 85:23–87:8, PageID.43744-46). Mr. Gunn explained in detail various "red flags" in the Voith SOW-4 proposal. (ECF 387, Tr.86:2–100:6, PageID.43745-59 ("[M]ost shocking of all is there is no quantities . . . I need to evaluate quantities against the hours in order to understand whether this is a reasonable price or not. There is no quantities anywhere"; "I'm given a lot of labor hours, but I'm not being told what the labor is actually doing. Not only that, the Voith estimate doesn't even tell me on a task level what the hours are . . . so it is incredibly difficult for either Mr. Emmert or myself to evaluate this estimate as being reasonable or financially certain or accurate"; "How do you know that on first shift millwrights you're going to need 14,895 hours? There's something behind that. How many feet of work are they installing? What are they doing? What task are they performing? Because in order for me to tell DTE and Consumers if that's a reasonable number of hours, I need to know what the labor is doing; otherwise, I can't go to a construction industry maintenance guide and prepare my own view of what it should cost. . . . I can't use this to tell you whether it's accurate or reasonable or financially certain")). Plaintiffs did not challenge any of Mr. Gunn's criticisms regarding the lack of evidence or back-up behind the Voith proposals, nor did Plaintiffs explain why this evidence has never been provided.

36

Without it, the Voith proposals are no more than numbers on a page, which Mr. Emmert uncritically accepted.

### 5. The Evidence Showed that Voith's Budgetary Proposals Were Wildly Excessive

In the absence of any supporting information that would enable a meaningful assessment of the Voith proposals, both sides' damages experts sought to compare the Voith cost proposals to the actual cost data available from TAES's work on the original Overhaul Contract. Those comparisons *both* showed that the Voith cost proposals are inflated.

Mr. Emmert testified that he performed a reasonableness check of the Voith estimates. (ECF 352, Tr. 173:14–174:19, PageID.37688-89). Together with DTE and Consumers personnel, Mr. Emmert identified comparable scope between TAES's work and Voith's repair work, and then calculated the actual hours TAES spent performing that scope (*See* ECF 352, Tr. 93:24–94:19, PageID.37608-09; *id.* 173:14–174:19, PageID.37688-89; ECF 387, Tr. 107:23–109:11, PageID.43766-68). The results showed that Voith's proposals included 434,033 craft labor hours for work that TAES completed using only 217,413 craft labor hours — almost exactly twice as many. (ECF 387, Tr. 109:7–112:9, PageID.43768-71). Rather than (i) accept the obvious conclusion that Voith's repair proposal was inflated, because it provided for almost double the number of hours TAES took to complete comparable scope, and (ii) reduce the Voith proposal by reference to the TAES

37

hours, Mr. Emmert chose to *inflate* the TAES hours after the fact.  *See id.*  As Mr. Gunn put it, "I say you use [the TAES hours] as a measuring stick to modify [the Voith hours], to fix it.  Mr. Emmert says, 'I'm going to modify [the TAES hours] until it makes [the Voith hours] look reasonable.'"   (ECF 387, Tr. 112:3-7, PageID.43771).

At trial, Mr. Emmert attempted to disown this analysis, claiming that "we did take a hard look [at the TAES data] and, you know, even used it in one test to see the reasonableness of what we were calculating in damages, but ultimately found that it really wasn't that comparable."  (ECF 352, Tr. 97:21-24, PageID.37612).  Mr. Emmert thus sought to manipulate, downplay, and ultimately discard his own analysis because he realized that it fatally undermined the credibility of the Voith proposals.  Mr. Emmert instead presented a new comparison at trial between TAES's work and Voith's proposals, this time based on the original TAES Contract Price.  Mr. Emmert attempted to reprice the TAES Contract Price to "2025 dollars" by escalating the entire TAES Contract Price (ECF 352, Tr. 173:2–174:8, PageID.37688-89).  Mr. Emmert testified that the escalated value of the TAES Contract was $837 million, which is higher than the $444 million Voith SOW-4 proposal, and this therefore "gave me some comfort that from a reasonableness perspective, I could rely upon the Voith contract."  (ECF 352, Tr. 174:7-8, PageID.37689).   However, as Mr. Gunn testified, Mr. Emmert's escalation

38

calculation was "[m]athematically . . . wrong," and failed to account for the fact that Voith's repair scope is far less extensive than TAES's full overhaul scope.  Once Voith's reduced scope of work was accounted for, as Mr. Gunn showed, TAES's Contract Price was around "50, 60 percent" of the Voith cost proposal.  (ECF 387, Tr. 112:15–116:10, PageID.43771-75).   Once again, Mr. Emmert's own analysis showed that the Voith cost proposal was inflated, and was roughly twice as high as TAES's contracted value for similar work, yet Mr. Emmert testified that this exercise showed the Voith cost proposal to be reasonable.   Either Mr. Emmert did not understand that it was inappropriate and misleading to compare the overall TAES Contract Price with Voith's proposed cost for completing a far lower scope of work, or he *did* understand that and chose to present this misleading comparison in any event.   Either way, Mr. Emmert's opinion adopting Voith's estimates necessarily failed to provide sufficient evidence of reasonably certain damages.

