UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONSUMERS ENERGY CO. and
DTE ELECTRIC CO.,

Plaintiffs,

v.

TOSHIBA AMERICA ENERGY
SYSTEMS CORP. and
TOSHIBA CORP.,

Defendants.
_________________________________/

Case No. 22-10847

F. Kay Behm
U.S. District Judge

**OPINION AND ORDER DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL (ECF No. 400)**

## I. PROCEDURAL HISTORY

After the jury verdict was rendered in this matter, Defendant, Toshiba America Energy Systems Corporation (TAES), filed a renewed motion for judgment as a matter of law and for a new trial. (ECF No. 400). This matter is fully briefed. (ECF Nos. 406, 407). The court held a hearing on July 29, 2026. (ECF No. 417). For the reasons set forth below, the motion is **DENIED**.

## II. ANALYSIS

### A. Legal Standards

The term "motion for judgment as a matter of law" under Federal Rule of Civil Procedure 50 merges the old terms "directed verdict" and "verdict JNOV." *Klopfenstein v. Fifth Third Bank*, No. 1:12CV851, 2024 WL 4348369, at *2 (S.D. Ohio Sept. 30, 2024) (citing *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent.*, LLC, 974 F.3d 767, 779 (6th Cir. 2020)). Under the Rule, the movant must show that a "reasonable jury would not have a legally sufficient evidentiary basis" to find for the non-moving party. Fed. R. Civ. P. 50(a)(1). Federal Rule 50(b) provides:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.... In ruling on the renewed motion, the court may:
>
> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

Because this is a diversity case applying Michigan law, the court applies the standard of review of Michigan courts. *See Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 466 (6th Cir. 2009) (quoting *Kusens v. Pascal Co.*, 448 F.3d 349 360 (6th Cir. 2006) ("In diversity cases, where a Rule 50 motion is based on the sufficiency of the evidence, this Court applies the standard of review used by the courts of the state whose substantive law governs the action")).

As the Sixth Circuit noted in *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 894 n. 3 (6th Cir. 1997), "Michigan courts use the terms 'directed verdict' and 'judgment notwithstanding the verdict' rather than judgment as a matter of law." Pursuant to Michigan law, on a motion for directed verdict the court must:

> view [ ] the evidence and all legitimate inferences in the light most favorable to the nonmoving party. And a directed verdict may be granted only if, after viewing all of the evidence in the light most favorable to the party opposing the directed verdict, reasonable minds could not differ on any question of material fact.

*Betts*, 558 F.3d at 467 (quoting *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 418 (2005)). Stated another way, the Michigan standard is that "[i]f reasonable jurors could honestly have reached different conclusions, the motion should [

] be[ ] denied. If reasonable jurors could disagree, [the court does not have] the authority to substitute its judgment for that of the jury." *Matras v. Amoco Oil Co.*, 424 Mich. 675, 681–82 (1986) (footnote omitted); *In re Brown*, 342 F.3d 620, 626–27 (6th Cir. 2003) ("[A] directed verdict or judgment notwithstanding the verdict is appropriate under Michigan law only when there is no factual dispute upon which reasonable minds could differ.") (citing *Meagher v. Wayne State Univ.*, 222 Mich. App. 700 (1997) (citation omitted)).

Generally, a court may grant a new trial under Fed. R. Civ. P. 59(a) "if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215. F.3d 628, 637 (6th Cir. 2000). The burden of demonstrating the necessity of a new trial is on the moving party, and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court. *Clarksville–Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991). When the grounds for moving for a new trial is that the verdict was against the weight of the evidence, "the court is not to set aside the verdict simply because it believes that another outcome is more justified ... the court is to accept the jury's verdict if it is one which reasonably could have been

reached." *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007) (citations omitted).

### B. The Contract Does Not Bar a Jury Trial and the Trial was not Infected by a Financially Interested Jury

TAES acknowledges that it moved previously and was unsuccessful in persuading the court that the jury trial waiver in the Parent Guaranty contract between Toshiba and the Utilities applied to the Overhaul Contract between TAES and the Utilities. TAES says that in denying the motion to strike Plaintiffs' jury-trial demands, the court appeared to place considerable weight on the view that the Overhaul Contract was separate and distinct from the Parent Guaranty. (ECF No. 242 at 5-10, PageID.26763-68). TAES argues that the evidence at trial "confirmed the close connection between TAES and Toshiba in the contracting and performance of the overhaul." (ECF No. 400, PageID.44636). According to TAES, the evidence from trial shows the "integration of TAES and Toshiba without differentiation" and thus "underscores that the jury trial waiver should be taken by its literal terms and applied to both TAES and Toshiba." *Id*. As the Utilities point out, that close connection was never in doubt where Toshiba was a designated subcontractor under the Overhaul Contract but not a party to that Contract.

Thus, the court is not persuaded that the evidence TAES points to changes the court's analysis.

The court is also not persuaded to reconsider its prior decision where TAES merely restates its argument that the Parent Guaranty should be read to apply its jury-waiver term to the Contract between the Utilities and TAES, because an unexecuted form of the Guaranty was attached to the Contract. As the Utilities explain in their response, TAES' argument fails for the reasons previously articulated by the court, including: (i) "TAES is not a party to the Guaranty" (ECF No. 242, PageID.26763); (ii) the vast majority of federal courts that have considered similar facts have held that a non-party to a contract containing a jury waiver cannot invoke the waiver to defeat an opponent's Seventh Amendment right (*id*. at 26763-64); (iii) the text of the Contract and Guaranty do not indicate an intent to apply the waiver to claims against TAES under the Contract (*id*. at 26766-67); and (iv) the different "dispute resolution procedures in the Guaranty and the Contract" contradict TAES's waiver argument (*id*. at 26767). For these reasons, the court declines to reconsider its earlier decision finding that the jury trial waiver in the Parent Guaranty does not apply to the Overhaul Contract.