### 6.  Plaintiffs Can Change or Cancel Voith's Scope of Work

Even if the Voith budgetary proposals were not unreliable and non-binding, they would still be insufficient to establish reasonably certain damages, because the Plaintiffs can de-scope or change any part of Voith's scope at any time.

Article 9 of Voith's agreement gives the Plaintiffs the right to "at any time by written notice to [Voith] make changes to the Work to be performed hereunder, which *changes may consist of* additions, *deletions* or other modifications[,]" and if

"the change involves a reduction in the Work, then the [Plaintiffs] may . . . compute and notify [Voith] of a proportional decrease in the Contract Price." (PTX-1113 at 17 (emphasis added)). Further, Section A.8 of each SOW-5 document states that the Plaintiffs "*may suspend or cancel* any or all of the specific Task Orders or portions of Task Orders prior to or during the execution of the Work" (PTX-1293 at 19; *see also* PTX-1292 at 19; PTX-1294 at 19; PTX-1295 at 19; PTX-1296 at 19; PTX-1297 at 19) (emphasis added)).

Plaintiffs' cancelation and de-scoping rights are not academic. As Mr. Emmert testified, in July 2025 the Plaintiffs exercised their right to remove the excitation wiring work — a $35 million line item based on the Voith proposal — from Voith's scope (ECF 352, Tr. 171:14-24, PageID.37686; ECF 354, Tr. 114:18-25, PageID.37961), and there is nothing stopping the Plaintiffs from further reducing Voith's scope of work post-verdict. (ECF 354, Tr. 116:5-12, PageID.37963). If Plaintiffs instruct further de-scopes, or instruct Voith to adopt lower-cost repair solutions (such as the TAES jacking-up plan), TAES would have paid damages for work which was never performed, leaving Plaintiffs with an unjust windfall.

### 7. Beyond Mr. Emmert Serving Merely as a Conduit for Voith's Budgetary Estimates, No Reasonable Jury Could Have Credited Mr. Emmert's Testimony for Purposes of Calculating Reasonably Certain Damages

Overall, Mr. Emmert's performance at trial displayed a poor understanding of the details of the Voith proposals and, at times, his own calculations, and a

willingness to accept positions asserted by his clients even when those positions differed from the testimony of the Plaintiffs' own technical experts.  For example, Mr. Emmert testified that, even if the Plaintiffs' technical experts testified that the DREs did not need to be replaced, it would have *no impact* on his damages assessment (ECF 354, Tr. 135:1-8, PageID.37982):

> Q.    If Dr. Tucker testified that his opinion is not that the DREs need to be replaced, but they need to be inspected, if Dr. McDonald testified that, in his opinion, the DREs don't need to be replaced, they need to be inspected, and if Mr. Crahan did not provide any opinion that the DREs need to be replaced, is there any adjustment at all that you think is appropriate to your BSD line item 12 that's $442 million?
>
> A.    Not sitting here right now, no, sir."

Mr. Emmert also testified that there were "no normal maintenance costs" included in his damages (ECF 352, Tr. 198:6-9, PageID.37713), yet was unaware, for example, that Voith's repair proposal included 60 days' work repairing ordinary, wear-and-tear cavitation on the stay vane and the draft tube.  (*See* ECF 354, Tr. 82:22–84:7, PageID.37929-31 ("[w]hether it relates to maintenance aspects or not from a contractual perspective, I don't know.  I've assumed that, or they are, related to the defective TAES performance")).

Mr. Emmert included in his damages assessment over $16 million for the Plaintiffs to buy two brand-new sets of wicket gates, even though Mr. Fecke, Plaintiffs' technical expert on the wicket gates, did not opine that the wicket gates

41

needed to be replaced.  (ECF 351, Tr. 115:22-25, PageID.37393).  When it was put to Mr. Emmert that he therefore had no technical support for his assumption that Plaintiffs were entitled to the cost of two brand-new sets of wicket gates, he was unconcerned:  "the technical support is what needs to be done *as identified and documented by the company*, and any other experts they used to identify what the issues are and the defects associated with each of the pieces of equipment." (ECF 354, Tr. 33:15-18, PageID.37880 (emphasis added)).  Mr. Emmert said this even while acknowledging that he was not aware of any expert other than Mr. Fecke who had testified that the wicket-gates needed to be replaced.  (ECF 354, Tr. 33:20-25, PageID.37880).  Mr. Emmert followed the dictates of his client, even when those views diverged from the testimony of the Plaintiffs' own technical experts.