TAES also argues that the jurors, as ratepayers of the Utilities, had a "direct financial interest in minimizing what they pay for electricity and necessarily understood that a verdict against TAES and in favor of Plaintiffs will minimize what they (and fellow Michiganders) will pay." (ECF No. 400, PageID.44637). As the court explained previously, any jurors' potential interest in the outcome of the litigation is indirect, at most, given that this interest is based solely on the potential jurors' status as Plaintiffs' ratepayers. (ECF No. 297). And as the Sixth Circuit explained in *Frye v. CSX Transportation, Inc*., 933 F.3d 591, 605 (6th Cir. 2019), "present and direct financial interests" may make the average person unlikely to act impartially. However, jurors are presumed to be impartial and in the absence of "concrete evidence of prejudice, the presumption of impartiality stands." *Id*. Here, the court finds that TAES has not offered "concrete evidence of prejudice." The brief testimony from the Utilities' damages expert, Mr. Emmert, that certain costs were incurred "on behalf of the Utilities and on behalf of Michigan rate--- and folks in Michigan who get electricity and that kind of thing" – does not change the court's conclusion, especially where the court issued a curative instruction. (ECF No. 352, PageID.37717, Tr. 202:1-4; ECF No. 354, PageID.37867, Tr. 20:3-9 (instructing jury to "disregard that portion of

Mr. Emmert's testimony")); *see Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 315 (6th Cir. 2016) ("Generally, a motion for a new trial should be denied when any prejudice that might have resulted from the error was cured by instructions from the court. A few improper stray comments are not sufficient to warrant a new trial, especially when the district court issued a curative instruction." (citing *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1047 (6th Cir. 1996))). The court does not find the statements of counsel identified by TAES[1] to be "thinly veiled references to the financial interest of the Michigan-ratepayer jurors." (ECF No. 400, PageID.44638).

Implied bias exists only when "the relationship between the juror and some aspect of the litigation makes it highly unlikely that the average person could remain impartial." *Frye*, 933 F.3d at 605. TAES cannot meet this standard where electricity rates in Michigan are set by the Michigan Public Service Commission. Mich. Comp. Laws § 460.6(a). And there is no evidence adduced at trial that a verdict for or against the Utilities would result in any change in the rates paid by Plaintiffs' ratepayers. The court is not persuaded

---

[1] *See* ECF No. 393, Tr. 28:11-14, PageID.44384 ("And it's an important case to the state of Michigan. It's important to the state of Michigan because the Ludington Power Plant is a unique asset that provides renewable energy to the state of Michigan and beyond."); *see also id*. Tr. 144:24-25, PageID.44500 (referring to Plaintiffs as "[c]ompanies that have been good civic citizens of the state of Michigan for more than 100 years").

that the pre-trial press, which no juror indicated they were exposed to, or the post-trial press suggests otherwise. There is also no evidence that any juror was exposed to the article that was published during trial. The jury was specifically instructed (1) not to consider evidence from outside the courtroom, including newspapers and other news reports, and (2) not to search for such evidence. (ECF No. 330, PageID.33016-17). The jury is presumed to have followed these instructions, absent evidence suggesting otherwise. *United States v. Metzger*, 778 F.2d 1195, 1209 (6th Cir. 1985) (presuming jury instructed not to read newspaper follows instruction even when prejudicial media coverage present, absent showing otherwise).

To the extent that TAES argues that all of the Utilities' ratepayers must be disqualified from serving on a jury in any case involving the utility because of a theoretical impact on rates, the court previously rejected this notion, citing *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1240, 1250, 1253-54 (N.D. Ohio 1980) (denying motion to exclude all utility customers from jury, rejecting "unsubstantiated" allegation that customers "probably believe[d]" rates would increase if utility lost).

C. Sufficiency of Evidence at Trial

1. *Could a reasonable jury find that TAES provided a warranty against cavitation erosion on non-runner components?*

TAES argues that the record is devoid of any evidence on which a reasonable jury could find that TAES provided a warranty against cavitation erosion on non-runner components. TAES points out that the Overhaul Contract contains a cavitation warranty for the runner in GC21(b)(iii), which applies only to the runner and not any other component. In contrast to this express cavitation warranty on the runner, TAES argues that the remainder of the Overhaul Contract is devoid of any express cavitation warranty and thus, the discharge rings are not subject to a cavitation warranty. This is confirmed, says TAES, by IEC Standard 60609-1, incorporated into the Overhaul Contract in several places, which states that cavitation warranties can be established only by "mutual agreement" of the parties. Additionally, TAES points to Mr. Hyuga's testimony that the Utilities requested that the cavitation warranty apply to nonrotating parts, which would include the discharge rings. According to Mr. Hyuga, TAES rejected those requests and he testified that the proposed provision applying the cavitation warranty to nonrotating parts was deleted from the draft contract. TAES says that the Utilities' argument that the

general warranty should apply to material loss on the discharge rings results in an impermissible absurdity that a broader cavitation warranty exists for the discharge rings under the general warranty than for the runner, because the general warranty would not be restricted to the specific terms of the pump-turbine cavitation warranty.