When asked by the jury how he had satisfied himself that Voith's staffing levels were reasonable, Mr. Emmert testified that he "talked with Voith about them" but acknowledged that he lacked the expertise to independently assess the estimate: "I mean, we looked at it from a reasonableness, but again, *I'm not the technical or the pricing person*, but again, have been around long enough to be able to identify and ask questions about something that we would find out of, out of sort, I guess, if you will, with what we would expect for a laborer or a foreman or somebody to be doing."   (ECF   354,   Tr.   235:4-9,   PageID.38082   (emphasis   added)).

42

### 8. Voith's Proposed Solution Includes Work that is Not Even Necessary

The clear weight of the evidence demonstrates that, as to certain components, the Voith estimates include work that does not need to be performed and constitutes betterment. Shaft seals are one example. The Voith estimates include a complete replacement of the shaft seals on all six Units. The unrebutted testimony of Mr. Davies established that following the installation of permanently affixed slinger rings on Units 4 and 3, there were no instances of excessive water leakage. (ECF 377, Tr. 162:19-24, PageID.42954). Indeed, Plaintiffs' technical expert Mr. Fecke testified that there had been no complaints about the shaft seals in Units 4 and 3 since TAES installed permanent slinger rings (ECF 351, Tr. 102:15–103:6, PageID.37380-81), and Mr. Koster conceded that the installation of a permanent slinger ring "worked on Unit 4[.]" (ECF 342, Tr. 60:7-14, PageID.35654). As for Units 1 and 6, Plaintiffs vetoed the installation of slinger rings on those Units. (*See* D-455; ECF 377, Tr. 162:9-10, PageID.42954 (Mr. Davies testifying that "Kris Koster stated that, that they were not going to allow us to install shaft seals on the remaining units"). Complete replacement of the shaft seals is not necessary; the installation of permanent slinger rings in the Units that do not yet have them would prevent excess water from entering the turbine-generator guide-bearing oil reservoir. (ECF 377, Tr. 207:15-25, PageID.42999 (Mr. Davies testifying that the permanently affixed slinger rings were effective at preventing water from entering the turbine-

generator guide-bearing oil reservoir)).  Spending over $100 million on replacing the main shaft seals is unnecessary and plainly constitutes betterment.

Another example is the Voith estimates' inclusion of a brand-new oil-heating system for the turbine guide bearings.  (*See* PTX-1253).  TAES's Mr. Mandrell testified that the issue of cold oil in the turbine guide bearings could be addressed through minor operational adjustments, or by continuing the low-cost solution currently in use:  using space heaters in the turbine pit area.  (ECF 383, Tr. 37:25–40:1, PageID.43401-04).  The inclusion of the new oil heaters in the more than $20 million estimate for new turbine guide bearings and oil heaters for all six Units is for unnecessary work.

What's more, Plaintiffs' technical experts admitted to *not* knowing what Voith's technical proposals entailed.   ECF 348, Tr. 157:10-22, PageID.36623 (Dr. Tucker responding, "I don't have a full understanding of it" when asked about Voith's plan to replace the DREs in Units 2 and 4); ECF 349, Tr. 248:16-24, PageID.36974 (Dr. McDonald agreeing with the statement: "you don't provide an opinion on exactly what should be done or, for example, you don't compare the repair plan that TAES and Toshiba have offered versus the repair plan that Consumers and DTE propose with Voith, right?"); ECF 350, Tr. 232:3-11, PageID.37222 (Dr. Martens – "Q. You did not review any of the Voith documentation as part of forming your opinions, correct? A. Not -- I don't recall --

44

I mean, I saw some of the Voith stuff."); ECF 351, Tr. 96:4-24, PageID.37374 (Dr. Fecke stating, "I haven't seen any of the Voith repair plans"); Dr. Lippold and Mr. Crahan did not even mention Voith during their testimony)).

The only Plaintiffs' expert who said anything about Voith's proposed repair solutions was Mr. Emmert.  As Mr. Emmert conceded, he did not "exercise any judgment . . . from a technical perspective[.]"  (ECF 354, Tr. 23:6-11, PageID. 37870).  Including such unnecessary work in the Voith proposals, and Mr. Emmert's blind adoption of the Voith proposals as damages estimates, fundamentally undermines Plaintiffs' proffered damages evidence.