TAES' theory presumes that the Utilities were required to prove the existence of a cavitation warranty that applied to the discharge rings or components other than the runner, to which an express cavitation warranty applies. As the court explained at the summary judgment stage of proceedings:

> Given the broad, unqualified General Warranty with respect to "all Work," it is not clear that cavitation was intended by the parties to be excluded, or that IEC Standard 60609 (requiring "mutual agreement" for "cavitation pitting" warranty) was intended to override the General Warranty. IEC Standard 60609 appears to conflict with the parties' express agreement that "all Work" be free of defects. As a result, summary judgment on this issue is not appropriate. *See Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 315 (6th Cir. 2010) (ambiguities in contract are for the trier of fact).

(ECF No. 252, PageID.27069). Thus, the question was left for the jury to decide.

The questions now are (1) whether there was evidence on which the jury could base a rejection of TAES's interpretation of the Overhaul Contract and adopt the Utilities' proposed interpretation and (2) find that TAES violated the general warranty. The court concludes that a reasonable jury could construe the contract to align with the Utilities' interpretation and to reject TAES's interpretation. The general warranty is broadly written while the runner warranty only applies to the runner. Notably, the runner warranty also provides that it does not limit the general warranty. Reasonable jurors could conclude that nothing in the runner warranty regarding runner cavitation limited the general warranty. Additionally, a reasonable jury could have accepted the testimony of Mr. Degenfelder over that of Mr. Hyuga regarding the contract negotiations and the scope of the general warranty. Mr. Degenfelder testified that the general warranty was intended to cover "everything" including "engineering, structural, design, fabrication ... on and on all the way through construction." (ECF No. 358, PageID.41198-99). He also testified that the runner warranty was intended as an additional warranty for cavitation damage on the runner while the general warranty covers "everything else as part of the Work," including material defects, cracking defects, and cavitation defects. (ECF No. 337, PageID.33449, 34593-94,

34596). Mr. Hyuga testified that the Utilities requested a cavitation warranty for non-rotating parts, but that was rejected and deleted from the draft contract. (ECF No. 368, PageID.42191, 42206). A reasonable jury could have rejected Mr. Hyuga's testimony because he did not recall being part of the negotiations on the general warranty (ECF No. 368, PageID.42217) and because his recollection of the cavitation warranty on non-rotating parts being deleted from the contract draft was not supported by any documentary evidence such as a draft contract showing the deletion.

The Utilities also point out that there was significant evidence that TAES's design choices either caused or exacerbated the damage to the DRs, including the design of the seal passage in Units 2 and 4, its design of the inspection pockets in those units, its decision to remove the pocket covers in those units, its decision to remove the stainless steel overlay in the DRs and its decision to use air injection in those units. (ECF No. 406, PageID.44778). The Utilities argue that while the specific mechanism of damage connecting those design choices was contested, the jurors had a host of evidence to find that one or more mechanisms linked the defective design to the damage. For example, Dr. Tucker testified that cavitation erosion was a primary factor, but galvanic correction was also a factor. (ECF No. 343, PageID.36028). TAES's

experts contended that the mechanism was galvanic corrosion, particulate erosion, or erosion corrosion. (ECF No. 367, PageID.42028; ECF No. 375, PageID.42604). Importantly, a reasonable jury could have relied on the evidence showing that, regardless of the mechanism, it was TAES's design choices that caused the damage. That evidence includes Mr. Marscher's testimony that the damage to the DRs was caused by particulate erosion, which he blamed in part on the TAES-designed inspection pockets. (ECF No. 367, PageID.42028, 41944). Similarly, Mr. Lais testified about erosion corrosion, which he blamed on the inspection pockets, and galvanic corrosion resulting from the choice of materials in the DR/DRE. (ECF No. 375, PageID.42648, 42662). TAES's own documents identified galvanic corrosion as the cause, which TAES blamed on the choice of materials in the DR/DRE and its own recommendation to use air injection. (PTX-1034-0007, 0018).

The court also finds that there was ample evidence for a jury to conclude that TAES's "Work" on the DR/DREs violated the general warranty, which promised that all of TAES's "Work" would be "free from defects." (PTX 0001-0033 (GC21(b)(ii)). "Work" is broadly defined in the contract to include

"engineering," "design," "assembly" and more. (PTX-0001-0004, § I(1)).[2] The general warranty also promised that TAES work "shall conform…to all of the terms, conditions, and requirements of this Contract," which included a 30-year service life. (PTX-0001-0033, GC21(b)(ii), PTX-002-0042,-0056-57). For example, Plaintiffs' expert Dr. Tucker testified that the DRs have failed as a result of significant material loss and need to be repaired. (ECF No. 343, PageID.35891-92, 36033). Plaintiffs' expert Mr. Crahan testified that the amount of erosion caused the DR to fail. (ECF No. 351, PageID.37443). TAES's witness Mr. Torvik testified that the damage to Units 2 and 4 was not ordinary wear and tear and it was not acceptable to leave as is. (ECF No. 366, PageID.41555). And Mr. Lais testified that the material losses to the DRs should be repaired at the next possible opportunity. (ECF No. 375,

[2] "The Contractor agrees to perform and complete, in a good, substantial, workmanlike and approved manner within the time hereinafter specified and in accordance with terms, conditions and provisions of this Contract, all of the work described in SECTION Ill - DESCRIPTION OF WORK, which is attached to and made a part of this Contract, and otherwise in the Contract Documents (as hereinafter defined). Unless and except as may be expressly provided otherwise in the Contract Documents, the Contractor shall furnish everything necessary to perform and complete such work, including but not limited to all engineering, structural design, fabrication, manufacturing, assembly, shop testing, delivery, installation, construction and field testing, and all supervision, labor, tools, equipment, facilities, materials and supplies (whether temporary or permanent, and whether or not to be incorporated into the finished structures, buildings, fixtures, facilities and/or other improvements that are to be erected, constructed and/or installed in the performance of the work), consumables, mobilization, demobilization, services and transportation required for or associated with any of the foregoing, that may be necessary for or to carry out such work, whether or not expressly stated or provided for in said attached Contract Documents (all of the foregoing, collectively, the 'Work')."