## V.  The Jury's Damages Award of $383,136,736, the Largest in Michigan History, is "Excessive" Under MCR 2.611 and *Palenkas*

The bases for a new trial under Rule 59(a) include "such grounds as a verdict against the weight of the evidence, an inconsistent verdict, *an excessive award of damages*, an error of law during the trial, or prejudicial misconduct by the court, opposing counsel, or a juror that deprived the moving party of a fair trial." *MSC.Software*, 2014 WL 6485492, at *2 (emphasis added).  "It is clear that a court has broad discretion to decide whether to grant a new trial."  *Id.*  (citing *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).  Under Michigan law, beyond the general requirements that a jury's damages award be supported by the record and tied to compensation for loses proved in the record, courts apply three factors to determine whether a jury's award was "excessive":

45

> [1] whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; [2] whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; [and 3] whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions.

*Gilbert v. DaimlerChrysler Corp.*, 685 N.W.2d 391, 400 (Mich. 2004) (citing *Palenkas v. Beaumont*, 443 N.W.2d 354, 356 (Mich. 1989)); *see also* MCR 2.611(A)(1)(c) (providing for new trial based on "excessive or inadequate damages appearing to have been influenced by passion or prejudice"); MCR 2.611(A)(1)(d) (providing for new trial due to "[a] verdict clearly or grossly inadequate or excessive").

## A.  Plaintiffs Sought to Circumvent the Contractual Limitation on Liability to Play on the Passion and Sympathy of the Jurors and Confound the Jurors' Quantification of Damages

Despite conceding that the Overhaul Contract limits Plaintiffs' damages in this matter to at most $597 million (as calculated by Plaintiffs), Plaintiffs made an emphatic plea in their closing argument that the "Utilities Cannot Recover Their Full Damages." (PI-118-113).  Plaintiffs contended that their "full damage" for the "Total Cost of Repair Project" is $790 million. (*Id.*; *see also* PI-118-121).  Plaintiffs made this claim of uncompensated injury despite the undisputed evidence that as of trial, Plaintiffs had spent only $29 million on repairs. (*See* PI-103-40).

The unmistakable implication of Plaintiffs' emphasis on purportedly uncompensated injuries of nearly $193 million dollars above the maximum

46

contractual limitation was that ratepayers in Michigan (which all the jurors were) would be left to foot the bill.  Plaintiffs said nearly as much in arguing in closing that this is "an important case to the state of Michigan."  (ECF 393, Tr. 28:11, PageID.44384).

The upshot of Plaintiffs' attempt to circumvent the contractual limitation by moving the goal post $193 million *above* the maximum liability cap was to encourage a rough compromise verdict measured against that false, illusory goal post, rather than a verdict driven by a reasonably certain estimate of damages:  the $383 million verdict is very close to half of the $790 million in "full damages" repeatedly touted by Plaintiffs in closing.   Plaintiffs' circumvention of the contractual limitation inescapably moved the needle on the jury's damages award: "When a verdict is procured through improper methods of advocacy, misleading argument, or other factors that *confound the jury's quantification of a party's injuries, that amount is inherently unreliable and unlikely to be a fair estimate of the injured party's losses*."  *Gilbert*, 685 N.W.2d at 400 (Mich. 2004) (emphasis added).

Indeed, Plaintiffs trumpeted their $790 million in "full damages" not only to *inflate* their own award but also to *depress* the amount owed to TAES for its counterclaim.   Plaintiffs expressly contended in closing that even if TAES had proven its counterclaim, the jurors should still award TAES *nothing* because that amount was far surpassed by the uncompensated injuries Plaintiffs suffered by being

47

unable to recover their full $790 million in damages:

> Now, the total cost of this repair project, as I said, to the Utilities is $790 million.  Mr. Emmert has reduced that amount, when he calculates damages, down to $651.6 million.  I explained that the damages cap further drops that number to $597 million.

> I would submit to you, ladies and gentlemen, if for some reason you do find that TAES is entitled to something, keep in mind the only hard number that they proved, the Utilities already are, are not recovering the full cost of this repair and their full damages.  Any amount that TAES might be somehow entitled to is far outweighed by the cost to repair the defects in this case.

(ECF 393, Tr. 73:21–74:7, PageID.44429-30).