PageID.42672-73). Additionally, there is evidence that TAES's design of the seal passage contributed to cavitation erosion, particulate erosion, or corrosion of the DRs. For example, expert witness Owens testified that the lack of a lower seal caused cavitation erosion. (ECF No. 349, PageID.36756). Mr. Marscher testified that one of the unexpected benefits of the lower seal was to lower the particulate erosion rate. (ECF No. 367, PageID.42047). And Mr. Lais wrote in his June 2024 report that the main reason for the corrosion in Units 2 and 4 is the configuration of the units, including the design without the lower seal ring. (ECF No. 377, PageID.42859).

There is also evidence that TAES's design and construction of the inspection pockets contributed to cavitation, particulate erosion, or corrosion of the DRs. Mr. Marscher testified that the pockets are the problem causing the erosion from one mechanism or another. (ECF No. 367, PageID.41944). Mr. Lais testified that the inspection pocket is the "culprit" of the material loss. (ECF No. 377, PageID.42864). Plaintiffs also marshal evidence showing that TAES's use of air injection accelerated damage to the DRs and/or removed the coating from the DRs. For example, in a letter dated October 31, 2024, TAES wrote to the Utilities that "we consider the air accelerated the corrosion on the legacy parking ledge area on those units." (PTX-1034-0018).

Further, Mr. Hyuga admitted that "[a]ir injection is related to galvanic corrosion, but more than that, the biggest impact is that it can lead to delamination of the painting or the . . . coating." (ECF No. 369, PageID.42362). Mr. Lais testified that "according to the theory of erosion corrosion, air injection, this can lead to an additional intensity a[t] the inspection pockets." (ECF No. 377, PageID.42864). There is also evidence that TAES's failure to reapply a stainless steel overlay on the DRs contributed to damage to them. More specifically, Dr. Tucker testified that carbon steel is much less resistant to erosion and the DR did not have the stainless steel weld overlay, and in those circumstances, galvanic corrosion can occur. (ECF No. 343, PageID.35899).

And there is evidence that TAES selected unsuitable materials for the DREs, leading to cracks that constitute defects. In a TAES document (Cause Analysis), it indicates that the "base material" is "unsuitable because it does not have the metallographic structure that is required in the specification." (PTX-0483A-0021). Professor Lippold also testified that "410 stainless was not a suitable choice" and was the "reason for the cracking." (ECF No. 350, PageID.37043, 37052). Further, Dr. Tucker testified that the "[DREs] have defects in them," for reasons including "Toshiba's material selection of

martensitic 410 stainless steel" and "the quality of the plates that make up the DRE themselves." (ECF No. 343, PageID.35892).

For these reasons, the court concludes that there was sufficient evidence on which the jury could base a rejection of TAES's interpretation of the Overhaul Contract and adopt the Utilities proposed interpretation and find that TAES violated the general warranty

*2. Could a reasonable jury reject TAES's waiver defense?*

TAES argues that the Utilities' assertion that the material loss was the result of design issues for Units 2 and 4 is foreclosed as a matter of law where the trial produced "overwhelming" evidence that the parties reached an agreement under which Plaintiffs received consideration in exchange for their waiver of claims relating to the design of these units. (ECF No. 400, PageID.44647-48). This evidence cited by Defendants includes a document from Matthew Ray in which he wrote that Change Order 9 was "the resolution to all claims from TAES to the Owner and the Owner to TAES"; this included retaining the design of Units 2 and 4 and "install[ing] the additional seal in all future units" in exchange for "the retention of specialty tools by the owner . . . to allow the additional seal to be installed at a later date." (D-1626 at 1). While Plaintiffs place great weight on negotiation history showing that a

proposal for a complete bilateral release was not agreed to in Contract Change Order 9, (ECF No. 337, PageID.34536-40), TAES contends that evidence of a rejection of a complete bilateral release does not negate evidence that the parties ultimately agreed to something less: a release or waiver of any Plaintiffs' claims based on the absence of a lower seal band in Units 2 and 4. (ECF No. 365, PageID.41369-99 (Torvik testimony); ECF No. 369, PageID.42317-23 (Hyuga testimony)).

However, the Utilities point to evidence from which a reasonable jury could conclude otherwise. As TAES acknowledges, Change Order 9 contains a one-way release of the claims by TAES against the Utilities and no express release of claims by the Utilities against TAES. Importantly, TAES had proposed a two-way release, but the Utilities rejected it, as shown in the redlined draft. (PTX 1392-0053 to 54). Mr. Degenfelder and Mr. Koster both testified regarding the Utilities' rejection of the two-way release. (ECF No. 337, PagedID.34534-41; ECF No. 342, PageID.33745-53). The documents TAES relies on to support its waiver theory are not written contract amendments, duly signed by the parties authorized representatives, which is required to amend the Contract. (PTX-0001-0008 (§ I.9)). Further, Mr. Ray's email was not contemporaneously written with the negotiation of Change