### B. Infected by Plaintiffs' Purported $790 Million in "Full Damages," the Jury's Award of $383 Million is Grossly Disproportionate to the Roughly $526 Million that Plaintiffs Paid TAES for Ten Years of Work on All Six Units at Ludington and Unsupportable by the Record

"The second *Palenkas* factor addresses 'whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained . . . .'  This inquiry into the reasonableness of the verdict concerns, in essence, whether the verdict is supported by the record." *Gilbert*, 685 N.W.2d at 400 (Mich. 2004).  It was undisputed at trial that Plaintiffs paid TAES roughly $526 million for the complete overhaul of all six Units at Ludington.  (PTX-0016 at 4-5 (Change Order 10, setting the Overall Total Fixed Price of TAES's overhaul work at $559,190,561.00); D-109, D-167, D-602; D-252 (totaling the undisputed total of TAES's counterclaims for unpaid work at $33,072,262.44)).  Meanwhile, the repair work that Plaintiffs sought at trial was focused principally on two of the

48

six Units (Units 4 and 2) with significantly less sought in repairs for the other four Units.  (PI-103-3 (Mr. Emmert's demonstrative estimating that Unit 4 is 31.4% of Plaintiffs' total damages, Unit 2 is 29.6%, Unit 6 is 11.3%, Unit 5 is 10.4%, Unit 3 is 9.2%, and Unit 1 is 8.1%)).

It was likewise undisputed at trial that the scope of Voith's repair work is substantially *less* than the work that TAES performed over a ten-year period on all six Ludington Units.  In fact, even for Unit 4, which Plaintiffs contended has the most extensive damage, Mr. Emmert concluded that Voith's proposed repairs constitute only 64.4% of the work that TAES performed on a single Ludington Unit during the overhaul.  (ECF 352, Tr. 174:2-19, PageID.37689; ECF 387 Tr. 116:1-10, PageID.43775).  Viewing the evidence in the light most favorable to Plaintiffs, that 64.4% scope arguably could apply to Unit 2 as well given that Voith's proposed repairs for Units 4 and 2 are comparable.  (*See* PI-103-3).  But that 64.4% scope is *wholly inapplicable to the other four Units* for which Mr. Emmert provided much *lower* damages figures.  *See id.*

Yet, the jury's $383,136,736 damage award is *64.15%* of the $597,237,641 contractual "damages limit" that Plaintiffs emphasized in closing.  (PI-118.113).  If the jurors sought to apply Mr. Emmert's 64.4% scope comparison for Unit 4 to *all six Units*, the jurors necessarily rendered an unsustainable award because Plaintiffs conceded that their damages were far lower for Units 5, 6, 1, and 3.  (PI-103-3).

49

As another important benchmark, the jury's award of $383 million is more than 73% of what Plaintiffs paid TAES for the overhaul of all six Units, which is unsupportable by the record given that Mr. Emmert proposed only a 64.4% scope comparison for even the Unit with the most extensive claimed damages (Unit 4).

## C.   The Jury's Award of $383,136,736 is a Demonstrable Outlier

The third *Palenkas* factor is easily met here when Plaintiffs' own counsel have proclaimed publicly that the jury's award of $383,136,736 is the largest civil jury award in Michigan's history.  No objective observation of the extensive, seven-week trial with 25 witnesses and over 500 admitted exhibits could support the jury returning with such a large award after only about one full day of deliberations.

For all of these reasons, TAES is entitled to a new trial under Rule 59 (and at a minimum a new trial on damages).

## CONCLUSION

For the foregoing reasons, the Court should grant judgment as a matter of law in favor of TAES under Rule 50(b) or, in the alternative, a new trial under Rule 59.

Dated:  January 15, 2026

Respectfully submitted,

**WHITE & CASE**

By:  */s/ Christopher M. Curran*
Christopher M. Curran

**FOLEY & LARDNER LLP**

Nicholas J. Ellis (P73174)
500 Woodward Avenue, Suite 2700
Detroit, MI  48226-3489
(313) 234-7100

Christopher M. Curran
Eric Grannon
J. Frank Hogue
Holly Zheng
701 Thirteenth Street, NW
Washington, DC  20005

50

nellis@foley.com

Jennifer M. Luther
150 East Gilman Street, Suite 5000
Madison, WI 53703
(608) 258-4215
jluther@foley.com

(202) 626-3600
ccurran@whitecase.com
egrannon@whitecase.com
fhogue@whitecase.com
holly.zheng@whitecase.com

*Attorneys for Toshiba America
Energy Systems Corporation and
Toshiba Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 15, 2026 I filed the foregoing document and this Certificate of Service with the Court using the ECF system, which sent notice of filing to all attorneys of record.

*/s/ Christopher M. Curran*
Christopher M. Curran