Order 9; instead, it was written nearly 19 months after Change Order 9 was executed. (PTX-0014, D-1626). And Mr. Ray was not the primary negotiator of Change Order 9, Mr. Degenfelder was. (ECF No. 337, PageID.34521). The Utilities also point to evidence that TAES's own conduct was inconsistent with an alleged waiver where Mr. Torvik emailed Mr. Hyuga in 2021, stating that Toshiba's conduct could result in the Utilities "then requiring Toshiba to supply and install lower hydraulic seal rings on U2 & U4." (PTX-0432-0001). TAES's email does not make much sense if there was a waiver in place, and the jury could so conclude. Additionally, the Utilities' witnesses all testified that they never agreed to waive their warranty rights with respect to Units 2 and 4. (ECF No. 337, PageID.34521-42, 34546, 34674-78; ECF No. 342, PageID.35745-53; ECF No. 340, PageID.35204). Thus, the court concludes that a reasonable jury could reject TAES's theory and find that the Utilities did not waive their warranty rights on Units 2 and 4 via Change Order 9.

*3. Can conditions known before the grant of Unit Interim Acceptance (UIA) or Unit Final Acceptance (UFA) form the basis of a warranty claim?*

According to TAES, under the express terms of the Contract, UIA and UFA are milestones (i) at which Plaintiffs certify that a Unit complies with contractual requirements, (ii) follow after rigorous inspection and testing

procedures detailed in the Contract, and (iii) provide Plaintiffs the right to require TAES to correct defective or uncompleted work at TAES's expense. (PTX-0002 at 78-82). TAES maintains that through such certification, UIA and UFA conclusively resolve previously identified issues and prevent Plaintiffs from later seeking compensation for any defects or uncompleted work identified during the extensive inspection and testing procedure. (ECF No. 400, PageID.44649-50). TAES asserts that it is entitled to judgment as a matter of law on claims for: (i) alleged defects or uncompleted work on Units 1-6 that had been identified when Plaintiffs issued UIA on those Units; and (ii) alleged defects or uncompleted work on Units 2, 4, and 5 that had been identified when Plaintiffs issued UFA on those Units.

Notably, the court rejected TAES's theory at the summary judgment stage, finding that the Overhaul Contract unambiguously provides that "the parties did not intend acceptance in the form of UIA or UFA" to waive the Utilities' claims "for defects identified prior to the issuance of UIA or UFA." (ECF No. 252, PageID.27065-66). And a reasonable jury could find that TAES failed to meet its burden of establishing waiver or release for several reasons. First, the definition of UIA and UFA expressly provide that they do not release any claims:

> [UIA and UFA] shall in no way relieve the Contractor of any obligations or liabilities that have arisen or may thereafter arise under or in connection with this Contract or the Work (whether in respect to the applicable Unit or otherwise), whether such obligations or liabilities are then known or unknown, accrued or not yet accrued, or deprive the [Utilities] of any right or remedy therefor.

(PTX-0002-0079 to -80 (TR § 5.5, UIA), -82 (TR § 5.9 (UFA)). Second, witnesses from both parties agreed that UIA and UFA do not waive the Utilities' warranty rights. (ECF No. 337, PageID.34678-80; 34528-30 (Degenfelder testimony)). Mr. Torvik also testified that the issuance of UFA does not waive any warranty claims. (ECF No. 366, PageID.41565). Third, the Utilities, in their UFA letters to TAES, specifically reserved all warranty claims. (PTX-0980; PTX0990; PTX0989). Fourth, the evidence shows that before litigation, TAES treated the DR issues as "valid warranty claims," (ECF No. 366, PageID.41554 (Torvik testimony)) and not as having been waived by UIA or UFA. Thus, there was sufficient evidence on which a reasonable jury could find that TAES failed to meet its burden of establishing waiver or release.

D. <u>Could a Reasonable Jury Find that the Utilities Proved Their Damages</u>?

Under Michigan law, "damages are not presumed in relation to contracts." *Doe v. Henry Ford Health Sys.*, 308 Mich. App. 592, 603 (2014).

Instead, plaintiffs have the burden to "prove the measure of damages with 'reasonable certainty.'" *Id*. (citation omitted). That requirement is satisfied so long as the evidence shows that a "reasonable basis for computation exists, although the result be only approximate." *Ensink v. Mecosta Cnty. Gen. Hosp*., 262 Mich. App. 518, 525 (2004) (citation omitted). "[M]athematical precision" is not required, and the "certainty requirement is relaxed where damages have been established" and the only question is the amount. *Atsalis Bros. Painting Co. v. Carboline Co*., No. 15-12054, 2017 WL 6261522, at *3 (E.D. Mich. Dec. 8, 2017) (citations omitted). In cases concerning construction-related contracts, Michigan courts following those rules have endorsed damages based on "the cost necessary to repair the defects." *Forton v. Laszar*, 239 Mich. App. 711, 718 (2000), *overruled on other grounds by Liss v. Lewiston-Richards, Inc.*, 478 Mich. 203 (2007). TAES argues that it is entitled to judgment as a matter of law because no reasonable jury could find that Plaintiffs' damages evidence satisfied the burden of proving damages to a reasonable certainty.

*1. Was Mr. Emmert's testimony unsupported?*

TAES maintains that Plaintiffs damages expert, Mr. Emmert, provided unsupported testimony on damages because he acted as a mere conduit for

Voith's budgetary estimates. TAES protests that Plaintiffs "have presented no evidence that Voith's non-binding, budgetary proposals constitute the type of competitively bid, binding estimates required, at a minimum, to prove reasonably certain damages." (ECF No. 400, PageID.44653-54). As the Utilities point out, multiple fact witnesses testified that they planned to spend these amounts, and thus, they are not "non-binding." (ECF No. 341, PageID.35576 (Koster); ECF No. 355, PageID.38310 (Maddipati); ECF No. 355, PageID.38217-18 (Wojtowicz)). Plaintiffs also point to the thousands of pages of "source documentation" supporting the evidence that the jury was able to review. (PTX-1176, PTX-1232). TAES's assertion that Mr. Emmert failed to make reductions for "maintenance and operations" was explored during the testimony of its own expert, Mr. Gunn, and the jury was free to adopt or reject that testimony. Thus, the court does not find Mr. Emmert's testimony "unsupported."

*2. Were the Voith estimates admitted for their truth?*

TAES argues that Voith's proposals and statements of work were not entered into evidence for the truth of the matter asserted. However, TAES did not make this argument in its Rule 50(a) motion. (ECF No. 389). "When a party fails to raise an argument in its Rule 50(a) pre-verdict motion, it is

precluded from making a Rule 50(b) post-verdict motion on that ground." *Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 736 (6th Cir. 2016); *see also Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) (noting the "well-established proposition that a post-trial motion for judgment as a matter of law 'is not available at anyone's request on an issue not brought before the court prior to submission of the case to the jury.'") (quoting *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997)). Accordingly, TAES may not assert this issue now and it need not be further addressed.

Similarly, TAES argues that the Voith proposals constituted inadmissible hearsay that should not have been admitted through Mr. Emmert. And TAES further argues that by not presenting any Voith witnesses at trial and by preventing TAES from doing so, Plaintiffs failed to lay any foundation for the Voith estimates from which the jury could have found reasonably certain damages. Again, TAES made no argument about the admissibility or the foundation for the Voith estimates in its Rule 50(a) motion, so the arguments are waived. *See Cranpark*, 821 F.3d at 736.

*3. Voith's Estimates*

TAES argues that Voith's estimates were not binding on Plaintiffs and thus could not be relied on by the jury. "A Rule 50(b) motion 'is only a renewal

of the preverdict motion,' and 'it can be granted only on grounds advanced in the preverdict motion.'" *Kay v. United of Omaha Life Ins. Co.*, 709 F. App'x 320, 328 (6th Cir. 2017) (quoting *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008)). *Kay* specifies that "this requirement protects 'the plaintiff's Seventh Amendment right to a jury trial' by 'requiring that parties raise important issues before the case is submitted to the jury.'" *Id*. at 328 (quoting *Ford*, 535 F.3d at 492). Courts "usually take a liberal view of what constitutes a pre-verdict motion sufficient to support a post-verdict motion," but to maintain a Rule 50(b) motion, "the Rule 50(a) motion must have 'provid[ed] notice to the court and opposing counsel of any deficiencies in the opposing party's case'" before the case went to the jury. *Id*. at 328 (quoting *Ford*, 535 F.3d at 492). Several of the challenges TAES raises here were not raised in its Rule 50(a) brief. TAES did not previously raise its arguments that (1) Voith was "incentivized to submit inflated cost proposals to increase the budget for its work and to injure a competitor" (ECF No. 400, PageID.44662-63), (2) Voith's estimate was not "subject to competitive bidding" (*id*. at PageID.44663-64), (3) Voith's estimate was "excessive" based on Mr. Emmert's comparison to TAES cost data (*id*. at PageID.44666-68), and (4) Voith's repair "includes work that is not even necessary" (*id*. at PageID.44672-74). TAES points to its

argument in its Rule 50(a) motion that "Plaintiffs have presented no evidence to even suggest that they attempted to scrutinize Voith's estimates, let alone obtain a reasonable estimate." (ECF No. 389, PageID.44280). Even taking a liberal view of TAES's argument in its Rule 50(a) motion, the court concludes that such argument did not provide sufficient notice to the court and opposing counsel of the purported deficiencies now identified in the Utilities' case before sending it to the jury.

*4. Was there evidence on which a reasonable jury could base its damages award?*

TAES makes a number of additional arguments in support of its claim that a reasonable jury could not reached this verdict on damages, including that the Voith budgetary proposals are unsupported and do not meet industry standards, that the evidence showed that Voith's proposals were excessive, that Plaintiffs can change or cancel Voith's scope of work, and that no reasonable jury could have credited Mr. Emmert's testimony for calculating reasonably certain damages. However, the Utilities have pointed to substantial evidence that it would cost more than the jury verdict to repair and replace TAES's defective work. For example, Mr. Koster testified about the extensive work that resulted in Voith Hydro's estimate of the cost of repairs,

negotiating the Voith contract, and issuing purchase orders that "exceed $508 million" for the repair. (ECF No. 341, PageID.35517). Mr. Koster also testified about $29 million in Voith Hydro costs that had already been invoiced and other non-Voith repair costs as well. *Id*. at PageID.35520. All of the Voith contract and estimate documents were admitted into evidence and showed the overall price for the Voith repair contract exceeded $500 million. (PTX-1176, 1244, 1245, 1231, 1232, 1235, 1236, 1253, 1256, 1292, 1297, 1244, 1245). Additionally, Mr. Maddipati of Consumers Energy testified that Consumers expects the repairs will cost $790 million total and the Consumers board approved $425 million for its share of the repair costs. (ECF No. 355, PageID.38280-83, 38310). Ms. Wojtowicz of DTE testified that DTE's board approved $430 million for its share of the repair costs. (ECF No. 355, PageID.38218-19).

The jury also heard from Mr. Emmert, Plaintiffs' damages expert, who quantified the Utilities' damages as $651.6 million. (ECF No. 352, PageID.37735). During his testimony, Mr. Emmert reviewed the Voith Hydo estimation process and explained why he found it to be "reliable." (ECF No. 354, PageID.37949). Mr. Emmert described substantial reductions he made to the Voith Hydro estimate for purposes of quantifying damages, which

reduced the damages attributed to the Voith repair by $93.6 million. (ECF No. 352, PageID.37687). Mr. Emmert also opined that the Utilities' damages included substantial costs beyond the Voith repair cost, including the cost of other repair contractors ($10.3 million); monitoring and repair ($71.2 million); project management ($46.3 million); corporate overhead ($48.6 million); and other repair work already performed ($19.6 million). (PTX-1049.3; ECF No. 352, PageID.37715, 37722-23, 37728, 37732). Notably, TAES does not challenge Mr. Emmert's calculation of any of those non-Voith damages, which add up to $196 million.

To be sure, TAES gathers and recounts evidence that undermines Mr. Emmert's testimony, but in the court's view, there is a "factual dispute upon which reasonable minds could differ" and thus, a judgment as a matter of law is not appropriate under Michigan law. *See In re Brown*, 342 F.3d at 626-27.

E. Motion for New Trial under Rule 59(e)

*1. The jury verdict form*

According to TAES, the verdict form asked the jury whether TAES's affirmative defense barred Plaintiffs' damages *entirely* and failed to ask the jury whether TAES's affirmative defenses barred the Plaintiffs' damages in part, which prejudiced TAES by negating a central aspect of its defense. (ECF No. 391). More specifically, TAES's position at trial was that Plaintiffs waived parts of their claimed damages through their grants of UIA and UFA and through their agreement that TAES need not add a lower band seal in Units 2 and 4. According to TAES, those positions were undermined by the verdict form's instruction that the affirmative defense of waiver was relevant only if it barred Plaintiffs' damages "entirely." TAES says the verdict form error was compounded by jury instructions that did not address the possibility that waiver could be a partial defense. TAES contends that a new trial is the only remedy for the allegedly flawed verdict form.

As to alleged errors in the verdict form, a court may grant a new trial "only if the questions 'mislead or confuse the jury, or if they inaccurately frame the issues to be resolved by the jury.'" *Chirco v. Charter Oak Homes, Inc.*, No. 01-CV-71403, 2008 WL 1743343, at *7 (E.D. Mich. Apr. 11, 2008)

(citation omitted). Further, a court must consider the jury instructions and verdict form "as a whole." *Craddock v. FedEx Corp. Servs., Inc.*, 102 F.4th 832, 844 (6th Cir. 2024) (citation omitted); *see also Swans v. City of Lansing*, 65 F. Supp. 2d 625, 639 (W.D. Mich. 1998) (The special verdict questions "must be read in conjunction with the judge's charge to the jury."). Here, in addressing Question 3 and 4 of the verdict form, the court emphasized to the jury the relevant affirmative defense instructions and explained that the jury should "take into account whether or not there was any partial level of mitigation of damages" or "contractual limitations" in awarding damages under Question 4. (ECF No. 393, PageID.44533-34). The instructions for release and mitigation of damages took account of partial affirmative defenses. More specifically, Instruction No. 24 explained that "TAES claims that the Utilities released TAES from all or some obligations owed under the contract." (ECF No. 390, PageID.44336). And Instruction No. 29 explained that the Utilities' "damages should be reduced by a particular amount" if the Utilities "failed to minimize their damages." *Id*. at PageID.44341. Further, Instruction No. 23 also explained that the jury could find that TAES's "alleged failure to execute certain promises was excused because the Utilities waived its performance," making it clear to the jury that it could find some promises waived and others

not. *Id*. at PageID.44334. The court would also point out that the court invited TAES's counsel "to address it in [his closing] arguments or ask for an additional instruction as we go through the verdict form." (ECF No. 393, PageID.44380-81). But TAES did not do so. Notably, during closing argument, counsel never explained TAES's affirmative defenses to the jury or how those defenses might apply in whole or in part based on the evidence. Counsel made only a "couple observations about the verdict form," none of which explained how the jury should take partial affirmative defenses into account. *Id*. at PageID.44485-86. TAES also did not take the court up on its offer to provide any additional, clarifying instructions. *Id*. at PageID.44534, 178:21-23.

For these reasons, the court finds no defect in the jury verdict form that warrants a new trial.

*2. The jury's damages award*

TAES argues that the jury's damages award is excessive under Mich. Ct. Rule 2.611 and *Palenkas v. Beaumont Hosp.*, 432 Mich. 527, 532 (1989) and thus a new trial is in order. Those factors are:

> [1] whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; [2] whether the

> verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; [and 3] whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions.

*Gilbert v. DaimlerChrysler Corp.*, 470 Mich. 749, 764 (2004). "[A] jury verdict will not be set aside or reduced as excessive unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss." *Am. Trim, L.L.C. v. Oracle Corp*., 383 F.3d 462, 475 (6th Cir. 2004) (citation omitted). "If there is any credible evidence to support a verdict, it should not be set aside." *Id*. "This court's review of a jury's damage award is extremely deferential, and we will not order a remittitur or a new trial unless the award is contrary to all reason." *Cranpark, Inc*., 821 F.3d at 739 (citation omitted).

TAES first argues that Plaintiffs sought to circumvent the damages limitation in the Overhaul Contract of $597 million by making the plea that they cannot recover their full damages of $790 million. According to TAES, the "unmistakable implication" of Plaintiffs' emphasis on uncompensated injuries was that ratepayers in Michigan would be left to foot the bill. And, according to TAES, this would encourage a rough compromise verdict rather than a verdict driven by a reasonably certain estimate of damages. TAES also

contends that Plaintiffs used the "full damage" argument to depress the amount owed to TAES on the counterclaim by asking the jury to award TAES nothing on that claim because Plaintiffs' uncompensated injuries surpassed that amount.

In the court's view, nothing in TAES's argument regarding how the Utilities presented their evidence suggests that the "verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact." The $790 million figure was based on evidence presented to the jury, such as Mr. Maddipati's and Ms. Wojtowicz's testimony in this regard. Trial counsel may propose favorable inferences to be drawn from the evidence without improperly influencing the jury. *Farley v. Country Coach Inc.*, 403 F. App'x 973, 983 (6th Cir. 2010). The court also does not find counsel's mention of the case being important to the State of Michigan to fall within the first *Palenkas* factor. This is not the type of improper advocacy discussed in *Gilbert* where plaintiff's counsel made "repeated attempts to equate plaintiff with the victims of the Holocaust" and likened defendant with Nazis. *Id*. at 771-73. Nothing in this case argued by Plaintiffs' counsel is even close to the type of inflammatory statements made in *Gilbert*. Thus, the first *Palenkas* factor does not support setting aside the jury's damages award.

As to the second *Palenkas* factor, TAES argues that the jury's verdict is grossly disproportionate to the $526 million that Plaintiffs paid TAES for 10 years of work on all six units at Ludington and is unsupported by the record. That is, it was undisputed at trial that the scope of Voith's work is substantially less than the work performed over a 10-year period on all six units. While it is unknown precisely how the jury reached its approximately $383 million verdict, TAES seeks to show how it *could have* done so and why that reasoning is not supported by the record. For instance, Mr. Emmert concluded that Voith's proposed repairs constitute only 64.4% of the work that TAES performed on Unit 4, which percentage TAES says could arguably apply to Unit 2 as well. (ECF No. 352, PageID.37689 (Emmert); ECF No. 387, PageID.43775 (Gunn)). But that percentage is not applicable to the other four units, for which Mr. Emmert provided lower figures. (PI-103-3). Yet, TAES argues, the jury's verdict is 64.15% of the contractual damages limit that Plaintiffs emphasized in closing. This, according to TAES, renders the verdict unsustainable because Plaintiffs conceded their damages were much lower for the other four units. *Id*. TAES also points out that the jury's verdict is more than 73% of what Plaintiffs paid TAES for the overhaul work of all six units, which is unsupported by the record given that Mr. Emmert proposed only a

64.4% scope comparison for the unit with the most extensive claimed damages.

The Utilities correctly point out that TAES does not take into account the 2025 value of the dollars the Utilities paid to TAES, which Mr. Emmert testified was $837 million. (ECF No. 352, PageID.37688-89). The verdict therefore represents less than 50% of the value paid to TAES. More importantly, TAES's arguments seem to represent mere speculation regarding how the jury might have calculated the damages. *Farley v. Country Coach Inc*., 403 F. App'x 973 (6th Cir. 2010) ("Country Coach can produce no admissible evidence that the jurors relied on the calculation proposed by Farley's attorney to reach its verdict" and thus the court rejected the claim that the jury verdict was the result of "speculation or confusion"). It also seems inconsistent for TAES to now complain that the jury might have awarded too much for certain units when it rejected the Utilities' proposed verdict form that would have specified damages unit by unit. (ECF No. 387, PageID.43792-94; ECF No. 373). The jury might have reasonably reached its verdict a number of different ways and the speculation offered by TAES does not provide any basis for undoing the verdict. Thus, the second *Palenkas* factor does not support setting aside the damages award.

As to the third *Palenkas* factor, TAES, in a conclusory fashion, argues that "[n]o objective observation of the extensive, seven-week trial with 25 witnesses and over 500 admitted exhibits could support the jury returning with such a large award after only about one full day of deliberations." (ECF No. 400, PageID.44679). TAES merely argues that the third *Palenkas* factor is satisfied because Plaintiffs' counsel have publicly stated that the jury's award is the largest in Michigan history. This *Palenkas* factor requires "whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions." *Id*. TAES has made no attempt to compare this verdict to anything within Michigan or other jurisdictions, as required by the third factor. And, in the court's view, the fact that the jury verdict is the largest in the state of Michigan's history, by itself, does not provide a basis for finding it was excessive. The jury heard testimony regarding how expensive the Ludington overhaul project was both in terms of what the Utilities paid TAES for the overhaul it performed (over $800 million in today's dollars) and in terms of the Utilities' claimed damages in this case (approximately $780 million). The Overhaul Contract also set a damages limitation of approximately $600 million, recognizing that breach of contract damages could exceed that number if not limited. Simply, the jury found that TAES

breached a large contract and awarded damages commensurate with breaching a contract of this size. Thus, the court does not find that consideration of the third *Palenkas* factor supports setting aside the jury's damages award.

Overall, the court concludes that none of the *Palenkas* factors support setting aside the jury's damages verdict.

## III. CONCLUSION

For the reasons set forth above, the court **DENIES** Defendant's renewed motion for judgment as a matter of law and for a new trial.

**SO ORDERED**.

Date: September 28, 2026

s/F. Kay Behm
F. Kay Behm
United States District Judge